1    **WO**

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

9    Darren Udd, et al.,                    No. CV-18-01616-PHX-DWL

10                  Plaintiffs,              **ORDER**

11   v.

12   City of Phoenix, et al.,

13                  Defendants.

## INTRODUCTION

Pending before the Court is the partial motion to dismiss filed by the City of Phoenix and Mary Roberts (together, "Defendants"). (Doc. 11.)[1] Roberts has moved to dismiss Plaintiffs' state-law claims against her for insufficient compliance with Arizona's notice of claim statute, A.R.S. § 12-821.01(A), and both Defendants have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims for abuse of process and intentional infliction of emotional distress. For the reasons below, the Court will grant the partial motion to dismiss in its entirety.

## BACKGROUND

This case was removed to the federal court on May 29, 2018. (Doc. 1.) Plaintiffs Darren Udd ("Darren") and Amy Udd ("Amy") (together, "Plaintiffs") filed their first

---

[1] Plaintiffs have requested oral argument. The Court will deny the request because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv. 7.2(f) (same).

amended complaint on June 11, 2018. (Doc. 9.) The facts as alleged by Plaintiffs are as follows:

I.      Facts Related to Underlying Claims

Darren is a peace officer certified by the Arizona Peace Officer Standards and Training Board ("AZPOST") who retired in December 2017 after working for approximately 24 years in the Phoenix Police Department (the "Department"), most recently as a homicide detective. (*Id.* ¶ 24.) Amy is Darren's spouse and a civilian employee of the Department. (*Id.* ¶ 54.) Roberts is an Assistant Chief for the Department. (*Id.* ¶ 4.)

During the relevant time period, Darren worked significant hours from home or otherwise outside the office and outside normal business hours, often working more than his regularly scheduled eight-hour shift. (*Id.* ¶¶ 28-29, 35.) Darren, like many other police detectives, did not record all the hours he worked. (*Id.* ¶ 31.) The Homicide Unit of the Department has historically recognized the non-standard work hours of its detectives and instituted a de facto department policy known as "flex time" that is not documented in the employee manual. (*Id.* ¶ 32.)

On December 20, 2016, Darren was directed to report to the office of his supervisor, where he was advised that Roberts personally directed that he not be assigned to work on any new cases. (*Id.* ¶ 39.) The Department claimed that it had received an anonymous report questioning his work hours, which caused the Department to open an investigation in October 2016 and conduct an audit of his magnetic entry card for headquarters and his radio transmissions and computer logs. (*Id.* ¶¶ 40-41.)

Plaintiffs allege that this audit had several significant limitations, which resulted in underreporting of the hours Darren worked. (*Id.* ¶ 43.) For example, it primarily calculated the hours Darren worked based on Darren's use of his magnetic entry card, assuming that the first use was his start of the work day and second use was his leaving work, which was not always accurate. (*Id.* ¶ 44.) Plaintiffs allege that the Department was aware of these limitations and the resulting underreporting. (*Id.* ¶¶ 43-45.) At one point, the audit showed

that Darren was deficient by 1,054.5 hours from between October 2015 and October 2016, valued at $36,717.69.  (*Id.* ¶ 47.)

In or around October 2016, after being provided the audit and investigation information, Roberts directed that Darren be criminally investigated for theft of time. (*Id.* ¶¶ 48, 63.)  Darren's supervisor, Sergeant Lumley, was not interviewed until January 26, 2017.  (*Id.* ¶ 63.)  In this interview, Lumley provided extensive exculpatory evidence.  (*Id.* ¶ 64.)  A search warrant was obtained for Darren's personal cell phone records in connection with this investigation, and the records were obtained on February 17, 2017. (*Id.* ¶¶ 50, 68.)  Darren was not interviewed before the investigation was opened and his interview did not occur until April 19, 2017.  (*Id.* ¶¶ 59, 69.)

Reports that originated in Roberts's office circulated throughout the department that Darren was under investigation for "theft."  (*Id.* ¶ 52.)  Amy was informed by her supervisor of the investigation, which caused her stress and anxiety.  (*Id.* ¶¶ 54-55.)

By April 2017, the amount of unaccounted for time had been reduced to 221 hours, valued at $7,695.22.  (*Id.* ¶ 71.)  Darren was never arrested during or after the investigation. (*Id.* ¶ 60.)  But an incident report indicated that he was an arrested suspect.  (*Id.* ¶ 61.)  The incident report also recommended that Darren be charged with a class 3 felony for theft of hours.  (*Id.* ¶ 76.)

The investigation was referred to the Maricopa County Attorney's Office ("MCAO") for possible indictment and prosecution.  (*Id.* ¶ 80.)  The MCAO declined to prosecute.  (*Id.* ¶ 82.)  The MCAO has declined to prosecute many sworn officers and civilian employees who have been referred for prosecution by the Department.  (*Id.* ¶ 83.) On information and belief, the MCAO has advised the investigatory units of the Department, including the Professional Standard Bureau and the Office of the Phoenix Chief of Police, to cease referring investigations for non-criminal activity.  (*Id.* ¶ 97.)

Plaintiffs allege that several employees of the Department over the age of 40 have been subjected to a series of internal investigations and other unwarranted adverse employment actions, causing some of them to take early retirement and leave the

Department. (*Id.* ¶¶ 90-91.) Plaintiffs further allege that male employees have been subject to investigations and adverse employment actions that female employees have not. (*Id.* ¶¶ 94, 96.)

During the investigation, Roberts made comments about Darren that attacked his reputation and falsely claimed that he would be prosecuted. (*Id.* ¶ 98.)

On May 16, 2017, Darren learned that Roberts had opened a separate criminal investigation into Amy for using Darren's garage key card at Department headquarters. (*Id.* ¶ 100.) Darren had allowed Amy to use his parking spot so she would not have to walk alone through downtown Phoenix at night. (*Id.*) Darren and Amy were both referred to the Phoenix City Prosecutor's Office for one count of theft. (*Id.* ¶ 110.) The case was referred to the Glendale City Prosecutor due to a perceived conflict of interest, and the Glendale City Prosecutor declined to prosecute either Darren or Amy. (*Id.* ¶¶ 111, 113.) An incident report indicates that both Darren and Amy were categorized as arrested suspects even though neither was ever arrested in connection with this matter. (*Id.* ¶¶ 112, 114.)

Due to stress and health concerns, Darren took FMLA leave around late May 2017. (*Id.* ¶ 101.) He remained on this leave until his previously scheduled vacation leave began on July 11, 2017. (*Id.*)

When Darren returned to work on August 7, 2017, he was ordered to immediately surrender his badge and gun, assigned to work from home, and placed on paid administrative leave. (*Id.* ¶ 102.) On September 6, 2017, Darren requested that he be returned to his former duties; in response, he was told that he was being transferred to callback duty. (*Id.* ¶¶ 104-105.) Callback was a desk job that involved returning calls to members of the public, which Darren considered to be a highly demeaning punishment. (*Id.* ¶¶ 108-109.)

Darren provided the City of Phoenix, in its capacity as his employer, with a Notice of Constructive Discharge. (*Id.* ¶ 126.) The City of Phoenix has not provided a written response to the Notice. (*Id.* ¶ 127.)

Darren took early retirement in December 2017. (*Id.* ¶ 128.) The City of Phoenix and the Department did not provide him with a designation that he had taken an honorable retirement. (*Id.* ¶ 130.)

After Darren took his early retirement, the City of Phoenix and the Department filed paperwork with AZPOST alleging misconduct in an effort to have Darren's peace officer certification removed. (*Id.* ¶ 131.) On May 2, 2018, Darren received a letter from AZPOST stating that a review of the criminal and administrative investigations had found nothing to support the violation of any AZPOST rule, that his case had been administratively closed without any Board action, and that he had no further issue pending with AZPOST. (*Id.* ¶ 132.)

Plaintiffs allege that, as a result of Defendants' conduct, Darren suffered physical and mental harm including emotional distress, pain and suffering, mental anguish, humiliation, stress, and stress-induced medical issues. (*Id.* ¶ 134.) They also allege that he suffered public ridicule, contempt, disrepute, harm to reputation, attacks on his integrity, lost wages and benefits, economic and other financial losses, lost earnings capacity, and other damages. (*Id.* ¶ 135.)

Plaintiffs further allege that, as a result of Defendants' conduct, Amy suffered severe and debilitating emotional distress, humiliation, degradation, harm to her good name and reputation, harm to her marital community, great anxiety, fear of unjust prosecution, and significant harm to her employability in her chosen field of psychology. (*Id.* ¶ 138.)

II.     Notice of Claim Service

On August 14, 2017, Darren served notices of claim on the City of Phoenix and Roberts. (*Id.* ¶ 140; Doc. 9-1 [Exs. 1-2].) A process server served the notice of claim on the City of Phoenix through hand delivery on Norris Cunningham, who indicated he was Special Deputy City Clerk, at the Phoenix City Clerk's office. (Doc. 9 ¶ 143.) A process server served the notice of claim on Roberts through hand delivery to Jeanette Ploium, Roberts's administrative assistant, at Phoenix Police Headquarters. (*Id.* ¶ 144.)

On April 2, 2016, a process server attempted, on behalf of both Darren and Amy, to

serve a new set of notices of claim on the City of Phoenix and Roberts.  (*Id.* ¶¶ 145, 150; Doc. 9-1 [Exs. 3-6].)  The service on the City of Phoenix occurred without incident.  A process server served the notices through hand delivery to Connie Haesloop, who indicated she was Special Deputy City Clerk, at the Phoenix City Clerk's office.  (Doc. 9 ¶¶ 148, 153.)

The attempt to serve Roberts was more complicated.  When the process server went to the reception area of Phoenix Police Headquarters and asked for Roberts, "he was told" by an unspecified person that Roberts "would not come down to the reception area to accept service" and that he needed to serve the notices of claim at the Phoenix City Clerk's office.  (*Id.* ¶¶ 149, 154.)  The process server then hand-served the notices of claim on Eric Ehrig at the Phoenix City Clerk's office.  (*Id.*)  Plaintiffs allege that "Ehrig indicated he was a Special Deputy City Clerk and he specifically stated that he was authorized to accept service on behalf of Assistant Chief Roberts."  (*Id.*)

III.  Claims

In the First Amended Complaint, Darren asserts claims against the City of Phoenix and Roberts, in her individual and official capacity, for (1) defamation, (2) abuse of process, (3) intentional infliction of emotional distress, (4) violation of 42 U.S.C. § 1983, (5) violation of Title VII, (6) violation of ADEA, (7) negligence, and (8) wrongful termination/constructive discharge.

In the First Amended Complaint, Amy asserts claims against the City of Phoenix and Roberts, individually and in her official capacity, for (1) abuse of process, (2) intentional infliction of emotional distress, (3) violation of 42 U.S.C. § 1983, (4) negligence, and (5) loss of consortium.

**LEGAL STANDARD**

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal,* 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

**ANALYSIS**

I.     Adequacy of Plaintiffs' April 2, 2018 Efforts to Serve Their Notices of Claim

Arizona's notice of claim statute bars a party from bringing a claim against a public employee if the party fails to file a notice of claim with that public employee within 180 days of the action accruing. A.R.S. § 12-821.01(A). "If a notice of claim is not properly filed within the statutory time limit, a plaintiff's claim is barred by statute." *Falcon ex rel. Sandoval v. Maricopa Cty.*, 144 P.3d 1254, 1256 (Ariz. 2006) (en banc). "Actual notice and substantial compliance do not excuse failure to comply with the statutory requirements of A.R.S. § 12-821.01(A)." *Id.* at 1256.

Here, the City of Phoenix doesn't dispute Plaintiffs' service efforts. Roberts, however, contends that Plaintiffs' service efforts on April 2, 2018 were inadequate. Thus, Roberts seeks to dismiss "Plaintiffs' state law claims contained in the April 2, 2018 Notices of Claim as to . . . Roberts." (Doc. 11 at 8.)

As an initial matter, the parties dispute which Federal Rule of Civil Procedure applies when a party seeks dismissal for improper service of a notice of claim. In her motion, Roberts sought relief under Rule 12(b)(6) and attached Ehrig's declaration in support. (Doc. 11 at 4-8.) In their response, Plaintiffs argued that, under Rule 12(d), Roberts's reliance on matters outside the pleadings (*e.g.,* the Ehrig declaration) required her motion to be converted into a motion for summary judgment. (Doc. 16 at 7-11.) In her

reply, Roberts changed course and argued that she was actually seeking dismissal for "insufficient service of process" under Rule 12(b)(5)—a rule that permits a movant to rely on extrinsic evidence without conversion into a motion for summary judgment. (Doc. 21 at 2-4.) Finally, in their surreply, Plaintiffs argued that (1) Roberts shouldn't be allowed to advance a new theory for the first time in her reply, and (2) Rule 12(b)(5) doesn't, in any event, apply in this circumstance because it only addresses the failure to serve the complaint and summons following initiation of a lawsuit. (Doc. 22 at 2-7.)

The Court declines to decide which Rule governs this type of motion[2] because, even if the Court were to disregard the Ehrig declaration and assess the sufficiency of Plaintiffs' service efforts based solely on the First Amended Complaint and the exhibits attached to it (as required under Rule 12(b)(6)), Roberts would prevail.

Arizona's notice of claim statute provides, in relevant part:

> Persons who have claims against a public entity, public school or a public employee shall file claims with the person or persons authorized to accept service for the public entity, public school or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. . . . Any claim that is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

A.R.S. § 12-821.01(A). "The language of the notice of claim statute makes clear that one who has a claim against a public entity and its employee 'must give notice of the claim to *both* the employee individually and to his employer.'" *Strickler v. Arpaio*, 2012 WL 3596514, *2 (D. Ariz. 2012); *see also DeBinder v. Albertson's, Inc.*, 2008 WL 828789, *3 (D. Ariz. 2008) ("[I]t is clear that the law requires that service be made on public employees, in addition to the entities that [employ] them, as a prerequisite to any lawsuit

---

[2] As the parties demonstrated through their briefing, there is disagreement on this question. *Compare McGrath v. Scott*, 250 F. Supp. 2d 1218, 1235-36 (D. Ariz. 2003) (applying Rule 12(b)(6)), *with Taraska v. Ludwig*, 2013 WL 655124, *4 (D. Ariz. 2013) ("[Defendant's] motion to dismiss is more like the procedural defense under Rule 12(b)(5) for insufficient process than a Rule 12(b)(6) motion to dismiss for failure to state a claim."), *and Peck v. Hinchey*, 2014 WL 10987731, *13 (D. Ariz. 2014), *aff'd in part, rev'd in part and remanded*, 655 F. App'x 534 (9th Cir. 2016), *as amended on denial of reh'g* (July 12, 2016) (noting that noncompliance with the notice of claim statute constitutes "[a] failure to exhaust non-judicial remedies . . . , which is subject to an unenumerated Rule 12(b) motion to dismiss").

against such employees.").

For service of process on individuals, Arizona Rule of Civil Procedure 4.1(d) provides that, absent exceptions that are inapplicable here:

> [A]n individual may be served by: (1) delivering a copy of the summons and the pleading being served to that individual personally; (2) leaving a copy of each at that individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (3) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Here, it is undisputed that service wasn't effectuated through subdivisions (1) or (2) of Rule 4.1(d)—the April 2, 2018 notices of claim weren't personally delivered to Roberts or left at Roberts's home—so the dispute turns on whether Plaintiffs satisfied subdivision (3).

The April 2, 2018 notices of claim were served on Eric Ehrig, an employee of the Phoenix City Clerk's office. (Doc. 9 ¶¶ 149, 154.) Notably, Plaintiffs do not allege that Ehrig was actually "authorized by appointment or by law" to receive service on behalf of Roberts. Moreover, under City of Phoenix Administrative Regulation 4.43(3), of which the Court takes judicial notice,[3] it is clear that although employees of the City Clerk's office are authorized to accept service for many different entities, they are not authorized to accept service on behalf of someone in Roberts's position.

Notwithstanding Ehrig's lack of actual authority to accept service on Roberts's behalf, Plaintiffs argue their service efforts should be deemed sufficient because (1) someone at Roberts's office, after refusing to accept service on Roberts's behalf, directed the process server to the Phoenix City Clerk's Office, and (2) once the process server arrived at the Clerk's Office, Ehrig held himself out as Roberts's authorized agent.[4]

---

[3] In the body of her motion, Roberts reproduced the text of Administrative Regulation 4.43. (Doc. 11 at 6-7.) In their response, Plaintiffs didn't dispute the accuracy of Roberts's reproduction—instead, they argued that Administrative Regulation 4.43 shouldn't be judicially noticed or considered for purposes of a 12(b)(6) motion. (Doc. 16 at 8-9 & n.2.) Both of these arguments are misplaced. When ruling on a 12(b)(6) motion, courts may consider "matters properly subject to judicial notice." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (citation omitted). Also, courts "may take judicial notice of . . . regulations not included in the plaintiff's complaint." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1153 n.3 (9th Cir. 2017).

[4] The parties hotly contest whether Ehrig did, in fact, hold himself out as Roberts's authorized agent. Plaintiffs submitted, as exhibits to their complaint, a pair of declarations from their process server stating that "Eric Ehrig . . . stated that he is authorized to accept service for Mary Roberts as Assistant Chief of Police." (Doc. 9-1 at 11, 15.) Roberts then

Plaintiffs summarize their position as follows: "Service of a notice of claim through an individual not authorized by statute can be effective if the individual explicitly states they are authorized to accept service and the court feels that reliance on such a representation is reasonable under the circumstances." (Doc. 16 at 6.)

This argument lacks merit. As an initial matter, Plaintiffs' position is difficult to reconcile with the plain language of Arizona Rule of Civil Procedure 4.1(d)(3), which states that service on an agent is effective only if the agent is "authorized by appointment or by law" to receive such service. Here, it is clear that Ehrig wasn't actually authorized by appointment or law to accept service for Roberts, and the text of Rule 4.1(d)(3) doesn't seem to contemplate any equitable exceptions to this requirement. For this reason, some courts have concluded that "apparent authority" arguments of the sort Plaintiffs seek to advance here are simply not cognizable in the notice-of-claim context. *Peck*, 2014 WL 10987731 at *14 (citation omitted) ("In the context of service of process of a Notice of Claim on an individual, apparent authority is insufficient to effectuate service; rather, the agent must actually be 'authorized by appointment or by law to receive service of process.'").

Moreover, even if "apparent authority" claims are potentially valid in the notice-of-claim context, as other courts have concluded,[5] Plaintiffs' allegations are insufficient to

submitted, as an exhibit to her motion, an affidavit from Ehrig stating that "[a]lthough I do not have a specific memory of this encounter with [the process server], I would not, under any circumstances, agree to accept service on behalf of Assistant Chief Mary Roberts, because she is not an individual for whom [my office] is authorized to accept service." (Doc. 11-1 at 3.) Finally, Plaintiffs submitted, as an exhibit to their response to the motion to dismiss, another declaration from the process server reiterating that "Ehrig stated he was authorized to accept service on behalf of Assistant Chief Roberts" and stating that "[a]s an experienced process server I understand the importance of proper service. I would never have served two documents on Mr. Ehrig if he had stated he was not authorized to accept service on behalf of Assistant Chief Roberts." (Doc. 16-1 at 2.) The Court need not resolve the parties' disagreements about which (if any) of these documents may be considered for purposes of the motion to dismiss because even if the Court were to accept all of Plaintiffs' declarations, and disregard Defendants' affidavit, dismissal would still be required.

[5] *See, e.g.*, *Grand Canyon Resort Corp. v. Drive-Yourself Tours, Inc.*, 2006 WL 1722314 (D. Ariz. 2006) (citing *Koven v. Saberdyne Sys., Inc.*, 625 P.2d 907, 911 (Ariz. Ct. App. 1980)) ("Arizona's Court of Appeals [has] interpreted the phrase 'agent authorized by law to receive service of process' as broad enough to encompass service on an 'ostensible' agent, or an agent that the principal knowingly or negligently held out as possessing the authority to receive service or process.").

advance such a claim here. It would be one thing if *Roberts* had told Plaintiffs, or their process server, that Ehrig was authorized to accept service on her behalf. In that circumstance, Roberts might be estopped from challenging Plaintiffs' reliance on her representation. But in the absence of any allegation that Roberts was personally involved in, or contributed to, the misunderstanding, Plaintiffs cannot prevail.

*Strickler v. Arpaio*, 2012 WL 3596514 (D. Ariz. 2012), involved very similar facts. There, a plaintiff seeking to sue Edwards-El, a Maricopa County Sheriff's Office ("MCSO") deputy, hired a process server to serve the notice of claim. *Id.* at *1. Even though "the receptionist at the MCSO's administrative office agreed to accept service on behalf of Deputy Edwards-El," the court concluded this service effort was insufficient because the receptionist wasn't actually authorized to accept service for Edwards-El and the process server never met "face to face" with Edwards-El. *Id.* at *2.

Similarly, in *Drake v. City of Eloy*, 2014 WL 3421038 (D. Ariz. 2014), a plaintiff seeking to sue Crane, a municipal employee, hired a process server to serve the notice of claim. *Id.* at *1. The process server delivered the notice to Crane's supervisor, the town's chief of police, who "told the process server that he was authorized to accept service for Crane" and even filled out a "signature sheet . . . showing that [he] signed on behalf of Crane." *Id.* Nevertheless, the court concluded this service effort was insufficient because "Plaintiffs have not alleged that *Crane represented* that [his supervisor] had authority to accept service on his behalf." *Id.* at *2.

And again, in *Chen v. Maricopa County*, 2013 WL 1045484 (D. Ariz. 2013), a plaintiff seeking to sue Fischione, the Maricopa County medical examiner, left a notice of claim with "the receptionist" at Fischione's office. *Id.* at *3. Even though "it was an accepted practice at the Office to receive legal process through the receptionist," the court concluded this service effort was insufficient because it was "not alleged that *Fischione represented* that the receptionist was his agent or would accept service on his behalf." *Id.* (emphasis added).

As these cases demonstrate, Plaintiffs' efforts to serve the April 2, 2018 notices of

claim on Roberts were inadequate.[6]  Thus, the Court must dismiss all of Amy's state-law claims against Roberts (because the only notice of claim that Amy attempted to serve on Roberts was the April 2, 2018 version).  This dismissal is with prejudice.  *Ferreira v. Arpaio*, 2016 WL 3970224, *10 (D. Ariz. 2016) ("Failure to comply with the notice of claim statute results in dismissal . . . with prejudice.").  The Court need not, however, dismiss Amy's § 1983 claim against Roberts because it's not a state-law claim.  *Drake*, 2014 WL 3421038 at *2 (because "Arizona's notice of claim requirements do not apply to actions brought pursuant to § 1983," failing to comply with the notice-of-claim statute only requires dismissal of state-law claims).

As for Darren, the complaint alleges that he served an initial notice of claim on Roberts on August 14, 2017 (*see* Doc. 9 ¶ 144; Doc. 9-1 at 6), and Roberts hasn't challenged the sufficiency of that service effort in the motion to dismiss.  Thus, the Court will dismiss the subset of state-law claims Darren didn't identify in his August 14, 2017 notice to Roberts and attempted to assert for the first time in his April 2, 2018 notice.  Because the actual notices are not part of the record, the Court cannot identify with precision, at this time, which of Darren's state-law claims against Roberts must be dismissed on this basis.

II.     Count 2 (Abuse of Process)

In Count 2 of the First Amended Complaint, Amy and Darren each allege a claim for abuse of process.  (Doc. 9 at 25-27.)  In their 12(b)(6) motion, Defendants seek dismissal of this claim on two independent grounds: (1) the tort of abuse of process requires the misuse of a judicial process, yet the challenged conduct—initiating investigations and making referrals to prosecutorial and certification agencies—didn't involve any judicial processes, and (2) Plaintiffs were required to allege, and failed to allege, that Defendants' "primary motivation" in pursuing these investigations and referrals was improper.  (Doc.

_____

[6]     Plaintiffs rely heavily on *Taraska v. Ludwig*, 2013 WL 655124 (D. Ariz. 2013), but that case is easily distinguishable.  In *Taraska*, the court deferred resolution of the service issue until summary judgment because there was a dispute concerning whether the agent who received the notice of claim was *actually* authorized to accept service on the defendant's behalf.  *Id.* at *5 n.4.  No such dispute exists here.

11 at 8-10.) In their response, Plaintiffs contend that (1) abuse-of-process claims may be premised on conduct occurring outside of litigation; (2) in Darren's case, there is an alleged abuse of the judicial process—Plaintiffs' procurement of a search warrant for his phone despite the absence of probable cause; (3) at the pleading stage, a plaintiff asserting an abuse-of-process claim only needs to allege the defendants were motivated by "an" improper purpose and need not allege the improper purpose was the "primary" motivating factor; and (4) alternatively, they've satisfied the primary-purpose test because "[i]t is impossible for any reasonable person to conclude that the motivation for Defendants['] conduct was anything other than completely and totally improper." (Doc. 16 at 11-14.)

As for the first issue, the Court agrees with Defendants that, under Arizona law, an abuse-of-process claim must be premised on the misuse of a "judicially sanctioned" process. *See, e.g.*, *Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 887 (Ariz. Ct. App. 2004) ("[A] plaintiff must prove that one or more specific judicially sanctioned processes have been abused to establish an abuse-of-process claim."). In fact, some Arizona courts have gone further and stated that abuse-of-process claims must be premised on conduct occurring during already-initiated legal proceedings. *See, e.g.*, *Fappani v. Bratton*, 407 P.3d 78, 81 (Ariz. Ct. App. 2017) (original emphasis omitted) (emphasis added) ("[A] valid claim for abuse of process requires well-pleaded facts alleging that the defendant used a judicial process *during civil litigation or criminal prosecution*."); *Ludwig v. Arizona*, 2018 WL 1015371, *5 (D. Ariz. 2018) (emphasis added) ("[A]buse of process addresses misuse of process *after proceedings have been initiated*."). Nevertheless, regardless of whether legal proceedings must have been initiated for an abuse of process claim to arise, it is clear that the tort requires the misuse of some process "done under the authority of the court," *Rondelli v. Pima Cty.*, 586 P.2d 1295, 1301 (Ariz. Ct. App. 1978) (citation omitted)—*i.e.*, a process that is "judicially sanctioned," *Crackel*, 92 P.3d at 887.[7]

---

[7]     *Parra v. Lippman Griffeth & Assocs., P.C.*, 2014 WL 1266388, *3 (Ariz. Ct. App. 2014), an unpublished case cited by Plaintiffs, does not suggest a different standard. There, in relation to a default judgment obtained in a lawsuit over a car accident, plaintiff's attorney notified the clerk of court of defendant's alleged failure to satisfy a judgment within 60 days. The notification was made pursuant to a statute that authorized the clerk of court, upon request, to provide the Motor Vehicles Division ("MVD") with a certified

With these principles in mind, the Court dismisses Amy's claim for abuse of process. Amy has not alleged that the City of Phoenix engaged in any actions against her that could constitute use of process, even under a broader definition that does not require any legal proceedings to have been initiated. Amy alleges only that she was investigated for using Darren's parking pass, referred to the Phoenix City Prosecutor's Office for one count of theft (which was transferred to the Glendale City Prosecutor), and categorized as a suspect in an incident report. (Doc. 9 ¶¶ 110-114.) She acknowledges that she was never arrested or prosecuted in connection with her use of the parking pass. (*Id.* ¶¶ 112-113.) None of these acts were "done under the authority of the court." *Rondelli*, 586 P.2d at 1301 (citation omitted); *cf. Fappani*, 407 P.3d at 83 ("A prosecutor has discretion to prosecute such cases as he or she deems appropriate . . . . Demanding that the county attorney prosecute a criminal violation of law, without more, does not implicate judicial process.").

Darren, in addition to alleging that he was subjected to two improper investigations and two improper referrals for prosecution—allegations that, as noted above, are insufficient to state a claim for abuse of process—also alleges that (1) the City of Phoenix and the Department filed paperwork with AZPOST alleging misconduct in an attempt to have his peace officer certification removed (Doc. 9 ¶¶ 131-132), and (2) Defendants improperly obtained a search warrant for his cell phone records (*id.* ¶ 50). Although the first allegation concerning the AZPOST referral fails for the same reason as the allegations concerning the investigations and criminal referrals (nothing was "done under the authority of the court," *Rondelli*, 586 P.2d at 1301 (citation omitted)), the second allegation concerning the search warrant cannot be so easily dismissed. *See, e.g., Davis v. United States*, 2010 WL 334502, *17 (C.D. Cal. 2010) (emphasis omitted) ("Many courts . . . have recognized that an abuse of process claim may lie where an arrest or search warrant was improperly obtained.").

Nevertheless, Darren's search warrant-related claim fails because he hasn't

copy of the judgment, which would require the MVD to immediately suspend the judgment debtor's driver's license and registration unless certain conditions were met. There is no question defendant's conduct there was "done under the authority of the court." *Rondelli*, 586 P.2d at 1301 (citation omitted).

plausibly alleged an improper purpose. "[T]here is no action for abuse of process when the defendant uses the process for its authorized or intended purpose, 'even though with bad intentions,' or if 'there is an incidental motive of spite.'" *Morn v. City of Phoenix*, 730 P.2d 873, 875 (Ariz. Ct. App. 1986) (quoting *Nienstedt*, 651 P.2d at 881). "A party can demonstrate [an ulterior purpose] by 'showing that the process has been used primarily to accomplish a purpose for which the process was not designed.'" *Crackel*, 92 P.3d at 887 (quoting *Nienstedt*, 651 P.2d at 881). Put another way, the plaintiff must "show that, in using the court process, the defendant took an action that could not logically be explained without reference to the defendant's improper motives." *Crackel*, 92 P.3d at 889.

Some courts have determined that, at the pleading stage, the plaintiff need not show that the improper purpose was the primary motivation, and instead need only allege a "willful act committed in the use of a judicial process for an improper ulterior purpose." *See, e.g., Safety Dynamics Inc. v. Gen. Star Indem. Co.*, 2014 WL 11281291, *4 (D. Ariz. 2014) (citing *Grabinski v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 265 F. App'x 633, 635 (9th Cir. 2008)); *Hein v. City of Chandler*, 2016 WL 11530432, *10-11 (D. Ariz. 2016) (same). The Court need not determine how much is required at the pleading stage, however, because Darren has failed to plausibly allege any improper purpose.

To be sure, Darren attempted to allege an improper purpose with respect to the search warrant. For example, Darren alleged that "the judicial process, the criminal justice system, multiple criminal investigations, obtaining search warrants, and multiple referrals to a prosecutor's office . . . was [sic] used for a purpose for which they were not intended by seeking criminal referral and the creation of false records of arrest for Darren." (Doc. 9 ¶ 168). But this is a conclusory statement failing to allege any ulterior purpose; it is essentially reciting an element of the claim, which is inadequate. *Iqbal*, 556 U.S. at 679. Darren also alleges that Defendants "improperly and intentionally attempted to use the judicial, criminal investigation, search warrant and prosecutorial referral process for the improper and ulterior purpose of mounting a criminal investigation, seeking an indictment, creating a false record of arrest, and attempting to cause the improper prosecution of Darren

Udd for theft of time." (Doc. 9 ¶ 169.) But using a process for its intended purpose, even with bad intentions, does not constitute abuse of process. Obtaining a search warrant in connection with an investigation and using that search warrant to obtain records relevant to that investigation are uses of process for the purposes for which they were intended.

It is also notable that, although Darren repeatedly makes the conclusory allegation that the search warrant lacked "probable cause" (Doc. 9 ¶¶ 50, 167, 202), he does not identify any facts to support this accusation. This creates another *Iqbal*-related infirmity. In this respect, this case resembles *Pataky v. City of Phoenix*, 2009 WL 4755398 (D. Ariz. 2009). There, the court granted a Rule 12(b)(6) motion to dismiss an abuse-of-process claim predicated on the City of Phoenix's retaliatory execution of a search warrant that was alleged to lack probable cause, holding that the plaintiff had "failed to allege anything more than mere speculation to support his assertion that [defendants] used court processes with an improper intent" and that the search warrant "was used for the purpose it was intended: to further an investigation of suspected wrongdoing." *Id.* at *6-7.

Accordingly, the Court dismisses Darren's claim for abuse of process.

III.    <u>Count 3 (Intentional Infliction of Emotional Distress)</u>

In Count 3 of the First Amended Complaint, Amy and Darren each allege a claim for intentional infliction of emotional distress ("IIED"). (Doc. 9 at 27-28.) In their 12(b)(6) motion, Defendants seek dismissal of this claim because (1) the tort of IIED requires "extreme and outrageous" conduct, and the conduct alleged in the complaint does not rise to this level, and (2) a defendant must have intended to cause emotional distress, or acted recklessly in doing so, and the complaint fails to allege sufficient facts to support that element. (Doc. 11 at 10-14.) In their response, Plaintiffs argue that the challenged conduct was sufficiently outrageous and that, "[w]here there is a reasonable difference of opinion regarding what is outrageous, it is for the jury to decide and not appropriate for a Rule 12(b)(6) motion." (Doc. 16 at 14-16.)

Under Arizona law, there are three elements to a claim for IIED: (1) "the conduct by the defendant must be 'extreme' and 'outrageous'"; (2) "the defendant must either

intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005) (en banc) (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)).

In the 12(b)(6) context, the "trial court is to act as a gatekeeper to determine whether the alleged actions are 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Morgan v. Freightliner of Arizona, LLC*, 2017 WL 2423491, *8 (D. Ariz. 2017) (quoting *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995)). "[T]he Court need not determine whether Defendants' conduct was outrageous enough to create liability, only whether reasonable persons could differ as to whether the conduct is 'extreme and outrageous.'" *Morgan*, 2017 WL 2423491 at *8; *see also Reel Precision, Inc. v. FedEx Ground Package Sys., Inc.*, 2016 WL 4194533, *3 (D. Ariz. 2016) ("The trial court must make a preliminary determination whether the conduct may be considered sufficiently 'extreme' and 'outrageous' to permit recovery.").

"[C]onduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct." *Reel Precision*, 2016 WL 4194533 at *2 (quoting *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980)). "It 'must completely violate human dignity. The conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Reel Precision*, 2016 WL 4194533 at *2 (quoting *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987)).

Arizona courts have noted that "[i]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Mintz*, 905 P.2d at 563 (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988)). In *Mintz*, the defendant employer failed to promote plaintiff, which she claimed was motivated by sex discrimination or retaliation, forced her to return to work after she was

hospitalized for emotional and psychological problems related to not being promoted, and then hand delivered a letter to her while she was again hospitalized, reassigning her job to another employee. *Id.* The Arizona Court of Appeals found that the failure to promote, even if it was discriminatory or retaliatory, was not sufficiently extreme and outrageous to state a claim for intentional infliction of emotional distress. *Id.* The court further found that forcing her to return to work and delivering the dismissal letter to her while she was in the hospital, although a closer call, were also insufficient, particularly because, in carrying out these actions, defendant was motivated by a "legitimate business purpose" in seeing that plaintiff's work be completed. *Id.*

The Court finds that Plaintiffs have not alleged sufficiently outrageous and extreme behavior to satisfy the first element of a claim for IIED. Plaintiffs allege that, after receiving a complaint about Darren's work hours, the Department, led by Roberts, conducted an audit and investigation into him, which found that he had underreported his hours. (Doc. 9 ¶¶ 40-41, 47.) Plaintiffs further allege that the Department subsequently conducted a criminal investigation, recommended prosecution of Darren, and publicly stated Darren was guilty (*id.* ¶¶ 76, 177-178) and also "creat[ed] a false permanent record of arrest" in his name in relation to the alleged theft of time and created similar false records in his name (and in Amy's name) regarding the misuse of the parking pass. (*Id.* ¶¶ 61, 114, 180.) However, Plaintiffs acknowledges that Darren "did not record all the hours [he] worked" (*id.* ¶ 31) and that he "allowed his wife to use his garage key card" (*id.* ¶ 100), thus, in effect, conceding the Department had some predication to investigate him and Amy. Similarly, the Department would have had some reason to inform AZPOST of misconduct.

All of the alleged conduct occurred within the employment context, where Arizona courts have been hesitant to allow IIED claims to proceed. Furthermore, as in *Mintz*, the Department arguably had a "legitimate business purpose" for its actions in ensuring that its employees abide by internal policies and the law and are punished for any violations.

Reasonable persons could not find that investigating and recommending

prosecution of individuals, where there is at least a modicum of evidence suggesting they have violated internal policy or law, constitutes conduct that "completely violate[s] human dignity" and "strike[s] to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Reel Precision*, 2016 WL 4194533 at *2 (quoting *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987)). *See also Nelson v. Phoenix Resort Corp.*, 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994) (escorting employee out of premises in middle of night by armed security team, allowing employee to use bathroom on way out only if accompanied into stall by armed escorts, and firing employee in lobby in front of coworkers and media was not extreme and outrageous). Moreover, even assuming the Department was acting primarily out of a retaliatory or discriminatory motive, the acts of investigating employees and recommending them for prosecution or further investigation do not rise to the level of conduct sufficiently outrageous to constitute a claim for IIED. *See Matson v. Safeway, Inc.*, 2013 WL 6628257, *4 (D. Ariz. 2013) ("[E]ven a defendant's 'unjustifiable' conduct does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'"); *see also Mintz*, 905 P.2d at 563 (finding that failing to promote plaintiff, even if motivated by retaliation or discrimination, was not sufficiently extreme and outrageous to state a claim).

Accordingly, **IT IS ORDERED** that**:**

1. The partial motion to dismiss (Doc. 11) is **GRANTED**;

2. All of Amy's state-law claims against Roberts (Counts 2, 3, 7, and 9) are **DISMISSED WITH PREJUDICE**;

3. Amy's claims against the City of Phoenix for abuse of process and IIED (Counts 2 and 3) are **DISMISSED WITHOUT PREJUDICE;**

4. The subset of Darren's state-law claims against Roberts that weren't identified in Darren's August 14, 2017 notice to Roberts, and which Darren attempted to articulate for the first time in his April 2, 2018 notice to Roberts, are **DISMISSED WITH PREJUDICE**; and

5. Darren's claims against the City of Phoenix and Roberts for abuse of process and IIED (Counts 2 and 3) are, to the extent not already dismissed with prejudice in the preceding paragraph, **DISMISSED WITHOUT PREJUDICE.**

Dated this 21st day of December, 2018.

_____
Dominic W. Lanza
United States District Judge