**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Darren Udd, et al., | No. CV-18-01616-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Pending before the Court are (1) a motion for summary judgment on all remaining claims by Defendants City of Phoenix ("the City") and Mary Roberts (collectively, "Defendants") (Doc. 98), (2) a motion for partial summary judgment by Plaintiffs Darren Udd and Amy Udd (collectively, "Plaintiffs") (Doc. 100), (3) Plaintiffs' motion to exclude certain opinions of defense expert Brent Taylor (Doc. 99), and (4) Plaintiffs' motion to strike all exhibits attached to Defendants' summary judgment reply (Doc. 111). For the following reasons, the first three motions will be granted in part and denied in part and Plaintiffs' motion to strike will be denied.

## BACKGROUND

### I.    Factual Background

Darren Udd ("Darren") is a retired homicide detective who formerly worked for the Phoenix Police Department ("PPD"). His wife, Amy Udd ("Amy"), currently works for the PPD as a communications operator. Mary Roberts is a PPD Assistant Chief who, during the time period relevant to this lawsuit, oversaw the PPD's Professional Standards Bureau ("PSB") and Special Investigations Division ("SID"). PSB investigates internal

policy violations committed by PPD officers, while SID investigates crimes allegedly committed by City employees.

On October 25, 2016, the PPD received an email from a concerned citizen alleging that Darren was parking his police cruiser at home and only leaving the house for three to four hours each day, sometimes not at all. (Doc. 98-4 at 2-3; Doc. 100-1 at 19-20.) It concluded: "Clearly there is an issue here, unless of course he is permitted to work from home, which would make this a mute [sic] point. If he has no work from home [privileges], his work hours are quite improper. We have BCC'd this to seven different people in your police department . . . . We would prefer to remain anonymous. We take no pleasure[] in reporting this, but if he were our employee we would want to know." (Doc. 100-1 at 20.)[1]

In response to this email, PSB conducted a Non-Audit Report ("NAR") to assess whether Darren was missing work hours. (Doc. 98-6 at 9; Doc. 100-2 at 45.)[2] The initial NAR found 387 hours missing over a five-month span, prompting PSB to perform a 12-month audit. (Doc. 98-6 at 9.) On December 14, 2016, Roberts received a report from PSB that Darren had 1054.5 missing hours over a 12-month period. (Doc. 100-2 at 45.) This was apparently the largest number of missing hours that department personnel had ever seen. (Doc. 98-1 at 69-70.)

Following Roberts's receipt of this report, SID began a criminal investigation into whether Darren had committed time theft. (Doc. 98 at 2; Doc. 100 at 3; Doc 100-1 at 69-70.) The SID investigation was overseen by Detective Sonia Stanley, who consulted a number of sources in an attempt to track down Darren's missing hours, including

---

[1] Plaintiffs dispute the "validity and source" of the email because the sender did not reply to subsequent communications. (Doc. 100 at 2.)

[2] NAR is a "snapshot" of missing hours that uses various electronic data points, including use of an officer's magnetic key card to enter PPD buildings, radio transmissions, and computer logs, to attempt to account for the missing hours. (Doc. 98-1 at 15; Doc. 35 ¶ 41.) The parties agree that NAR does not provide a precise accounting of missing hours and that further investigation tends to reduce, or "wash out," the total number of missing hours due to PPD personnel performing job duties outside the office. (Doc. 98 at 2; Doc. 100 at 2-3; Doc. 98-1 at 43.)

spreadsheets of Darren's shift/work hours, electronic records of Darren's PPD access card activity, user history records for the PPD's records management system, and weekly payroll time forms. (Doc. 98-6 at 9.) Detective Stanley also obtained Darren's off-site parking permit, which revealed that he "is not authorized to park the vehicle at home, as he lives too far outside the city limits." (*Id.*)

During the SID investigation, Darren continued to work on his assigned cases but did not, by order of Roberts, receive any new cases. (Doc. 35 ¶¶ 39-40.) This resulted in a reduction of his overtime hours. (*Id.* ¶ 39.)

Plaintiffs allege that, shortly after the SID investigation began, Amy's supervisor, Heather Grosskopf, told Amy that she had heard "Darren Udd was under investigation for theft and it did not look good." (Doc. 105-1 at 175-77.)

On December 23, 2016, Detective Stanley authored a search warrant application to obtain information concerning Darren's cell phone. (Doc. 98-6 at 10.) The application was approved by a judge and Detective Stanley faxed the warrant to Verizon that day. (*Id.*)

On January 4, 2017, Detective Stanley received the requested information from Verizon and forwarded the information to the PPD Crime Analysis Research Unit for GPS analysis. (*Id.*)

On January 26, 2017, Detective Stanley spoke with Darren's supervisor, Sergeant Lumley. (*Id.* at 11.) Sergeant Lumley made various statements during this interview that were favorable to Darren. For example, Sergeant Lumley stated that Darren often performed follow-up work in the field on the way into the office and that Darren would provide advance notice when he was going to arrive after the beginning of his shift. (*Id.* at 11-12.) Sergeant Lumley also described Darren as a "responsible, hardworking senior detective[]" and answered "no" when asked if he was ever concerned about Darren failing to work his full shifts. (*Id.*) Additionally, Sergeant Lumley noted that he was aware that Darren often worked off duty, on his own computer, but "couldn't enumerate [those hours be]cause he probably wouldn't tell me." (*Id.* at 12.) Sergeant Lumley also provided Detective Stanley with his notes on Darren's activity, which included a number of criminal trials. (*Id.* at 12-13.) Finally, Sergeant Lumley stated that he was "very surprised when he

learned [Darren] was being investigated" because Darren was "a very hard working detective, with a great reputation." (*Id.* at 13.)

On the other hand, not all of Sergeant Lumley's statements were favorable to Darren.[3] For example, the cell-tower information from Darren's personal cell phone suggested that, on one day when he was supposed to be working, he remained at home all day and never went into the office. (Doc. 98-17 at 6.) When asked about this, Sergeant Lumley stated that "[h]e does not allow detectives to work full shifts from home" and that he "has never authorized Detective Udd to work a full shift from home." (*Id.* at 6-7.) Additionally, when Sergeant Lumley was presented with "data points indicating a pattern of when Detective Udd arrived at [the office]," he responded that "those times would not be consistent with the amount of flex time he authorized, and the number . . . was large enough [that he] would have remembered had he allowed this much time." (*Id.* at 7.) Finally, Sergeant Lumley emphasized that "he would not have given any employee authorization to make their own work schedule and work wherever they chose for their weekly 40 hours." (*Id.*)

On February 2, 2017, Detective Stanley discovered that Verizon had sent her information for the wrong cell phone. (*Id.* at 11.)

On February 14, 2017, Detective Stanley authored a search warrant application to obtain information concerning the correct cell phone. (*Id.* at 10.)

Plaintiffs allege that, on February 16, 2017, Roberts told Detective Adriana Miner (while the two were attending a fallen officers' service) that Darren's "indictment and termination [are] inevitable" and that she was "waiting to hear back from fiscal to get the

---

[3] Although the interview summary that appears in Detective Stanley's report describes some of Sergeant Lumley's favorable statements concerning Darren (Doc. 98-6 at 11-14), the PSB summary report identifies additional statements by Sergeant Lumley that were less favorable to Darren (Doc. 98-17 at 6-7). It is unclear, from the summary judgment materials submitted by the parties, whether Sergeant Lumley was interviewed once or twice—the wording of the PSB report suggests there was a single, joint interview. (Doc. 98-17 at 6 ["Sergeant Eric Lumley #5097 was interviewed by PSB investigators and SID detectives."]).

precise dollar amount in order to determine what class of felony to charge him with." (*Id.* at 33.) As discussed in more detail *infra*, Roberts denies this conversation happened. (Doc. 98-14 at 11-13.) Detective Miner does not recall the specifics alleged by Plaintiffs but does recall having a conversation with Roberts at a fallen officers' service. (Doc. 105-1 at 157-59, 153-54.)

On February 17, 2017, Detective Stanley received the results from Verizon and forwarded the information to the PPD Crime Analysis Research Unit for GPS analysis. (*Id.* at 11.)

On March 27, 2017, Detective Stanley retrieved copies of the law enforcement sign-in logs from the Maricopa County Superior Court. (*Id.* at 17.)

On April 19, 2017, Detective Stanley and Sergeant Heather Maldonado interviewed Darren, with Darren's lawyer present. (*Id.* at 14.) During the meeting, Detective Stanley explained to Darren the steps she had already taken in the investigation. (*Id.*) Darren admitted that he parked his work vehicle at home even though his request for permission to park at home had been denied. (*Id.* at 15.) Darren also explained that he is an insomniac and often works on his cases at night on his personal computer, work that would not be evident from a review of his work computer. (*Id.*) Darren provided information to Detective Stanley about some of the dates for which time was missing. (*Id.*) Darren also noted that he had an access card that granted him entry to the city parking garage at 305 West Adams Street. (*Id.*) Finally, Darren flatly denied that he left his house at 10 a.m. and returned by 2 p.m., as the citizen complaint suggested. (*Id.* at 16.) Detective Stanley explained to Darren that, based on his representations, she would be able to account for some of the missing time. (*Id.*)

On April 26, 2017, Detective Stanley called Darren to ask him to bring his work laptop to the office the next day. (*Id.*) Additionally, Detective Stanley informed Darren that, based on the access card, she had been able to clear all but 96 of his missing hours. (*Id.*) In response, Darren revealed that his wife had been the one using the access card to park her personal vehicle at the city garage. (*Id.*) Based on this new information, Detective Stanley informed Darren that she would have to add back the hours she had cleared and

that she did not feel comfortable speaking to him without an attorney present. (*Id.*)

At the conclusion of the SID investigation into Darren's missing hours—taking into account the GPS data from Darren's personal phone and work phone, Sergeant Lumley's notes, court sign-in records, the interview of Darren, and records from Darren's work computer—Detective Stanley was unable to account for 221 of Darren's initial total of 1054.5 missing hours. (*Id.* at 17-19.) Detective Stanley concluded her report as follows: "[T]he total amount of unaccounted for time over one hour is 221 hours, multiplied by Detective Udd's hourly wage of $34.82/hour, equals the amount of $7,695.22  It is recommended that Darren Udd be charged with theft per A.R.S. § 13-1802, a Class 3 felony." (*Id.* at 19.)

On April 27, 2017, SID began a separate criminal investigation into Plaintiffs' use of the parking pass. (Doc. 98-7 at 11.) The theory underlying the investigation was that Plaintiffs "committed theft when they utilized a City of Phoenix issued parking pass for the Adams Street garage for personal use. In doing so, [Plaintiffs] did not pay the required fees for employees parking a personal vehicle at the garage. [Such conduct constitutes] theft for each employee, with the range of $390 - $611, a Class 1 misdemeanor." (*Id.* at 5.) Detective Christa Mose was assigned to the investigation. (*Id.* at 11)

On May 9, 2017, Darren sent an email to co-workers seeking donations for a fellow detective's retirement party. (Doc. 105 at 7.) In that email, Darren stated: "Be advised that you will most likely be under video surveillance when you are in my cubicle since I am still under investigation and will likely be indicted for my criminal behavior . . . ." (Doc. 105-1 at 87-88.) Darren contends this email "clearly upset" Roberts. (Doc. 105 at 7.)

On June 21, 2017, Commander John Collins received a report from Sergeant Maldonado summarizing Detective Stanley's investigation into Darren's missing hours. (Doc. 98-8.) On the final page of the report, Sergeant Maldonado wrote: "Recommendation: This investigation is to be submitted to the Maricopa County Attorney's Office ['MCAO'] for one count of theft, a class 3 felony." (*Id.* at 4.) In a handwritten note, Commander Collins wrote: "Forward to [Assistant Chief] Roberts for review." (*Id.*) Roberts, in turn, added a handwritten note that read: "Approved for

submittal to MCAO. Return to Sgt. Maldonado who will provide a copy to PSB." (*Id.*) During her deposition in this case, Roberts testified that she had a non-discretionary duty to submit all investigations to the MCAO for which there was probable case that a crime had been committed. (Doc. 98-14 at 19.)

Separately, on June 21, 2017, Detective Mose interviewed Amy's supervisor, Grosskopf, concerning the parking pass. (Doc. 98-7 at 12.) Grosskopf reported that it is "common knowledge" among Amy's co-workers that employees must pay to park in the Adams Street garage and that "there are emails and 'ENS' (employee notification system) that go out periodically to remind employees that they need to pay for parking." (*Id.*)

On June 27, 2017, Detective Mose completed her incident report concerning the parking pass issue. On the final page of the report, she concluded: "Theft, a Class 1 misdemeanor, is requested for Darren Udd and Amy Udd." (Doc. 98-7 at 13.) The report cited the following four pieces of evidence as providing support for the proposed charge: (1) Darren's admission that he knew the parking pass was assigned to a city vehicle, yet Amy was using it for a personal vehicle; (2) the "pattern of usage" at the parking garage, which matched Amy's work schedule but not Darren's work schedule; (3) the fact that Darren had signed a form that "specifically outlines the rules regarding usage of the pass," and (4) Grosskopf's statements concerning Amy's knowledge of the rules requiring employees to pay for parking. (*Id.*)

On August 7, 2017, Darren received an at-home work assignment pending resolution of the criminal investigation. (Doc. 98-15 at 2.)

On August 14, 2017, Darren, through counsel, sent a Notice of Claim to the City. (Doc. 105-1 at 95.) The Notice of Claim alleged state-law claims of defamation, intentional infliction of emotional distress, and abuse of process, as well as a number of federal claims. (*Id.*)

On September 1, 2017, Detective Stanley received a "turndown" notice from the MCAO, which stated that the MCAO was declining to prosecute the time-theft case against Darren because there was "no reasonable likelihood of conviction." (Doc. 100-4 at 1-2.)

On September 5, 2017, Commander Collins received a report from Sergeant

Maldonado summarizing Detective Mose's investigation concerning the parking pass. (Doc. 98-9.) On the final page of the report, Sergeant Maldonado wrote: "Recommendation: This investigation is to be submitted to the City Prosecutor's Office for one count of theft each for Mrs. Udd and Detective Udd . . . for the unlawful use of the parking pass for 13 months at $47.00 per month." (*Id.* at 3.) In a handwritten note, Commander Collins wrote: "Forward to [Assistant Chief] Roberts for review." (*Id.*) Roberts, in turn, added a handwritten note that read: "Approved for submittal. Return to Sgt. Maldonado who will provide a copy to PSB." (*Id.*)

On October 4, 2017, PSB began an administrative investigation into allegations that Darren (1) failed to complete his full duty shifts and (2) parked his city vehicle at his residence. (Doc. 98-16 at 2; Doc. 98-17 at 2.) At this time, Darren requested to return to his prior job, but he was instead assigned to "call-back" duty, which he regarded as "menial" and "punitive." (Doc. 98-5 at 82.) Call-back duty involves "making telephone calls to citizens in situations that did not warrant a patrol officer to be dispatched." (Doc. 105-1 at 7.) Additionally, his schedule changed such that his schedule and Amy's schedule were "in opposition." (Doc. 98-5 at 82.)

On November 10, 2017, Darren provided the City of Phoenix with a "Notice of Constructive Discharge." (Doc. 105-1 at 7.) In that notice, Darren described the "intolerable working conditions" he was experiencing. (*Id.*)

On December 1, 2017, the Glendale City Prosecutor's Office announced that it would decline to prosecute the misdemeanor theft charges because "the filing of charges was not appropriate." (Doc. 100-4 at 30.) (The investigation of Plaintiffs was referred to Glendale rather than Phoenix due to a perceived conflict, *see* Doc. 35 ¶ 111.)

On December 15, 2017—while the PSB investigation was still pending—Darren took early retirement. (Doc. 100 at 2.)

On December 21, 2017, Darren's request for an "Honorably Retired" identification card was denied. (Doc. 105-1 at 82.)

On January 5, 2018, Darren was mailed his "Retired" card. (*Id.*) Darren contends that "not receiving an Honorable Retirement is a huge red flag that negatively impacts

employability." (*Id*. at 8.)

On March 1, 2018, the PSB investigation of Darren concluded. It sustained the allegations that Darren failed to complete his full duty shifts and improperly parked his city vehicle at his residence. (Doc. 98-17 at 2.) Among other things, the PSB report noted that there were 21 instances where the last recorded data point for Darren's work day was his "fueling log"—a scenario that suggested Darren was visiting the gas station to "fuel[] his City assigned vehicle" after leaving the office for the day and while en route to his home. (*Id.* at 5-6.) The report noted that "[t]he time of these 21 fueling incidents varied from one half hour before the end of [Darren]'s work shift to five and one half hours before the end of the work shift." (*Id.*) The summary report concluded: "An administrative review of [Darren]'s attendance revealed 580 hours of accounted time during the review period. [Darren] said he came to work late and left early because he did a large amount of work from home, and this work from home equaled more hours than the 580 which were unaccounted for. Despite an exhaustive review, PSB investigators were unable to corroborate [Darren]'s claim. During the review period [Darren] also parked his City assigned vehicle at his residence. [Darren] was not authorized to park at his residence, but he admitted he did so because he felt it was a more efficient use of his time." (*Id.* at 10.) Because Darren had retired before the investigation was completed, no disciplinary action was taken. (*Id*. at 11.)

On October 31, 2018, PSB issued Amy a written reprimand for her use of the parking pass and closed the investigation. (Doc. 98-18 at 4.)

II.    Other PPD Time-Theft Investigations

Darren cites two other investigations of time theft by PPD officers in support of his allegation that he was discriminated against because of his age and gender. First, Darren references the investigation of Lieutenant Michael Rivera. (Doc. 105 at 13.) In that case, Sergeant Maldonado submitted a report to Roberts stating that the number of missing hours did not amount to a felony, whereupon Roberts asked Sergeant Maldonado to conduct a second review. (Doc. 105-1 at 111.) Sergeant Maldonado stated in her deposition that she was not aware of another instance in which Roberts asked her to conduct a second review.

(*Id.*)  Lieutenant Rivera died before the second review was completed.  (*Id.*)

Second, Darren describes the investigation of Detective Kim Cooper.  (Doc. 105 at 13-14.)  This investigation began after Detective Cooper's ex-husband informed the PPD that she was using a city vehicle to transport their child.  (Doc. 98-1 at 6.)  The six-month NAR of Detective Cooper turned up 300.25 missing hours.  (Doc. 105-1 at 201.)  Detective Cooper's direct supervisor, when interviewed, explained that he explicitly allowed Detective Cooper to "work from home, come in late, and leave early with an expectation that she would make up any missing hours."  (*Id.*)  Detective Cooper declined to be interviewed.  (*Id.*)  Detective Mike Smorong concluded there was "insufficient probable cause to show the crime of theft occurred based on the supervisor permissions."  (*Id.* at 202.)  Roberts approved the recommendation to close the case and referred the matter to PSB.  (*Id.*)  Detective Cooper retired while a PSB investigation into her use of the city vehicle to transport her child was in progress.  (*Id.* at 204-06.)

III.   Records Kept By Defendants

The "incident reports" summarizing the investigations of Plaintiffs contain notations suggesting that both were arrested.  (Doc. 100 at 6-7.)  A "bug" in the PPD software required administrators to check the "arrested" box whenever an investigation was submitted to a prosecutor's office for potential prosecution, regardless of whether the subject of the investigation had actually been arrested.  (*Id.* at 8.)  Plaintiffs allege these false arrest records were sent to the MCAO, the Glendale City Prosecutor's Office, and the Arizona Peace Officer Standards and Training Board ("AZPOST"), an organization that certifies law enforcement officers.  (*Id.* at 8-9.)   Defendants state that "[t]he only individuals who have access [to] and have seen Plaintiffs' . . . records are the investigators who inputted the data, their chain of command, and the two prosecuting entities that Plaintiffs were referred to for potential prosecution."  (Doc. 104 at 3.)

In 2018, Darren's name was added to the "*Brady* list," a list of police officers accused of professional misconduct that prosecutors must disclose to criminal defendants.  (Doc. 105 at 12-13.)  Plaintiffs contend that Defendants attempted to impede Darren's appeal of the placement of his name on the *Brady* list, but Defendants state this is "pure

speculation." (Doc. 105 at 12-13; Doc. 109 at 8.) Plaintiffs acknowledge that Darren's name was later removed from the *Brady* list. (Doc. 105 at 13.)[4]

IV.     Procedural History

On May 8, 2018, Plaintiffs commenced this action by filing a complaint in Maricopa County Superior Court. (Doc. 1-1 at 12.) The complaint alleged state-law claims of defamation, abuse of process, and intentional infliction of emotional distress, as well as federal claims under 42 U.S.C. § 1983, Title VII, and the Age Discrimination in Employment Act ("ADEA"). (Doc. 1-1 at 29-37.)

On May 29, 2018, Defendants removed the case to this Court. (Doc. 1.)

On June 11, 2018, Plaintiffs filed their first amended complaint ("FAC"). (Doc. 9.) The FAC added claims of negligence, wrongful termination/constructive discharge, and loss of consortium. (*Id.* at 34-36.)

On June 28, 2018, Defendants filed a partial motion to dismiss Plaintiffs' claims for abuse of process and intentional infliction of emotional distress (for failure to state a claim) and to dismiss state-law claims against Roberts (for failure to comply with Arizona's notice of claims statute). (Doc. 11.)

On December 21, 2018, the Court granted the partial motion to dismiss. (Doc. 32.)

On January 29, 2019, Plaintiffs, with leave of Court, filed a second amended complaint ("SAC"). (Doc. 35.)

On August 1, 2019, the parties filed a motion to extend the page limits on their summary judgment motions. (Doc. 93.) That request was denied. (Doc. 94.)

On August 30, 2019, Defendants filed a motion for summary judgment on all remaining claims. (Doc. 98.) That same day, Plaintiffs filed a motion to exclude certain opinions of Defendants' expert witness, Brent Taylor, and a motion for partial summary

_____

[4]     On March 20, 2020, Plaintiffs filed a motion to supplement the summary judgment record with evidence that Darren's name was not, in fact, removed from the *Brady* list. (Doc. 120.) Because this motion is not yet fully briefed, the Court will not address it now. The parties may address the summary judgment ramifications, if any, of Plaintiffs' supplementation request in their yet-to-be-filed response and reply briefs.

judgment.  (Docs. 99, 100.)

On September 30, 2019, Defendants responded to Plaintiffs' motions (Docs. 103, 104) and Plaintiffs responded to Defendants' motion (Doc. 105).

On October 22, 2019, Plaintiffs filed replies in support of their respective motions (Docs. 108, 110) and Defendants filed a reply in support of their motion (Doc. 109).

On October 28, 2019, Plaintiffs filed a motion to strike all exhibits attached to Defendants' reply.  (Doc. 111.)

On November 11, 2019, Defendants filed a response.  (Doc. 112.)

On November 18, 2019, Plaintiffs filed a reply.  (Doc. 113.)

On March 18, 2020, the Court issued a tentative order addressing the four pending motions.  (Doc. 115.)

On March 23, 2020, the Court heard oral argument.  (Doc. 121.)

**DISCUSSION**

I.    <u>Motion To Strike</u>

The Court will begin by addressing Plaintiffs' motion to strike because its resolution could affect the scope of evidence that may be considered when addressing the other pending motions.  Plaintiffs move to strike all exhibits attached to Defendants' summary judgment reply because the case management order states that "[n]o evidence may be submitted with a reply."  (Doc. 111, citing Doc. 29 at 6.)  In response, Defendants contend that each exhibit attached to their reply was either (1) already part of the record or (2) properly filed in response to new arguments raised in Plaintiffs' summary judgment response.  (Doc. 112.)

Plaintiffs are correct that it is possible to construe the wording of paragraph 8(c) of the case management order as categorically precluding the submission of any evidence in support of a summary judgment reply.  That was not, however, the Court's intent—the purpose of paragraph 8(c) is simply to prevent sandbagging.  Here, Defendants have not engaged in sandbagging with respect to the challenged exhibits—those exhibits constitute evidence that is responsive to arguments raised in Plaintiffs' response.  It is permissible to

attach evidence to a reply under these circumstances.[5]   *See, e.g., TSI Inc. v. Azbil BioVigilant Inc.*, 2014 WL 880408, *1 (D. Ariz. 2014) ("While a party may not file 'new' evidence with a reply, it may file 'rebuttal' evidence to contravene arguments first raised by the non-moving party in its opposition. . . .   District of Arizona precedent is clear . . . that it is immaterial that [the movant] already had this evidence in its possession at the time it filed is motion for summary judgment, so long as it is rebuttal evidence."); *E.E.O.C. v. Creative Networks, LLC & Res-Care, Inc.*, 2008 WL 5225807, *2 (D. Ariz. 2008) (acknowledging that "a party may not file 'new' evidence with a reply and then deprive the opposing party of an opportunity to respond to the new evidence" but holding that evidence attached to defendant's reply was "proper" because it merely "rebut[ted] arguments first raised by Plaintiff in its opposition to Defendant's Motion for Summary Judgment").   Thus, Plaintiffs' motion to strike will be denied.

II.     Cross-Motions For Summary Judgment

   A.     **Standard Of Review**

   A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).   "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

   "Summary judgment is appropriate when 'there is no genuine dispute as to any

---

[5]     In contrast, and as discussed in more detail below, some of the arguments raised in Defendants' reply constitute new arguments, not rebuttal arguments.

- 13 -

material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Finally, a key limitation on a district court's power to enter summary judgment is that this power may be exercised only "so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex*, 477 U.S. at 326. Accordingly, a party moving for summary judgment must raise, in its initial motion, all of the grounds on which it is seeking relief. It is impermissible, in contrast, for a movant to raise new grounds for the first time in its reply. Indeed, the general rule is that "[t]he district court need not consider arguments raised for the first time in a reply brief," *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), and this rule applies with particularl force in the summary-judgment context. *See, e.g.,* S. Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 166 (2020) ("Moving parties are expected to put all of their arguments . . . in the opening brief . . . [and] aren't supposed to include new arguments . . . in their reply briefs . . . . When the moving party includes impermissible content in a reply brief, the court can . . . simply disregard the impermissible content."); *Fried v. Surrey Vacation Resorts, Inc.*, 2010 WL 2330272, *1 (W.D. Wisc. 2010) ("[T]he movant in a summary judgment motion cannot introduce new . . . arguments in its reply materials."). *Cf.* Fed. R. Civ. P. 56(f)(2) (district court may grant summary judgment "on grounds not raised by a party" only "[a]fter giving notice and a reasonable time to respond").

In this case, the parties foresaw that it might be difficult to raise all of their preferred arguments in a 17-page motion and thus sought, unsuccessfully, an extension of the page limits. (Docs. 93, 94.) With the benefit of hindsight, the Court would have granted this request. Nevertheless, because the request was denied, the Court must limit its consideration to the arguments and issues properly raised in the parties' initial motions.

### B. **Federal Claims**

#### 1. Section 1983 claim

In Count Four of the SAC, Plaintiffs assert a claim against the City and Roberts under 42 U.S.C. § 1983. (Doc. 35 ¶¶ 194-218.) Specifically, Plaintiffs allege violations of (1) their substantive due process rights under the Fourteenth Amendment, (2) their procedural due process rights under the Fourteenth Amendment, (3) their right to "protected speech" under the First Amendment, and (4) their right to be free from unreasonable searches and seizures under the Fourth Amendment. (*Id.*) Plaintiffs further contend the City is liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), because (1) Roberts is a final policymaker, or (2) alternatively, Roberts ratified the unconstitutional acts of her subordinates. (Doc. 105 at 9.)

##### a. **Qualified immunity**

Roberts argues that, to the extent Plaintiffs' § 1983 claim is premised on violations of their rights to substantive and/or procedural due process under the Fourteenth Amendment, she is entitled to qualified immunity. (Doc. 98 at 5-8.)[6] Meanwhile, Plaintiffs argue in their affirmative summary judgment motion that "Defendants are not entitled to qualified immunity." (Doc. 100 at 12-14.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A government official's conduct violates

---

[6] Roberts does not, in contrast, invoke qualified immunity to the extent the § 1983 claims are premised on violations of the First and Fourth Amendments. (Doc. 98 at 8-9.)

"clearly established" law when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 741 (citation omitted). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular— not to define clearly established law at a high level of generality.") (quotation omitted).

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted). Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### i. *Substantive due process*

Roberts argues that the only theories articulated by Plaintiffs that could possibly fall under the rubric of substantive due process are (1) a claim premised on the "right[] to a better criminal investigation" and/or (2) a claim premised on the right "to not have an investigation referred for prosecution unless it would result in actual prosecution." (Doc. 98 at 6-7.) Roberts contends that such rights simply do not exist and are not, in any event, clearly established by the case law. (*Id.*)

Plaintiffs' response is, in many respects, non-responsive. (Doc. 105 at 4-6.) Plaintiffs don't directly acknowledge Roberts's arguments and instead seem to argue they

can prevail on a substantive due process claim because (1) Roberts arbitrarily deprived Darren of his liberty interest in pursuing an occupation, (2) "Defendants initiated a wrongful prosecution based on known faulty evidence and ignored exculpatory evidence," and/or (3) Roberts's "deliberate use of criminal prosecutions to intimidate and retaliate against PPD employees" is behavior that "shocks the conscience." (*Id.*)[7]

Roberts is entitled to qualified immunity on any § 1983 claim premised on a substantive due process theory. Plaintiffs' first argument appears to be that Roberts's actions stigmatized Darren and besmirched his reputation as a police officer, which in turn prevented him from being able to pursue employment opportunities following his retirement. However, the primary case proffered by Plaintiffs as the "clearly established" law supporting this claim—*Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169 (9th Cir. 1998)—is a case that discusses procedural due process rights.[8] This does not satisfy Plaintiffs' burden of demonstrating "that the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero,* 931 F.2d at 627. *Cf. Roska v. Sneddon*, 366 Fed. App'x 930, 936 (10th Cir. 2010) ("The district court correctly held that the [cases cited by plaintiffs] did not clearly establish the law regarding a procedural due process claim because both cases dealt only with substantive due process.").[9]

---

[7] Plaintiffs' cross-motion on qualified immunity is even less focused—it makes little effort to distinguish between the various constitutional provisions underlying their § 1983 claim. (Doc. 100 at 12-14.)

[8] *Mustafa* never references substantive due process and courts discussing *Mustafa* almost invariably label it as a case about procedural due process. *See, e.g.*, *Ames v. Lindquist*, 769 F. App'x 502, 505 (9th Cir. 2019) (discussing *Mustafa* under a procedural due process heading); *Kilroy v. Los Angeles Unified Sch. Dist.*, 2018 WL 7916367, *10 (C.D. Cal. 2018) (assessing procedural due process claim under *Mustafa*); *Pavel v. Univ. of Oregon*, 2017 WL 1827706, *5 (D. Or. 2017) (describing *Mustafa* as a case in which the Ninth Circuit found "the defendant did not violate procedural due process").

[9] Plaintiffs' response also cites *Sagana v. Tenorio*, 384 F.3d 731 (9th Cir. 2004), but the Ninth Circuit noted in that case that it had "never held that the right to pursue work is a fundamental right" and went on to reject a substantive due process challenge to certain restrictions that were enacted as part of a temporary worker program because the defendant had "legitimate reasons" for creating them. *Id.* at 742-43. *Sagana*, in short, arose in an entirely different context and thus could not have "ma[d]e it obvious to all reasonable

In support of their second argument, Plaintiffs appear to rely on *Hall v. City of Los Angeles,* 697 F.3d 1059 (9th Cir. 2012). (Doc. 100 at 13.) *Hall* holds that to support a "deliberate-fabrication-of-evidence claim, a plaintiff . . . must, at a minimum, point to evidence that . . . Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent." *Id.* at 1068. Plaintiffs bold and italicize the second part of this passage but neglect the predicate nature of the claim. (Doc. 100 at 13.) Plaintiffs don't identify anything in the record that suggests Roberts (or anyone else in the PPD) deliberately fabricated evidence.[10]

Third, Plaintiffs point to *Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1998), as the clearly established law showing that "Roberts'[s] deliberate use of criminal prosecutions to intimidate and retaliate against PPD employees shocks the conscience." (Doc. 105 at 6.) This argument is unavailing. *Nunez* addressed whether a police department "violated the police officers' substantive due process rights by promoting inexperienced candidates in disregard of official policy." 147 F.3d at 871. The court rejected that claim because the officers lacked a property interest in promotion. *Id*. at 872. It's unclear why Plaintiffs believe *Nunez* is factually analogous to this case and provides the "concrete and factually defined context" that makes "obvious to all reasonable

---

government actors, in [Roberts's] place, that what [s]he is doing violates federal law." *Shafer,* 868 F.3d at 1117.

[10] During oral argument, Plaintiffs' counsel suggested that PPD investigators had "fabricated" evidence during the time-theft investigation by concluding, whenever they "couldn't find a[n] electronic signature after [Darren] punched into his office," that Darren hadn't been working. But even assuming that the PPD investigators employed a flawed methodology when conducting the time-theft investigation, this is not the same thing as the intentional fabrication of evidence. *See, e.g., Peck v. Hinchey*, 755 Fed. App'x 723, 723 (9th Cir. 2019) ("Plaintiffs have failed to raise a genuine issue of material fact that [the law enforcement officer] deliberately made a false statement or fabricated evidence, as opposed to making reasonable mistakes in methodology or in interpreting data."); *Black v. Montgomery Cty.*, 835 F.3d 358, 372 (3d Cir. 2016) ("[T]here is a notable bar for evidence to be considered 'fabricated.' We have noted that testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong.") (internal quotations and citation omitted).

government actors, in the defendant's place, that what he is doing violates federal law." *Shafer*, 868 F.3d at 1117.

Furthermore, a review of the shocks-the-conscience standard illustrates that Plaintiffs' grievances come nowhere close to meeting that standard. *Rochin v. California,* 342 U.S. 165 (1972), is the case from which the "shocks the conscience" standard originates. In *Rochin*, police officers handcuffed Rochin to a hospital bed, directed a doctor to force an emetic through a tube into his stomach against his will, and induced vomiting to recover two morphine capsules. *Id.* at 166. The Supreme Court held that this behavior "offend[ed] even hardened sensibilities" and that the actions of the officers were "methods too close to the rack and the screw." *Id.* at 172. Although this standard admits of some subjectivity, it's obvious that overseeing an investigation of, and making a criminal referral for, alleged time theft doesn't approach behavior that shocks the conscience.

### ii. *Procedural due process*

Roberts argues Plaintiffs cannot prevail on a procedural due process claim because neither took advantage of the relevant procedural protections that were available to them: (1) Darren retired before the PSB investigation was completed (meaning he forfeited his right to challenge the result of that investigation) and (2) Amy "merely received a written reprimand" and "could have filed a grievance challenging the written reprimand, but chose not to do so." (Doc. 98 at 7-8.) Roberts cites *Knappenberger v. City of Phoenix*, 566 F.3d 936 (9th Cir. 2009), as a case precluding liability under these circumstances and further contends "[t]here is no case law notifying Defendant Roberts that any constitutional rights were denied or that PPD's actions were prohibited . . . ." (*Id.*)

In their response, Plaintiffs offer only one argument that specifically addresses the concept of procedural due process—they argue that, under "the labor agreement and City Charter," Darren retained the right to review the results of the PSB investigation, and challenge those results, even after he retired. (Doc. 105 at 4-5.) Additionally, as discussed in the preceding section of this order, Plaintiffs' citation of *Mustafa*, which they proffered as a case supporting their substantive due process claim, is better viewed as a procedural due process case.

Roberts is entitled to qualified immunity on any § 1983 claim premised on a procedural due process theory. First, *Mustafa* does not serve as clearly established law supporting Plaintiffs' position. There, the Ninth Circuit held that "[t]he termination of a public employee which includes publication of stigmatizing charges triggers due process protections . . . . [T]o take advantage of these protections, an employee must show that (1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment." 157 F.3d at 1179 (internal quotation omitted). Essentially, this means that when a public employee is terminated for stigmatizing (but disputed) reasons, and those stigmatizing reasons are publicized by the employer, the employee has a right to "a name-clearing hearing." *Perez v. City of Roseville*, 926 F.3d 511, 523 (9th Cir. 2019) (internal quotation marks omitted). However, there must be a "temporal nexus" between the employer's statements and the termination. *Id.* at 523-24. Although the Ninth Circuit has "avoided bright-line rules in determining whether this temporal nexus has been satisfied," it held in *Perez* that there is no clearly established law requiring an employer to provide a name-clearing hearing if the challenged statements were made at least 19 days before the termination. *Id.* at 524.

Darren cannot prevail in light of this holding. He retired on December 15, 2017 (Doc. 100 at 2), yet the challenged stigmatizing statements were (1) the alleged submission of "false charges" to the MCAO on June 21 and September 5, 2017 and (2) the transmission of an identification card labeling him as "Retired" (rather than "Honorably Retired"), which was sent on January 5, 2018. (Doc 98-8; Doc. 98-9; Doc. 105 at 5-6.) Even assuming that these "stigmatizing charges" were contested in terms of accuracy, that the submission of a report for prosecutive evaluation and/or the issuance of an identification card could qualify as "publication," and that Darren was constructively discharged, these events occurred more than 19 days before and after the date Darren was allegedly discharged. Thus, as in *Perez*, the Court is "bound by [Ninth Circuit] precedent to conclude it was not clearly established that defendants were required to provide [Darren] with a name-clearing hearing, and [Roberts is] therefore entitled to qualified immunity." 926 F.3d at 524.

- 20 -

Amy's invocation of *Mustafa* is even less compelling. She doesn't allege she was terminated or constructively discharged—she merely received a reprimand—and the Ninth Circuit rejected the plaintiff's procedural due process claim in *Mustafa* in part because he "was not terminated, but rather was transferred." 157 F.3d at 1179.

Darren's argument concerning his supposed rights under "the labor agreement and City Charter" is also unavailing. *Mustafa* and *Perez* set forth the procedural due process protections that are afforded to public employees whose termination is accompanied by the publication of stigmatizing charges. Darren has not cited any cases suggesting, let alone clearly establishing, that the constitutional standard varies depending on the terms of a particular public employer's labor agreement or city charter.

### b. First Amendment

Darren alleges he was subjected to various forms of retaliation—including being placed under investigation, being referred for criminal prosecution for time theft, being reassigned to at-home work assignment and call back duty, and being (along with his wife) referred for criminal prosecution for parking pass misuse[11]—because he engaged in three forms of protected speech: (1) acting as an "outspoken critic" at monthly meetings attended by PPD leadership, (2) sending an email to colleagues on May 9, 2017, which stated, "Be advised that you will most likely be under video surveillance when you are in my cubicle since I am still under investigation and will likely be indicted for my criminal behavior . . . there is a Live [sic] direct feed to PSB and the fourth floor," and (3) filing a notice of

---

[11]     This list represents the Court's best attempt to interpret Plaintiffs' response brief, which is not a model of clarity when it comes to identifying which conduct is being challenged as retaliatory. (Doc. 105 at 6-8.) The brief refers specifically to "the referral for criminal prosecution on June 21, 2017" and the "refer[ral] for potential prosecution for alleged misdemeanor misuse of a parking pass . . . on September 5, 2017" and also contains an allusion to unspecified other "disciplinary actions" and "adverse actions." (Doc. 105 at 7-8.) Because the preceding brief, Defendants' motion, focused on Darren's reassignment to at-home duty and call-back duty (Doc. 98 at 8-9), the Court assumes these are the other "adverse actions" to which Plaintiffs were referring. Finally, the last paragraph of Plaintiffs' response brief alleges that "*the underlying investigations* and referrals were the result of the protected activities." (Doc. 105 at 8, emphasis added.)

claim on August 14, 2017. (Doc. 105 at 6-8.) Defendants respond that Darren cannot show a causal nexus between his speech and the challenged actions because (1) PPD follows a standard policy of reassigning employees who are the subject of pending investigations/criminal referrals (Doc. 98 at 8-9); and (2) Roberts was required to refer Plaintiffs for criminal prosecution because the underlying investigative reports were supported by probable cause (Doc. 109 at 3-5).

Roberts is entitled to summary judgment on any § 1983 claim premised on a First Amendment theory. As an initial matter, the Court disagrees with Defendants' argument that, under *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), the "sole" issue to be resolved is whether there was probable cause to refer Plaintiffs for criminal prosecution. (Doc. 109 at 4.) It is true that a plaintiff asserting a claim for retaliatory *prosecution* under the First Amendment must show that the underlying charges lacked probable cause. *Beck v. City of Upland*, 527 F.3d 853, 863-64 (9th Cir. 2008) ("[U]nder *Hartman* [*v. Moore*, 547 U.S. 250 (2006)], if a plaintiff can prove that the officials secured his arrest or prosecution without probable cause and were motivated by retaliation against the plaintiff's protected speech, the plaintiff's First Amendment suit can go forward."). The purpose of this "bright-line, objective standard" is to function as "a substitute for inquiries into the prosecutor's subjective state of mind" in cases where the prosecutor made an "intervening decision to prosecute." *Id.* at 863. Here, however, there was no prosecution—the MCAO and the Glendale City Prosecutor's Office declined the referrals. Additionally, Plaintiffs seek to challenge a variety of different actions, not just the criminal referrals. Thus, Plaintiffs' First Amendment claim is best analyzed as a traditional claim by a public employee for First Amendment retaliation, not as a retaliatory prosecution claim under *Hartman* and *Nieves*. *Cf. Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (listing a series of acts taken against a public employee, including "an unwarranted disciplinary investigation" and "a criminal investigation," and stating that "some, perhaps all, of the [those] acts, considered individually, were adverse employment actions for purposes of plaintiffs' First Amendment retaliation suit").

Nevertheless, the claim still fails. To prevail on a First Amendment retaliation

claim, a public employee must show his speech was a "substantial or motivating factor" in the adverse action, at which point the burden shifts to the defendant to "show[] that the employee's protected speech was not a but-for cause of the adverse employment action." *Eng v. Cooley*, 552 F.3d 1062, 1071-72 (9th Cir. 2009). Here, to the extent Plaintiffs seek to challenge the initial decision to investigate Darren for time theft, that claim fails because the investigation began in December 2016 (upon the PPD's receipt of the citizen complaint), which was five months before Darren sent the email in May 2017 and eight months before Darren filed his notice of claim in August 2017. Those instances of speech obviously could not have been the "substantial or motivating factor" behind an investigation that began months earlier. And as for Plaintiffs' assertion that Darren was "outspoken" at monthly meetings, Darren's declaration provides no timeline for this nebulous outspokenness—not only is it unclear what he said, but it's unclear when he said it. (Doc. 105-1 at 3 ["As a senior detective I had a history of being outspoken and speaking at monthly meetings . . . .].) No reasonable juror could find retaliation on this record.

Next, even assuming that the temporal proximity between Darren's email and notice of claim (which were sent in May 2017 and August 2017) and the criminal referrals (which occurred in June 2017 and September 2017) creates a question of fact as to the "substantial or motivating factor" requirement, Plaintiffs do not appear to dispute Roberts's testimony that she was required to refer to the MCAO, for potential prosecution, all investigations in which she believed there was probable case that a crime had been committed.[12] Thus, a finding of probable cause would have prompted Roberts to refer Plaintiffs' cases for prosecution even in the absence of Darren's protected speech. This means that Darren's speech could not have been the but-for cause of the adverse action. *Eng*, 552 F.3d at 1072.

In an attempt to avoid this outcome, Plaintiffs argued obliquely in their motion

[12]     Specifically, Roberts answered "No" when asked the following question during her deposition: "So when you were the assistant chief over SID and if somebody came to you with an investigation, and you believed probable cause was met for the elements of a crime, would you have the discretion not to submit that?" (Doc. 98-14 at 19.) Roberts later elaborated that "You can't pick and choose. Every case, if the elements are there for probable cause, submit the case." (*Id.*)

papers (Doc. 105 at 8)—and then argued more directly during oral argument—that the referrals for prosecution occurred without probable cause. This argument lacks merit. "Probable cause is not a high bar." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018) (citation and internal quotation marks omitted). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (citations and internal quotation marks omitted).

First, as for the time-theft referral, an SID investigation spanning six months was unable to account for 221 missing hours. (Doc. 98-6 at 17-19.) The investigation, which was spurred by the receipt of a complaint from a concerned citizen who claimed that Darren was routinely working a less-than-eight-hour shift, involved gathering an array of electronic and other evidence, cross-referencing it with Darren's schedule, and seeking to determine whether Darren had actually worked his expected hours. At the conclusion of the investigation, Detective Stanley (the officer primarily responsible for conducting the investigation), Sergeant Maldonado (Detective Stanley's supervisor), and Commander Collins (the supervisor who forwarded the underlying investigative materials to Roberts) all concluded there was probable cause that a crime had been committed. Additionally, although Darren's supervisor, Sergeant Lumley, made some comments during his interview that could be viewed as exculpatory, Sergeant Lumley also expressed concern when presented with the electronic evidence "indicating a pattern of when [Darren] arrived at [the office]," stating that he hadn't authorized Darren to arrive at those times and "the number . . . was large enough [that he] would have remembered had he allowed this much time." (Doc. 98-17 at 6-7.)[13]

---

[13] Additionally, the PSB report explains why Darren's "fueling log" data is suggestive of a pattern of repeatedly leaving work early. (Doc. 98-17 at 5-6.) Although it is unclear whether this specific information was compiled at the time of the MCAO referral and/or provided to Roberts at the time of the referral decision, and although Plaintiffs presumably have counter-arguments about why this data shouldn't be interpreted as evidence of time theft, it further supports the conclusion that probable cause existed.

Given this backdrop, Plaintiffs' extensive criticisms of the methodology that Detective Stanley employed when conducting the investigation (Doc. 100 at 5) miss the mark. The issue isn't whether Darren actually committed time theft—instead, the probable-cause inquiry turns on whether the evidence showed a "substantial chance" of time theft, which "is not a high bar." *Wesby*, 138 S.Ct. at 586 (citation and internal quotation marks omitted). Additionally, Roberts was not acting in a vacuum—she made the referral to the MCAO at the behest of three subordinate officers, all of whom also concluded that probable cause was present. No reasonable juror could conclude, on this record, that Roberts made the time-theft referral to the MCAO, even though she knew the proposed charge lacked probable cause, simply because she wished to retaliate against Darren for his exercise of First Amendment rights. *Cf. Wuerffel v. Cook County Sheriff's Office*, 2019 WL 4674602, *4 (N.D. Ill. 2019) (rejecting § 1983 claim by former police sergeant, who alleged that she was subjected to a retaliatory time-theft investigation due to her political beliefs, because "it is 'objectively reasonable' to investigate public employees for misconduct" and "[t]he record in this case is rife with evidence of Wuerffel's time theft, which the Defendants were well within their means to investigate and address").

Second, as for the parking-pass referral, the investigation was predicated on Darren's admission, in the middle of the time-theft investigation, that Amy had been parking for free in the city's parking garage by using his parking pass. During the ensuing investigation, Detective Mose gathered relevant paperwork (which included a form, signed by Darren, that specifically forbade the type of use at issue), interviewed Amy's supervisor (who stated that Amy had been informed of the need to pay to park in the garage), and examined the usage history associated with Darren's pass (which confirmed that Amy had been the one using it). Based on all of this evidence, Detective Mose recommended that Plaintiffs be charged with misdemeanor theft, as did Sergeant Maldonado and Commander Collins. Notably, Darren acknowledges in his declaration that Amy's use of his parking pass constituted "a policy violation." (Doc. 105-1 at 5 ¶ 8.) Given this backdrop, the

relatively low bar of probable cause was satisfied.[14]

Finally, and for similar reasons, Plaintiffs cannot prevail on their claim that the decision to transfer Darren to at-home duty and call-back duty constituted impermissible First Amendment retaliation. In support of their motion, Defendants proffered evidence that it is "customary" PPD practice to make such reassignments when an officer is under investigation. (Doc. 98 at 10, citing Doc. 98-14 at 5, 7.) Plaintiffs did not dispute that evidence in their response. (Doc. 105 at 8 [not disputing Defendants' contention that "all employees who are placed under investigation are removed from duty"].)[15] This means that Darren's speech could not have been the but-for cause of the adverse action. *Eng*, 552 F.3d at 1072.

…

---

[14] During oral argument, Plaintiffs asserted that the PPD had declined to make criminal referrals in other cases involving parking-pass misuse, even when there was probable cause that a violation had occurred. If there were evidence to support this claim, it might create a jury issue as to retaliation (because it seems to conflict with Roberts's assertion that all investigations supported by probable cause are referred for prosecution). However, Plaintiffs' counsel acknowledged that "apparently I didn't get those in [to the summary judgment record]. I wish I had." Accordingly, this assertion cannot be considered for summary judgment purposes. *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("[A]rguments and statements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.") (citation and internal quotation marks omitted).

[15] During oral argument, Plaintiffs attempted to belatedly dispute this assertion by pointing to the deposition testimony of John Collins, the City's 30(b)(6) witness, who testified the PPD evaluates, on "a case-by-case basis," whether to reassign a particular employee who is under investigation, taking into account "the nature of the allegation, what direction the investigation has gone, [and] what evidence they have looked at or considered." (Doc. 109-4 at 7.) This argument lacks merit. Putting aside the irony of Plaintiffs' reliance on evidence that Defendants submitted in support of their reply—evidence that Plaintiffs are actively seeking to strike from the record (Doc. 111)—Roberts's deposition testimony establishes that it was customary for the PPD to pursue a reassignment when, as here, a homicide detective was being investigated for "a written reprimand or higher that's going to be a detriment to the bureau." (Doc. 98-14 at 7.) Thus, even if Collins's deposition testimony suggests that other types of PPD officers facing less-serious allegations might not be reassigned while under investigation, Plaintiffs have not identified a triable dispute of fact on the issue of but-for causation.

### c.    **Fourth Amendment**

Plaintiffs contend their Fourth Amendment rights were violated via the submission of a search warrant affidavit to obtain Darren's cell phone records because the affidavit "contain[ed] knowingly false and deliberately misleading information." (Doc. 105 at 8.) Specifically, Plaintiffs take issue with the statement that Darren was being investigated for 1054.50 hours of missing time because "Defendants already knew most of those hours had already been accounted for during its investigation." (*Id*.) In response, Defendants point out that Detective Stanley, who is not a defendant in this case, was the one who authored and submitted the affidavit. (Doc. 98 at 10-11.) Defendants further argue that because existing law at the time did not require officers to secure a search warrant before obtaining cell phone location data, there can be no Fourth Amendment violation. (*Id*.)

Roberts is entitled to summary judgment on any § 1983 claim premised on a Fourth Amendment theory. As an initial matter, it's not clear that anything in Detective Stanley's affidavit was false or deliberately misleading. It described the NAR methodology, stated how many hours the initial audit found missing, explained why cell site location information would be helpful, and stated that the information being sought "may be indicting or exculpatory." (Doc. 98-25 at 4.) It was factually accurate to state that Darren was being *investigated* for 1054.50 missing hours. Further, the affidavit as a whole suggests the 1054.50 figure was not an infallible final figure: Detective Stanley acknowledged the requested information could be exculpatory. (*Id*.)

Moreover, even if Detective Stanley had included false statements in the search warrant affidavit, Roberts cannot be held liable under a respondeat superior theory for Detective Stanley's actions. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, in a § 1983 suit, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. Here, Defendants submitted evidence that Roberts had no role in reviewing or preparing the search warrant affidavit (Doc. 98-14 at 9-10) and

Plaintiffs did not submit any contrary evidence with their response.[16]  Thus, Plaintiffs cannot prevail on this claim.

### d.  *Monell* **Liability**

Plaintiffs' theory of *Monell* liability against the City is not a model of clarity.  In Count Four of the SAC, the few paragraphs that specifically discuss the City (as opposed to Roberts) allege a "policy and custom" of making improper referrals to prosecutor's offices.  (Doc. 35 ¶¶ 199-201.)  Accordingly, in their motion, Defendants argue that Plaintiffs cannot prevail on such a claim because (1) the City made 10-15 referrals of sworn officers over a three-year period, 2-3 of those referrals resulted in prosecutions, and there is no evidence that the declined cases lacked probable cause, and (2) there is no evidence that Roberts knowingly ratified any unconstitutional conduct by a subordinate.  (Doc. 98 at 9-11.)  In response, Plaintiffs accuse Defendants of "mischaracteriz[ing] Plaintiffs' claims by asserting that the claims rely on the . . . prosecutor turndowns as the basis for the constitutional violations" and assert that the "turndowns are indicative of the baselessness of the prosecution initiated by the final policymaker—Mary Roberts."  (Doc. 105 at 10.)  Plaintiffs further contend that the number of accepted referrals was only 1-2 (not 2-3).  (*Id.*)  Finally, Plaintiffs make the alternative argument that "liability against the City of Phoenix may also be established through Mary Roberts' ratification of any other individual who contributed to these constitutional violations."  (*Id.*)

The City is entitled to summary judgment on Plaintiffs' *Monell* claim.  As discussed above, Plaintiffs have not established that Roberts's referral of *their* cases for prosecution resulted in a violation of their constitutional rights.  Without such a showing, they cannot prevail against the City on a *Monell* pattern-and-practice claim.  *See, e.g., Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("[T]he liability of municipalities . . . is contingent on a

---

[16]     Although Plaintiffs assert in their response that Roberts "approved seeking search warrants" (Doc. 105 at 10), they fail to identify any evidence supporting this assertion. Additionally, approving a subordinate's plan to seek a search warrant is not the same thing as being specifically aware of, and condoning, the presence of false statements in the search warrant affidavit.

violation of constitutional rights. Here, the municipal defendants cannot be held liable because no constitutional violation occurred."); *Doe v. Round Valley Unified Sch. Dist.*, 873 F. Supp. 2d 1124, 1135 (D. Ariz. 2012) ("[B]ecause John Allen committed no violation, the School District committed no violation").

There is one potential caveat to this analysis. Because the Court rejected Plaintiffs' procedural and substantive due process claims against Roberts based on qualified immunity, this means Plaintiffs could theoretically prevail on a *Monell* claim against the City if their due process rights had, in fact, been violated (and it was only the absence of "clearly established" precedent that prevented Roberts from being held individually liable for the violation). *See generally Lowry v. City of San Diego*, 818 F.3d 840, 855 (9th Cir. 2016) ("[Q]ualified immunity analysis is irrelevant to the issue of *Monell* liability").[17] Nevertheless, that circumstance isn't present here. Plaintiffs' discussion of procedural due process focuses exclusively on the alleged failure of Defendants to provide Darren with an opportunity to learn about and challenge the results of the *PSB* investigation (Doc. 105 at 4-5), but Plaintiffs' *Monell* theory focuses only on the City's practice of making *criminal* referrals. Finally, Plaintiffs' substantive due process claim misses the mark because, as discussed above, this case does not involve fabricated evidence or otherwise approach the shocks-the-conscience standard.

2. <u>Title VII</u>

In Count Five of the SAC, Plaintiffs contend that Defendants violated Title VII by (1) "preferentially referring male officers . . . to various prosecutor's offices for potential prosecution . . . while at the same time not referring similarly situated female officers for the performance of essentially the same or similar acts," (2) retaliating against Darren after he "engaged in protected activity through reporting acts of discrimination," and (3) subjecting Amy to "illegal association discrimination and retaliation" due to "the protected activity of her spouse." (Doc. 35 ¶¶ 219-227.)

---

[17]     Thus, Defendants' assertion that "*Monell* liability for the City cannot be predicated on any activity for which Defendant Roberts is immune" (Doc. 109 at 6) is inaccurate.

In their motion, Defendants offer four reasons why they are entitled to summary judgment on the Title VII claim: (1) a police department's initiation of a criminal investigation and/or referral of an investigation for criminal prosecution cannot constitute an "adverse employment action" for Title VII purposes, even if the subject of the investigation/referral happens to be an employee, (2) to the extent Darren seeks to challenge his treatment during the PSB investigation, he has not shown that any similarly-situated female was treated differently (his one proffered female comparator, Detective Cooper, was also referred for a PSB investigation), (3) Darren's retaliation claim fails because his first protected activity (the submission of the notice of claim) didn't occur until August 2017, which is after the alleged retaliatory acts had occurred, and (4) Amy's "associational discrimination" claim fails because that doctrine only applies in cases involving discrimination on the basis of race or national origin (and doesn't apply in cases, such as this case, involving allegations of gender discrimination). (Doc. 98 at 13-16.)

Defendants' first argument—which is legal, rather than factual, in nature—is unavailing. Defendants have not identified any case holding that a police department's decision to initiate a criminal investigation of one of its employees (or to refer that employee to a prosecutor's office for potential prosecution) cannot, as a matter of law, constitute an adverse employment action under Title VII,[18] and Ninth Circuit authority suggests that such conduct can so qualify. *Coszalter,* 320 F.3d at 976 (suggesting that "an unwarranted disciplinary investigation" and "a criminal investigation" could "perhaps" be considered "adverse employment actions for purposes of plaintiffs' First Amendment retaliation suit"); *Gomez v. Cty. of Los Angeles,* 314 Fed. App'x 928, 930 (9th Cir. 2009)

---

[18]     In their reply, Defendants belatedly cite *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005 (9th Cir. 2018), as a case establishing that a criminal investigation and/or referral cannot constitute an adverse employment action.  (Doc. 109 at 7.)  This argument is unavailing.  *Campbell* involved a non-criminal investigation, the employee "was allowed to continue to work as normal throughout this investigation," and the employer "took no action against" the plaintiff even though the investigation revealed misconduct.  892 F.3d at 1013.  The facts of this case are far different.  Also, *Campbell* didn't cite, much less purport to overrule, *Coszalter*.

("[Undersheriff] Waldie contends that the failed initiation of a criminal investigation [of a fellow law enforcement officer] cannot qualify as an adverse employment action. We disagree.").[19]

Given this conclusion, there is no need to reach Defendants' second argument, which concerns whether Plaintiffs have proffered sufficient evidence of disparate gender-based treatment during PSB investigations. Darren's Title VII claim isn't based solely on the PSB investigation and Defendants didn't challenge, at least in their motion, the sufficiency of the evidence showing that Darren was treated differently than female employees when it came to criminal investigations and referrals.[20]

Defendants' third argument concerns Darren's retaliation claim. To assert a prima facie Title VII retaliation claim against an employer, a plaintiff must show that "(1) she had engaged in protected activity; (2) she was thereafter subjected by her employer to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action." *Porter v. California Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005). The causal link is governed by a "but for" test. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). If a prima facie case is established, "the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show that the stated reasons were a

---

[19] Other Circuits appear to take a different position. *See, e,g., Lincoln v. Maketa*, 880 F.3d 533, 540-41 (10th Cir. 2018) (granting qualified immunity to sheriff, where subordinate law enforcement officer alleged he was subjected to a "pretextual criminal investigation[]," because there was no clearly established Supreme Court or Tenth Circuit law recognizing that such investigations qualify as adverse employment actions, but noting that "[o]ther circuits disagree with one another on the issue" and identifying the Ninth Circuit as a court recognizing that criminal investigations can qualify).

[20] Although the first sentence of the Title VII section of Defendants' motion happens to mention that one element of a Title VII claim is "that similarly-situated females were treated more favorably" (Doc. 98 at 13), the motion does not go on to challenge the sufficiency of Plaintiffs' evidence as to that element, at least as it relates to SID investigations. It was only in Defendants' reply that they sought to develop the no-disparity-in-SID-investigations argument. (Doc. 109 at 7-8.) *Zamani* precludes this approach.

pretext for retaliation." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008).

Here, the parties agreed in their briefs that the sole "protected activity" occurred on August 14, 2017, when Darren submitted his notice of claim. (*Compare* Doc. 98 at 14 *with* Doc. 105 at 14 ["Darren Udd engaged in protected activity . . . on August 14, 2017."].)[21] Thus, the universe of adverse employment actions that could be considered retaliatory must have occurred on or after this date. The parties appear to dispute the relevant timeline of acts that followed, so, in the interest of clarity, the relevant actions identified in Plaintiffs' brief (Doc. 105 at 14) are: the misdemeanor parking pass referral on September 5, 2017; the commencement of the PSB investigation on October 4, 2017; the change in schedule and placement on callback duty that was roughly contemporaneous with the commencement of the PSB investigation on October 4, 2017; Darren's alleged constructive discharge on December 15, 2017; and "attempts to include Darren on the *Brady* list", which occurred in September 2018.

Plaintiffs argue these adverse employment actions are properly considered retaliatory, and satisfy the causal link requirement, because (1) they were in close temporal proximity to Darren's protected activity and (2) they constitute a pattern of antagonism. (Doc. 105 at 14.) Defendants respond that these actions "flowed from investigations that were initiated long before the trigger date." (Doc. 109 at 9.)

Drawing all reasonable inferences in Plaintiffs' favor, they have established a prima facie case of temporal proximity with respect to all but one of the challenged actions.

---

[21]     During oral argument, Plaintiffs sought to change their position, arguing that "in hindsight" they should have argued that the Title VII retaliation claim is also based on other "protected activity," including Plaintiffs' filing of EEOC complaints in late 2017 and 2018. The Court will decline to consider this argument because it wasn't properly raised in Plaintiffs' response brief. *Cf. Quarles v. Helmerich & Payne Int'l Drilling Co.*, 2017 WL 2955346, *2 (E.D. La. 2017) ("[I]t is patently unfair to consider arguments at oral argument that were not fully briefed. Oral argument is provided to give the parties a chance to flesh out their existing theories of the case, but it does not properly serve as an opportunity for either party to present an entirely new theory of the case.") (citations and internal quotation marks omitted).

*Villiarimo*, 281 F.3d at 1065 ("in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity"). The Ninth Circuit has explained that the adverse employment action must come "fairly soon" after the protected activity to support this inference. *Id*. With one exception, the lapse of time between Darren's protected activity and the allegedly adverse actions—from three weeks to four months—falls within the range that courts consider "fairly soon." *See, e.g., Whitmire v. Wal-Mart Stores Inc.*, 359 F. Supp. 3d 761, 799 (D. Ariz. 2019) (collecting cases that support an inference of retaliation within a similar time frame).

The exception is the *Brady* list referral. This referral occurred on September 13, 2018. (Doc. 105-1 at 193.) This was 13 months after Darren filed his notice of claim. It is difficult to infer causation under these circumstances. To be sure, the Ninth Circuit has "caution[ed] that a specified period of time cannot be a mechanically applied criterion," because "[a] rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." *Coszalter*, 320 F.3d at 977-78. Nevertheless, here the referral occurred long after Darren stopped working for the PPD, and efforts were made less than a month later to claw back the referral. (Doc. 105-1 at 197 [letter dated October 12, 2018: "The [MCAO] . . . has determined that your name shall be *removed* from the Law Enforcement Rule 15 Disclosure Database."].)

Finally, Defendants have identified legitimate and nonretaliatory reasons for taking the remaining adverse actions: specifically, the pre-existing investigation into Darren's time theft and misuse of the parking pass. (Doc. 109 at 9.) Thus, the burden shifts to Plaintiffs to show this reason was pretextual.

A showing of pretext "requires more than simply denying the credibility of the defendant's proffered reason for the challenged employment action or relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted." *Coleman v. Home Health Resources Inc.*, 269 F. Supp. 3d 935, 947 (D. Ariz. 2017) (internal quotation and alteration omitted). Here, Plaintiffs have not made the required showing. They don't appear to dispute that all of the actions Defendants took

against Darren after August 14, 2017 "flowed from investigations that were initiated long before the trigger date" (Doc. 109 at 9) and don't identify any evidence suggesting this reason is unworthy of credence. Indeed, as discussed in other sections of this order, Defendants have produced undisputed evidence that Roberts was required to refer, for potential criminal prosecution, any investigation she believed was supported by probable cause and was also required, by PPD policy, to reassign homicide detectives who were the subject of pending investigations. Thus, Defendants are entitled to summary judgment on Darren's Title VII claim to the extent it is premised on a retaliation theory.

Finally, as for Amy's "associational discrimination" claim, the only argument raised in Defendants' motion is a purely legal argument—they contend that Amy cannot assert an associational discrimination claim because Darren isn't alleging he was subjected to race- or national origin-based discrimination.[22]

This argument lacks merit. Although the cases cited by Defendants (Doc. 98 at 15) happened to involve claims of race- and national origin-based discrimination, they don't hold that associational discrimination is limited to those contexts. Moreover, although "the standard for proving an associational discrimination claim is an open question in [the [Ninth] [C]ircuit," *Burkiri v. Lynch*, 648 Fed. App'x 729, 731 n.1 (9th Cir. 2016), other courts have suggested that associational discrimination claims should be cognizable in cases (like this case) involving allegations of sex-based discrimination. *See, e.g., Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 128 (2d Cir. 2018) ("[W]e see no principled basis for recognizing a violation of Title VII for associational discrimination based on race but not on sex."); *Baer v. Montachusett Reg'l Tech. Sch. Dist.*, 380 F. Supp. 3d 143, 154 (D. Mass.

---

[22] In their reply, Defendants identify several additional reasons why Amy cannot prevail on this claim, including (1) she "was not terminated; she was merely investigated for her role in the admitted use of her husband's parking pass"; (2) because this investigation "occurred only after Darren admitted his wife was using the pass," it could not have been pursued "in retaliation for Darren's protected activities"; and (3) the investigation obviously didn't dissuade Amy from engaging in future protected conduct because she subsequently filed her own notice of claim. (Doc. 109 at 9.) Although these arguments very well may prove meritorious at trial, they are not properly before the Court because they weren't raised in Defendants' motion. *Zamani*, 491 F.3d at 997.

2019) (assuming "that Title VII prohibits gender-based associational discrimination").

Thus, Defendants' motion for summary judgment as to Count Five of the SAC (the Title VII claim) is granted as to Darren's retaliation claim but otherwise denied.

### 3. ADEA

The SAC alleges that Darren was one of "several other employees over the age of 40 . . . [who] were subjected to a series of internal investigations and other unwarranted adverse employment actions based on their age" and that "[o]ther similarly situated younger employees of the Phoenix Police Department were treated differently . . . ." (Doc. 35 ¶¶ 90, 93.) Thus, in Count Six of the SAC, Plaintiffs contend that Defendants violated the ADEA by (1) discriminating against Darren due to his age, (2) retaliating against Darren after he "engaged in protected activity through reporting acts of discrimination," and (3) subjecting Amy to "illegal association discrimination and retaliation" due to "the protected activity of her spouse." (*Id.* ¶¶ 228-238.)

Defendants argue they are entitled to summary judgment on Darren's ADEA discrimination claim because (1) being subjected to a criminal investigation isn't an adverse employment action, (2) Plaintiffs failed to explain the basis for their ADEA claim in their mandatory disclosures, (3) "Plaintiff has identified no evidence to support a claim for age discrimination," and (4) Darren admitted during his deposition that he could "identif[y] no one under 40 who was treated differently." (Doc. 98 at 16.) Additionally, Defendants argue that Darren's ADEA retaliation claim fails for the same reasons as his Title VII retaliation claim and that Amy's ADEA associational discrimination claim fails (1) for the same reasons as her Title VII associational discrimination claim and (2) for the additional reason that she falls in the same protected class as Darren (*id.* at 15-16).

Defendants are entitled to summary judgment on Darren's ADEA discrimination claim. Although, as discussed above, Defendants' contention that a criminal investigation can never serve as an adverse employment action is unavailing, Darren's claim fails because he has not proffered evidence that creates a triable issue of fact as to whether younger, similarly situated employees were treated differently. A prima facie case of age discrimination requires proof that the plaintiff was "(1) at least forty years old, (2)

performing his job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). This standard has been applied in cases beyond those involving discharge. *France v. Johnson*, 795 F.3d 1170, 1174 (9th Cir. 2015) (promotion). Under Ninth Circuit law, "an age difference of less than ten years will be presumptively insubstantial." *Id.* However, "[a] plaintiff who is not ten years or more older than his or her replacements can rebut the presumption by producing additional evidence to show that the employer considered his or her age to be significant." *Id.*

Here, Darren points to two other investigations as proof of age discrimination. However, the officer that was the subject of one of those investigations (Detective Cooper) was only four years and nine months younger than Darren, and the officer that was the subject of the other investigation (Lieutenant Rivera) was older than Darren. (Doc. 105 at 15.) The less-than-five-year age gap between Darren and Detective Cooper is "presumptively insubstantial" under Ninth Circuit law and Darren has not identified any evidence to overcome this presumption and show that Defendants actually considered his age to be significant.

Defendants are also entitled to summary judgment on Darren's ADEA retaliation claim. Neither party briefed this issue in any detail, instead choosing to incorporate their briefing concerning the Title VII retaliation claim. (Doc. 98 at 16; Doc. 105 at 15.) Because the Court has concluded that Defendants are entitled to summary judgment on Darren's Title VII retaliation claim, this means his ADEA retaliation claim fails, too.

Finally, Defendants are entitled to summary judgment on Amy's ADEA associational discrimination claim. Because Plaintiffs haven't shown that Darren was subjected to impermissible discrimination under the ADEA, it follows that Amy cannot assert a derivative associational discrimination claim.

C. **State-Law Claims**

Defendants move for summary judgment on Plaintiffs' state-law claims for defamation, negligence, and loss of consortium. (Doc. 98.) Plaintiffs move for summary

judgment on a subset of their defamation claim, the issues of duty and breach within their negligence claim, and the applicability of the collateral source rule. (Doc. 100.)

It should be noted that a previous order of this Court limited the parties against whom Plaintiffs may bring their state-law claims. (Doc. 32.) Pursuant that that order, Amy has no state-law claims against Roberts and Darren has no negligence claim against Roberts (because that theory of liability wasn't included in his August 14, 2017 notice of claim). Thus, Amy's state-law claims and Darren's negligence claim only lie against the City.

### 1. Defamation

Under Arizona law, a plaintiff asserting a claim for defamation must show: "(1) that the defendant made a false statement; (2) that the statement was published or communicated to someone other than plaintiff; and (3) that the statement tends to harm plaintiff's reputation." *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1061 (D. Ariz. 2012) (*citing Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989)).

Here, it is necessary to begin by identifying which statements form the basis for Plaintiffs' defamation claim. This has been something of a moving target. During discovery, Defendants propounded an interrogatory requiring Plaintiffs to "[i]dentify every statement you claim to be defamatory." (Doc. 98-11 at 3.) In their initial response, Plaintiffs identified, with precision, only one statement: "Assistant Chief Roberts made public defamatory statements at the fallen officer's memorial event held on or about February 16, 2017." (*Id.*) However, Plaintiffs later supplemented this response by appearing to identify, in bullet points, 10 additional defamatory statements. (Doc. 98-12 at 4-5.) Nevertheless, Plaintiffs' response to Defendants' summary judgment motion seems to identify only five defamatory statements: (1) a statement by Roberts that Darren's "indictment and termination [are] inevitable," which Roberts allegedly made to Detective Miner during a fallen officers' service in February 2017 (Doc. 105 at 11);[23] (2) a statement

---

[23] Plaintiffs' summary judgment response also alludes to a different conversation between Roberts and Detective Miner, which occurred on an elevator, but the response doesn't contend that Roberts made any defamatory statements during that conversation. (Doc. 105 at 11.)

by Heather Grosskopf (who was Amy's supervisor) to Amy that "Darren Udd was under investigation for theft and it did not look good" (*id.* at 12); (3) the submission of "incident reports" to AZPOST, the MCAO, and the Glendale City Prosecutor that "contained knowingly false records of arrest" (*id.* at 12); (4) a "report forwarded to AZPOST" that included both a statement that Darren had been "terminated for cause" and "yellow highlight[ing] falsely indicating misconduct" (*id.*); and (5) the initial inclusion of Darren on the *Brady* list (*id.* at 12-13).[24] Finally, and complicating matters even further, in their reply in support of their cross-motion for summary judgment, Plaintiffs state that their "claim for defamation involves two components. The first involves disputed statements by . . . Roberts . . . . The second component involves publishing knowingly false [incident reports] and other information to third parties." (Doc. 110 at 2-3.)

All of these statements are difficult to reconcile. In an abundance of caution, the Court will construe Plaintiffs' defamation claim as being premised on the five categories of statements identified in their summary judgment response.

### a. Roberts's alleged statement to Detective Miner

Plaintiffs contend that on February 16, 2017, while at a fallen officers' memorial service, Roberts told Detective Miner that Darren's "indictment and termination [are] inevitable" and that she was "waiting to hear back from fiscal to get the precise dollar amount in order to determine what class of felony to charge him with." (Doc. 105 at 11.) As proof of this statement, Plaintiffs have proffered the deposition testimony of Darren— he contends that Detective Miner called him "minutes" after the memorial service, set up a meeting with him, and then proceeded to recount the conversation she'd had with Roberts. (Doc. 105-1 at 27-34.) This meeting took place "less than 15 minutes" after

---

[24] Plaintiffs' summary judgment response also notes that, even though investigations are supposed to be confidential, there were "rumors" about the investigation concerning Darren. (Doc. 105 at 11.) However, it does not appear that Plaintiffs intended these rumors to function as an independent basis for their defamation claim. Additionally, Defendants correctly state in their reply that any such claim would fail because Darren freely shared details about his investigation. (Doc. 109 at 7.)

Darren received the initial call from Detective Miner.  (*Id.* at 28.)

Defendants contend that Plaintiffs cannot prove, with admissible evidence, that the alleged conversation between Roberts and Detective Miner actually happened.  Roberts, during her deposition in this case, flatly denied ever making the challenged statements to Detective Miner.  (Doc. 98-14 at 11-13 ["Never happened."].)  And Detective Miner, during her deposition in this case, could only recall "the comment about receiving information from fiscal."  (Doc. 105-1 at 157-62.)  Detective Miner also stated that she had reviewed Darren's deposition testimony and disputed the accuracy of his description of her conversation with Roberts: "I don't remember some of these things that were said."  (*Id.* at 158.)  Thus, Defendants contend that Roberts's allegedly defamatory statement is "based on hearsay and unsupported by the evidence."  (Doc. 98 at 12-13.)  In response, Plaintiffs identify two reasons why Darren's account of his conversation with Detective Miner should be deemed admissible: (1) under Rule 801(d)(2), "[a] statement is not hearsay if it is offered against a party opponent," and (2) "[e]ven if hearsay, the statement Det. Miner made to Darren Udd" is admissible under Rule 803(1)-(3) because it  "occurred minutes after her conversation with Detective Roberts . . . Det. Miner was upset . . . and the statement reflected her state of mind."  (Doc. 105 at 12.)

Plaintiffs' arguments lack merit.  Darren's account of his conversation with Detective Miner isn't admissible against Roberts or the City under Rule 801(d)(2).  Detective Miner isn't a party in this action, so her alleged statement isn't admissible as a party-opponent admission under Rule 801(d)(2)(A).  Moreover, although Detective Miner's alleged statement is potentially admissible under Rule 801(d)(2)(D), because she is an employee of the City (which is one of the parties in this action), Plaintiffs haven't made any attempt to show that Detective Miner's alleged statement concerned "a matter within the scope of that [employment] relationship" as required by Rule 801(d)(2)(D).  *See generally Oki Am., Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 314 (9th Cir. 1989) (the party seeking to admit evidence under Rule 801(d)(2)(D) bears the burden of demonstrating that it fell within the scope of the employment relationship).  Indeed, even if Plaintiffs had

attempted to make such a showing, the Court questions whether it would fall within the scope of a police officer's duty to reveal to a co-worker that he was going to be indicted.

Plaintiffs' reliance on Rule 803 is also misplaced. First, Detective Miner's statement wasn't a present sense impression under Rule 803(1), which requires the statement to have been made "while or immediately after the declarant perceived it." *See generally Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) (to qualify under Rule 803(1), "an out-of-court statement must be nearly contemporaneous with the incident described and made with little chance for reflection"). Here, the sequence is that Detective Miner attended a memorial service, had a conversation with Roberts at some unspecified point during the memorial service, called Darren "minutes" after the memorial service had ended, and then met with Darren "no more than 15 minutes" after the phone call to recount Roberts's earlier statement. Although "there is no talismanic time period for admission of a present-sense impression," *see United States v. Wills*, 2018 WL 6716096, *5 (D.D.C. 2018) (quotation omitted), courts have routinely concluded that the sort of delay present here is too long to qualify. *See, e.g., Hilyer v. Howat Concrete Co., Inc.*, 578 F.2d 422, 426 n.7 (D.C. Cir. 1978) (statement was inadmissible under Rule 803(1) because it "could not have been made until at least fifteen minutes and possibly up to forty-five minutes after the accident"); *Marion v. Maricopa County Adult Probation*, 2011 WL 3267286, *2 (D. Ariz. 2011) (Rule 803(1) inapplicable where "the statements were made 'approximately 30 minutes after' the [incident]").

Second, Detective Miner's statement wasn't an excited utterance under Rule 803(2), which defines an excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Id.* Here, as an initial matter, there is a conflict over whether Detective Miner was excited at the time of her conversation with Darren.[25] Nevertheless, even assuming she was excited,

---

[25] Compare Doc. 105-1 at 161 [Detective Miner answered "no" when asked whether she was upset or shocked] with Doc. 105-1 at 27-28 [Darren testified that Detective Miner "was rather upset and excited" and "physically upset" during their conversation].

Rule 803(2) isn't applicable. "'The lapse of time between the startling event and the out-of-court statement although relevant is not dispositive in the application of rule 803(2)' . . . . [O]ther factors . . . includ[e] the age of the declarant, the characteristics of the event and the subject matter of the statements." *United States v. Rivera*, 43 F.3d 1291, 1296 (9th Cir. 1995) (citation omitted). In *Rivera*, the Ninth Circuit held it was not an abuse of discretion to admit statements made at least a half hour after the startling event where the event was the sexual assault of a 15-year-old girl, the victim was in a semi-hysterical state when she recounted the ordeal to her mother, and the conversation constituted the victim's first real opportunity to report the crime. *Id.* Here, in contrast, Detective Miner was an experienced, adult police officer of sound physical and mental condition, she had ample opportunity to reflect upon and deliberate about her conversation with Roberts before meeting with Darren, she didn't mention the substance of that conversation during her initial phone call with Darren, and she wasn't describing a violent crime committed against her. Rule 803(2) doesn't apply in this circumstance.

Third, Detective Miner's statement wasn't a statement of then-existing mental, emotional, or physical condition under Rule 803(3). To the contrary, Plaintiffs are seeking to introduce the statement to serve as a summary of a previous conversation between Detective Miner and Roberts. As the First Circuit once observed, it is a "mistake[]" to "equate[] a declarant's recounting of a previous conversation with a declarant's statement of then existing intent. . . . Were Rule 803(3) construed [in this fashion], it would undermine the operation of the hearsay rule in a wide variety of circumstances." *Marshall v. Commonwealth Aquarium*, 611 F.2d 1, 4-5 (1st Cir. 1979).

b. **Grosskopf's alleged statement to Amy**

Shortly after the SID investigation of Darren began, Amy's supervisor, Heather Grosskopf, told Amy that she had heard "Darren Udd was under investigation for theft and it did not look good." (Doc. 105 at 12, citing Doc. 105-1 at 175-77.) Defendants argue this statement cannot be defamatory because it is composed of a factually true statement (Grosskopf had heard Darren was under investigation) and an opinion (it did not look

good). (Doc. 98 at 13-14.) Plaintiffs' brief is not responsive—they simply note that Grosskopf "refused to tell Amy who had provided her with this information" before transitioning to an unrelated discussion of hearsay exceptions. (Doc. 105 at 12.)

The Court agrees with Defendants' uncontested characterization of Grosskopf's comment as a combination of a true statement, which is a complete defense to defamation,[26] and a non-actionable opinion.[27]

### c. Incident reports

Plaintiffs argue that "Defendants knowingly created and published public records that falsely asserted Darren Udd and Amy Udd were arrested for theft." (Doc. 100 at 10. *See also* Doc. 105 at 12 ["The information submitted to AZPOST, MCAO, and the Glendale City Prosecutor contained knowingly false records of arrest."].) The specific documents at issue are "incident reports" generated by the PPD. (Doc. 100-5 at 1-3 [incident report pertaining to the referral of Darren for time theft, which refers to one "arrested suspect," includes a check in the box entitled "arrested," and includes responsive information under the heading "Arrest Date/Time"]; Doc. 100-5 at 21-23 [incident report pertaining to the referral of Darren for the parking pass, containing same notations].). In Defendants' motion for summary judgment, they identify only one reason why the incident reports cannot be considered defamatory: because statements made to a prosecuting attorney concerning violations of criminal law are "absolutely privileged." (Doc. 98 at 14.)

---

[26] *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 941 (Ariz. 1991) ("In a civil action for libel, the truth of the contents of the allegedly libelous statement is a complete defense. Moreover, when proving the statement's truth, the defendant need not prove the literal truth of every detail, but must only prove that the statements are substantially true. Substantial truth is an absolute defense to a defamation action in Arizona.").

[27] *Yetman v. English*, 811 P.2d 323, 332-33 (Ariz. 1991) ("[I]f the comment is not interpreted as asserting or implying actual fact, but only as a 'mere opinion' . . . , then it is absolutely privileged and the[] verdict must be for the defendant."). If should be noted that, under Arizona law, "[i]n most instances . . . it is for the jury to determine whether an ordinary reader or listener would believe the statement to be a factual assertion, mere opinion or hyperbole." *Burns v. Davis*, 993 P.2d 1119, 1129 (Ariz. Ct. App. 1999). Nevertheless, Plaintiffs' brief doesn't dispute Defendants' contention that the "it did not look good" component of Grosskopf's statement was an opinion.

- 42 -

However, in Defendants' response to Plaintiffs' summary judgment motion, Defendants offer two additional defenses: (1) anyone who received the incident reports would be able to tell Plaintiffs were not actually arrested and (2) Plaintiffs have shown no damages. (Doc. 104 at 5.)

Neither side is entitled to summary judgment on Plaintiffs' claim for defamation based on the incident reports. As for Defendants' claim of privilege, it's true that the submission of a criminal referral to a prosecutor's office is conduct that may trigger an absolute privilege against defamation liability under Arizona law. "Arizona views the Restatement as authority for resolving questions concerning rules in defamation cases." *Burns*, 993 P.2d at 1126. Under Section 587 of the Restatement (Second) of Torts, "[a] party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding . . . if the matter has some relation to the proceeding."[28] Additionally, the comments to a different portion of the Restatement clarify that the phrase "communications preliminary to a proposed judicial proceeding" in Section 587 includes the submission of a criminal referral to a prosecutor's office. *See* Restatement (Second) of Torts, § 598, cmt. e ("Formal or informal complaints to a prosecuting attorney or other law enforcement officer concerning violations of the criminal law are absolutely privileged under the rule stated in [section] 587.").

Nevertheless, the submission of a criminal referral doesn't automatically qualify as privileged conduct under Section 587. Comment (e) to Section 587 provides that "the rule stated in this Section applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." Here, there are

---

[28]    The parties have not briefed whether a law enforcement officer (Roberts) or municipality (the City) qualifies as a "party to private litigation or a private prosecutor" for purposes of defamation immunity under Section 587. Thus, the Court assumes, without deciding, that such parties may qualify.

disputed issues of fact as to whether Roberts actually believed the submission of the referrals would result in prosecution (which is different from whether the referrals were supported by probable cause), so Defendants are not entitled to summary judgment based upon a claim of absolute privilege.[29]

Nor are Plaintiffs entitled to summary judgment on their claim for defamation based on the incident reports. As discussed above, a reasonable juror could conclude that Defendants' transmission of at least some of the reports was absolutely privileged conduct.[30] Additionally, Defendants contend that anyone who received the incident reports would be able to tell Plaintiffs were not actually arrested—it is undisputed that the computer system required the author to check the "arrested" box (Doc. 110 at 2) and Defendants state that the prosecutors and other individuals who received the incident reports were aware of this glitch. (Doc. 104 at 5.) This is a textbook example of an issue of fact that cannot be resolved at summary judgment. *Cf. Burns*, 993 P.2d at 1129 ("The trial court first decides whether, under all the circumstances, a statement is even capable of a defamatory meaning. If so found, the jury then determines whether the defamatory

---

[29] Additionally, Plaintiffs challenge not only the submission of the incident reports to two prosecutor's offices (the MCAO and the Glendale City Prosecutor's Office), but also the submission of the incident reports to AZPOST, which is not a prosecutor's office. Defendants' motion does not attempt to explain how or why Section 587 would apply to such a submission. And although Defendants assert for the first time in their reply that the submission of reports to AZPOST was "conditionally privileged" (Doc. 109 at 6), "[t]he district court need not consider arguments raised for the first time in a reply brief." *Zamani*, 491 F.3d at 997.

[30] Plaintiffs argue that the inclusion of false information in a police report can't be considered privileged conduct because "[m]aking a false report to the police is a crime." (Doc. 110 at 3.) But this observation undermines, rather than supports, Plaintiffs' position. In *Ledvina v. Cerasani*, 146 P.3d 70 (Ariz. Ct. App. 2006), the court rejected the argument that an absolute privilege against civil defamation liability would "work to protect those who make intentionally false and malicious defamatory statements to police" because "there are safeguards for the subjects of malicious accusations, and disincentives for making scurrilous allegations to police," which include the potential for criminal prosecution for making a false statement. *Id.* at 75-76. Put another way, civil immunity for making false statements to a prosecutor's office isn't incompatible with potential criminal liability for the same conduct.

- 44 -

meaning was actually conveyed.") (internal citation omitted).

Given this conclusion, there is no need to address the parties' remaining arguments concerning the "terminated for cause" statement to AZPOST and the *Brady* list. Neither side is entitled to summary judgment on the defamation claim.

### 2. Negligence

Both parties move for summary judgment concerning Plaintiffs' negligence claim. (Doc. 98 at 16-17; Doc. 100 at 11-12.)

Once again, the analysis is complicated by the fact that Plaintiffs' theory of liability is difficult to pin down. In their MIDP disclosure statement, Plaintiffs stated that their negligence claim was based on the City's operation of "a flawed record system that creates records of arrest for any misdemeanor or felony referral to a prosecutor's office, even if no arrest actually occurred." (Doc. 98-3 at 10.) Similarly, in their affirmative summary judgment motion, Plaintiffs state that their "negligence claim involves the failure to comply with the proper standard of care that would be expected of a reasonable police officer/police department regarding the public records maintained toward an individual who had not been arrested." (Doc. 100 at 11.) These statements suggest the negligence claim is premised solely on the creation of the incident reports that falsely stated Plaintiffs had been arrested.

Nevertheless, Defendants argued in their summary judgment motion, which was filed on the same day that Plaintiffs' motion was filed, that the "negligence claim appears to be based" on two different theories: (1) negligence in creating false law enforcement records, and (2) negligence in conducting the criminal investigations. (Doc. 98 at 16.) In their response, Plaintiffs didn't dispute this characterization or clarify that they were only pursuing the former theory. To the contrary, they advanced a variety of reasons why Defendants should be held liable for conducting a negligent investigation, including "ignor[ing] compelling exculpatory evidence." (Doc. 105 at 15-16.)

In an abundance of caution, the Court will analyze both theories below, even though it is questionable whether the "negligent investigation" theory is properly part of the case. …

### a. **False arrest records**

"To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). Thus, "negligence that results in no immediate harm or damage delays accrual of the cause of action until such damage is sustained. And, the damage must be actual and appreciable, non-speculative, and more than merely the threat of future harm." *CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A., Inc.*, 7 P.3d 979, 982-83 (Ariz. Ct. App. 2000) (citations and internal quotation marks omitted). *See also Amfac Distribution Corp. v. Miller*, 673 P.2d 792, 793 (Ariz. 1983) ("Negligence alone is not actionable; actual injury or damages must be sustained before a cause of action in negligence is generated."). In discussing "uniform rules of damages for all tort cases," the Arizona Supreme Court has noted that "[o]ne of the basic principles of damage law is the concept that a wrongdoer may be held liable for all damages which he may have caused and all costs which the victim may sustain as a result of the wrong." *Univ. of Arizona Health Scis. Ctr. v. Superior Court of State In & For Maricopa Cty.*, 667 P.2d 1294, 1300 (Ariz. 1983). "[T]he right to damages must be established without speculation, but . . . uncertainty as to the amount of those damages will not preclude recovery and is a question for the jury." *Id.* at 1301. *See also Felder v. Physiotherapy Assocs.*, 158 P.3d 877, 885 (Ariz. Ct. App. 2007) (noting in a negligence suit that although "uncertainty as to the amount of damages does not preclude recovery . . . 'conjecture or speculation' cannot provide the basis for an award of damages").

Defendants argue that any negligence claim premised on the creation of false arrest records must be rejected because (1) Plaintiffs seek to rely on a theory of negligence *per se*, yet that theory was not properly pleaded in their complaint or disclosed during the discovery process, and (2) Plaintiffs cannot show damages because the only people who saw the records were investigators and prosecutors who knew what the checked box meant.

(Doc. 98 at 17; 109 at 10.)  Plaintiffs respond that (1) they are entitled to argue a negligence *per se* theory, and (2) "there is evidence concerning damages . . . [because] the Parties have produced economic damage reports," and "[t]he jury is also free to make an award for pain and suffering."  (Doc. 105 at 16-17.)

Defendants' first argument is without merit.  "Negligence per se is not a cause of action separate from common law negligence.  It is a doctrine under which a plaintiff can establish the duty and breach elements of a negligence claim based on a violation of a statute that supplies the relevant duty of care."  *Craten v. Foster Poultry Farms Inc.*, 305 F. Supp. 3d 1051, 1054 n.2 (D. Ariz. 2018).  Thus, negligence *per se* need not be pleaded separately to be argued at summary judgment.  *Id*.  *See also Hernandez v. Singh*, 2019 WL 367994, *6 n.5 (D. Ariz. 2019).

Defendants' second argument is not so easily dismissed.  As noted, Plaintiffs contend they sustained two different categories of damages as a result of Defendants' negligent creation of false arrest records: economic damages and pain-and-suffering damages.  But the only evidence proffered by Plaintiffs for their economic damage claim is a non-page-specific citation to the experts' damage reports.  (Doc. 105 at 17, citing Doc. 99.)  The cross-referenced materials are 128 pages long and it's unclear where, exactly, Plaintiffs hoped to direct the Court's attention.  This, alone, is a sufficient basis for summary judgment on the negligence claim for economic damages.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."); Gensler, *supra*, at 160 ("The court has no duty to search the record to identify the facts that might . . . defeat summary judgment.").

In any event, it appears that Plaintiffs' expert relied on the checked "arrest" box as one reason why Darren's future ability to obtain employment as a law enforcement officer would be impaired.  (Doc. 99-1 at 12.)  But to survive summary judgment, Plaintiffs needed to show, without conjecture or speculation, that the allegedly tortious conduct relating to the arrest records actually caused them to suffer economic harm.  Plaintiffs have failed to do so.  The only parties that have set eyes on these records are investigators, prosecutors,

and (according to Darren) AZPOST.  (Doc. 100-1 at 5; Doc. 104 at 3.)  The theoretical risk that some unknown party might, in the future, see these records, which in turn might impair Darren's ability to secure a future law enforcement job, is too speculative for this type of economic damage claim to survive summary judgment.

Finally, as for the availability of pain-and-suffering damages, the analysis is complicated by the fact that Plaintiffs' brief doesn't identify any evidence of such damages—it merely asserts that the jury could choose to award them.  This is not the appropriate way to avoid summary judgment.  Nevertheless, during oral argument, Plaintiffs' counsel pointed out that Darren's affidavit, which is part of the summary judgment record, contains an avowal that he has suffered "deteriorating health caused by the stress of these events." (Doc. 105-1 at 8 ¶ 17.)  Counsel thus argued that Darren should be allowed to present a claim for "anxiety" damages to the jury and identified *Felder* as a case supporting this outcome.[31]

This argument is unavailing.  In Arizona, "the rule is that where no malice or intent is shown, no damages may be awarded for mental anguish or distress of mind.  The exception to the rule occurs when it is shown that there is a physical invasion of a person or the person's security."  *Valley Nat'l Bank v. Brown*, 517 P.2d 1256, 1261 (Ariz. 1974).  Thus, Arizona courts have repeatedly rejected claims for anxiety damages in negligence actions where the plaintiff did not suffer any physical invasion.  *See, e.g., DeStories v. City of Phoenix*, 744 P.2d 705 (Ariz. Ct. App. 1987) (plaintiffs could not recover emotional distress damages arising from asbestos exposure); *Deno v. Transamerica Title Ins. Co.*, 617 P.2d 35, 37 (Ariz. Ct. App. 1980) (noting that "[o]ur Supreme Court has placed restrictions upon recovery for emotional distress where the basis for such a recovery is

[31]    During oral argument, Defendants' counsel attempted to respond to Plaintiffs' belated proffer of anxiety-related evidence by stating that Plaintiffs had retained a psychological expert to evaluate Darren, but the expert concluded that Darren did not "have any treatable mental conditions associated with happened here."  Defendants' counsel further noted that she would have attached that evidence to the summary judgment briefing had she known Plaintiffs would be raising an anxiety claim.  This underscores why it was necessary for Plaintiffs to properly raise their claims and arguments in their motion papers.

negligence and emotional distress is unintended" and concluding that plaintiffs could not recover damages for the emotional distress they experienced as a result of a title company's mistake in describing land they purchased). In contrast, the court in *Felder*—which is the case cited by Plaintiffs to support their position—allowed the plaintiff's anxiety claim to proceed because he "suffered physical injuries, including an orbital bone fracture, ruptured retinal tissue, subretinal hemorrhaging, and other injuries to his eye." 158 P.3d at 889. Thus, "[b]ecause Felder suffered serious physical harm, he is able to recover for his anxiety." *Id.*

Here, the Court has already dismissed Plaintiffs' claim for intentional infliction of emotional distress (Doc. 32) and there is no suggestion that Defendants' alleged negligence (*i.e.,* checking the wrong box in an incident report) caused a physical invasion of Darren's body, let alone a physical invasion akin to the invasion in *Felder*. Accordingly, Plaintiffs cannot recover anxiety damages as part of their negligence claim. And because they have not identified any non-speculative evidence of other damages, it follows that Defendants are entitled to summary judgment on this claim.

### b.   **Negligent police investigation**

Under Arizona law, a city cannot be held liable for simple negligence on the part of police officers in the course of investigative police work. *Spooner v. City of Phoenix*, 435 P.3d 462, 467 (Ariz. Ct. App. 2018). However, "[i]t would appear that in Arizona [a] city may be liable if its police officers are *grossly* negligent in their investigation of a crime which results in an arrest." *Landeros v. City of Tucson*, 831 P.2d 850, 851 (Ariz. Ct. App. 1992). "Gross negligence is highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit." *Merritt v. Arizona*, 2019 WL 6050237, *22 (D. Ariz. 2019) (quotation omitted).

Defendants argue that (1) Plaintiffs did not plead gross negligence in the SAC, (2) there was no arrest, (3) Plaintiffs cannot establish the elements of gross negligence[32] on

---

[32]    The case Defendants cite to establish the elements of gross negligence in a police

this factual record, and (4) probable cause is a complete defense to a grossly negligent police investigation.  (Doc. 98 at 17; Doc. 109 at 11-12.)  Plaintiffs respond by attempting to distinguish the "arrest" requirement that seems to appear in *Landeros* and arguing that gross negligence is usually a question for the jury.  (Doc. 105 at 16.)

Plaintiffs have identified no evidence showing that the police investigation was sufficiently flagrant, lawless, and destructive to constitute gross negligence.  Elsewhere in their briefing Plaintiffs question the methodology of the investigation, but a merely unreasonable investigation is insufficient to support a claim of gross negligence.  *Merritt*, 2019 WL 6050237 at *22.  *See also Marlowe v. Pinal County*, 2008 WL 4264724, *12 (D. Ariz. 2008) (finding no gross negligence where officer went to the wrong house and detained the wrong person while ignoring many obvious signs of his errors).  Moreover, other courts in this district have treated the failure to plead gross negligence as a basis for dismissal.  *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1017 (D. Ariz. 2012) ("Plaintiffs have not alleged that the officers engaged in gross negligence, and the time to amend their complaint is long past.").

Accordingly, Defendants' motion for summary judgment on Plaintiffs' negligence claim will be granted, and Plaintiffs' motion for partial summary judgment on duty and breach will be denied.

### 3. Loss of Consortium

Defendants argue that Amy's claim for loss of consortium must be dismissed because (1) if Darren's negligence claim fails, there's no underlying tort from which the loss of consortium can be derived, and (2) loss of consortium was not expressly stated in Amy's notice of claim.  (Doc. 98 at 18.)  In response, Plaintiffs argue that the facts provided in Amy's notice of claim provided the City with sufficient notice to assess liability, as required by A.R.S. § 12-821.01.  (Doc. 105 at 17.)

---

investigation, *Kerns v. United States*, 2007 WL 552227 (D. Ariz. 2007), was reversed by the Ninth Circuit, which held that "the district court erred in permitting Kerns to proceed on his alternative theory based on the Arizona tort of gross negligence by an investigator." *Kerns v. United States*, 2009 WL 226207, *1 (9th Cir. 2009).

"Consortium includes love, affection, protection, support, services, companionship, care, society, and in the marital relationship, sexual relations. . . [and] [t]he purpose of a consortium claim is to compensate for the loss of these elements." *Barnes v. Outlaw*, 964 P.2d 484, 487 (Ariz. 1998) (internal quotation omitted). "Loss of consortium is a derivative claim, which means that the success of a loss-of-consortium claim is dependent on the success of another claim." *Martin v. Staheli*, 2019 WL 6904511, *4 (Ariz. Ct. App. 2019). An underlying cause of action is a threshold requirement for a loss of consortium claim, but the plaintiff must also show a loss of affection or companionship. *Barnes*, 964 P.2d at 487. ("We do not mean to suggest that in every tort action there exists a corresponding loss of consortium claim. There must first be some basis to infer that affection or companionship was actually lost.").

Although the Court has dismissed Plaintiffs' negligence claim, other claims remain. Defendants fail to explain why Amy could have only experienced a loss of consortium as a result of negligence. Her consortium claim derives from an alleged loss of companionship and affection, and it's at least conceivable that torts other than negligence could cause such losses. Indeed, other courts have recognized that loss of consortium claims may be derivative of torts other than negligence. *See*, *e.g.*, *Linn v. Montgomery*, 903 N.W.2d 337, 343 (Iowa 2017) (defamation); *Tavilla v. City of Phoenix*, 2011 WL 4794940, *9 (Ariz. Ct. App. 2011) (intentional infliction of emotional distress). Thus, to the extent Amy's loss of consortium results from Darren's remaining claims, Defendants' first argument for summary judgment is unavailing.

Arizona's notice of claim statute provides that parties with claims against a public entity or employee "shall file claims with the person or persons authorized to accept service . . . as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues." A.R.S. § 12-821.01(A). The notice of claim "shall contain facts sufficient . . . to understand the basis on which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount." *Id.* "If a notice of claim is not properly filed within the statutory time limit,

a plaintiff's claim is barred by statute." *Falcon ex rel. Sandoval v. Maricopa Cty.*, 144 P.3d 1254, 1256 (Ariz. 2006). "Actual notice and substantial compliance do not excuse failure to comply with the statutory requirements of A.R.S. § 12-821.01(A)." *Id.* However, "as long as a claimant provides facts to support the amount claimed, he has complied with the supporting-facts requirement of the statute, and courts should not scrutinize the claimant's description of facts to determine the 'sufficiency' of the factual disclosure." *Backus v. State*, 203 P.3d 499, 505 (Ariz. 2009).

Amy's notice of claim provides, in relevant part, that her "marital community [has] suffered due to the improper and illegal acts of others." (Doc. 98-13 at 6.) Although this statement is vague and conclusory, it adequately put the City on notice of Amy's theory of liability and the basis for the amount claimed. *Andrich v. Kostas*, 2020 WL 377093, *7 (D. Ariz. 2020) (noting that the level of scrutiny required for a notice of claim is different from Rule 12(b)(6) and *Iqbal*). The notice of claim doesn't use the term "loss of consortium," but Defendants have not identified a case holding that the failure to use such magic words is fatal. Summary judgment on this claim is accordingly denied.

D. **Constructive Discharge**

In Count Eight of the SAC, Darren asserts a claim for "wrongful termination/constructive discharge." (Doc. 35 ¶¶ 248-56.) The SAC explains that, although the Court previously dismissed Darren's state-law constructive discharge claim against Roberts, his state-law constructive discharge claim against the City remains intact and he is also asserting a "federal constructive discharge claim" against Roberts and the City. (*Id.* ¶ 250.)

Defendants contend they are entitled to summary judgment on the constructive discharge claim because Darren "was not presented with the choice of retirement or termination" and instead made a voluntary choice to retire, before the PSB investigation concluded, in an effort to avoid discipline arising from that investigation. (Doc. 98 at 4.) Defendants liken this case to *Knappenberger*, in which the Ninth Circuit rejected a constructive-discharge claim brought by a different PPD official who resigned while an

administrative investigation was pending.  Plaintiffs respond that (1) *Knappenberger* is distinguishable because the plaintiff in that case alleged that he was "coerced" into resigning, whereas Darren's theory in this case (as it pertains to his federal constructive discharge claim) is that he was exposed to "intolerable working conditions," and (2) Defendants ignore that Darren is also asserting a state-law constructive discharge claim against the City, which is governed by a different standard than a federal claim ("objectively difficult or unpleasant working conditions").  (Doc. 105 at 2-4.)  In their reply, Defendants argue for the first time that the conditions to which Darren was exposed were insufficiently unpleasant to result in a constructive discharge under state law.  (Doc. 109 at 2.)

It is questionable whether Darren will be able to prevail on a constructive discharge claim at trial.  The SAC suggests his federal constructive discharge claim is derivative of his claim under 42 U.S.C. § 1983 (Doc. 35 ¶ 250), but the Court has now granted summary judgment to Defendants on the § 1983 claim.  Additionally, although Darren asserts in his moving papers that his "state law constructive discharge claim under A.R.S. § 23-1502(A) . . . [is] a standalone claim" (Doc. 105 at 3), Arizona courts have made clear "that although constructive discharge may transform a resignation into a discharge," the discharge, "by itself, . . . does not afford an employee a remedy."  *Peterson v. City of Surprise*, 418 P.3d 1020, 1023 (Ariz. Ct. App. 2018).  Instead, "[t]o prevail on a claim for constructive discharge, an employee also must prove a common-law or statutory claim for wrongful termination."  *Id.*  Finally, Defendants' reply identifies a variety of reasons why the conduct to which Darren was exposed may be insufficient, under state law, to transform his resignation into a discharge.

Nevertheless, Defendants are not entitled to summary judgment because the sole argument they raised in their motion—that Darren's claim fails under *Knappenberger*—misses the mark.  A claim for constructive discharge on the basis of coercion (which was the claim in *Knappenberger*) is distinct from a claim premised on discriminatory or intolerable working conditions (which is Darren's claim here).  *Knappenberger*, 566 F.3d

at 940 ("We deemed Kalvinskas's choice to be involuntary not because of discriminatory or intolerable working conditions, but rather, because of the coercion inherent in the choice between retirement and a complete deprivation of income."). It would be impermissible to grant summary judgment to Defendants on Plaintiffs' state-law constructive discharge claim based on arguments raised for the first time in a reply. *Zamani*, 491 F.3d at 997.

### E. Collateral Source Rule

Darren is currently receiving retirement benefits from the Public Service Personnel Retirement System ("PSPRS"). (Doc. 100 at 15-16; Doc. 110 at 9-11.) Plaintiffs argue that the collateral source rule applies to their claims, and therefore Darren's damages should not be offset by his PSPRS retirement benefits, because (1) the City did not provide all of the funding for his PSPRS benefits (he made mandatory contributions through payroll deductions), (2) PSPRS is a state pension plan, not a pension plan established and administered by the City, and (3) applying an offset would result in a windfall to City. (*Id*.) Defendants argue the collateral source rule is inapplicable because (1) they pay into PSPRS, and will continue to pay into PSPRS, for the benefit of Darren, meaning it is not a "wholly independent" source, and (2) denying an offset would result in a windfall to Darren. (Doc. 104 at 14-17.)

Plaintiffs have the better side of this argument. From the outset, it should be acknowledged that there is an array of conflicting caselaw from other jurisdictions (which both parties have cited in their briefs) concerning whether a law enforcement officer's pension benefits should be deemed a collateral source in a tort action.[33] Nevertheless, the

---

[33] *Compare King v. City of New York*, 2007 WL 1711769, *2 (S.D.N.Y. 2007) ("The City Legislature enacted the Pension out of a moral obligation, and its benefits are available regardless of whether the City is the tortfeasor. Many courts in similar circumstances have concluded that social security benefits, insurance benefits, and other special funds do not serve as offsets. As this Pension is intended for the general welfare of New York City firefighters and police officers, the Pension can aptly be characterized as a fringe benefit. It is therefore a collateral source covered by the rule.") *with Russo v. Lorenzo*, 67 So.3d 1165 (Fla. Ct. App. 2011) (deceased police officer's pension was not collateral source, so officer's wife's damages in wrongful death action had to be reduced by pension benefits).

Court must follow Ninth Circuit and Arizona law when determining the applicability of the collateral source rule in this case. *In re Air Crash Disaster Near Cerritos, Cal. on Aug. 31, 1986*, 982 F.2d 1271, 1277 (9th Cir. 1992) ("A federal court applies state law in matters involving the collateral source rule.").

"The collateral source rule is well established in Arizona tort law." *Lopez v. Safeway Stores, Inc.,* 129 P.3d 487, 491 (Ariz. Ct. App. 2006). It "requires that payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." *Id.* (citation, brackets, and internal quotation marks omitted). "In many respects, the rule is punitive because it allows a plaintiff to fully recover from a defendant for an injury even when the plaintiff has recovered from a source other than the defendant for the same injury." *Id.* at 491-92 (citations and internal quotation marks omitted). At bottom, the collateral source rule represents "an attempt to resolve a basic conflict between two guiding principles of tort law, namely, (1) the limitation of compensation to the injured party to the amount necessary to make him whole and (2) the avoidance of a windfall to the tortfeasor if a choice must be made between him and the injured party. Because the law must sanction one windfall and deny the other, it favors the victim of the wrong rather than the wrongdoer." *Id.* at 496 (citation omitted).

Defendants rely heavily on *Hall v. Olague*, 579 P.2d 577 (Ariz. Ct. App. 1978), in support of their claim that Darren's PSPRS benefits should not be deemed a collateral source under Arizona law. Specifically, Defendants seize on the following sentence within *Hall*: "The so-called 'collateral source rule' states that total or partial compensation for an injury which the injured party receives from a collateral source *wholly independent* of the wrongdoer does not operate to reduce the damages recoverable from the wrongdoer." *Id.* at 577 (emphasis added). Defendants reason that, because "the City paid into PSPRS while [Darren] was employed, and will continue to pay into PSPRS for the benefit of [Darren]," it follows that his PSPRS benefits cannot be considered a "wholly independent" source of benefits. (Doc. 104 at 15-16.)

This argument is unavailing. *Hall* involved a tort action by an Air Force sergeant who sustained injuries in an automobile accident that prevented him from working for a year. 579 P.2d at 577. The trial court precluded the sergeant from seeking damages for his year of lost wages, under the theory that he'd already received full compensation for those wages under a federal statute that entitles members of the armed services to "pay no matter how disabled," but the Arizona Court of Appeals reversed, holding that the trial court erred in failing to apply the collateral source rule. *Id.* In reaching this conclusion, the court looked to the Restatement of Torts. *Id.* The court also stated that "the serviceman had constructively paid for the benefits" because service members "receive[] and accept[] a lower salary than may be expected from the equivalent civilian occupation in exchange for security and benefits not available to most employees in civilian life." *Id.* at 579.

*Hall* does not support Defendants' position. First, the "wholly independent" language in *Hall* was arguably dicta. The outcome in *Hall* did not turn on whether the defendant had paid for any portion of the plaintiff's wage-replacement benefit. Second, the sentence containing the "wholly independent" language was immediately followed by an approving citation to the Restatement of Torts—and as discussed below, the Restatement undermines, rather than supports, Defendants' position. Third, the logic of *Hall* suggests that Darren's PSPRS benefits also should be considered a collateral source— there is a strong argument that he, like the Air Force sergeant in *Hall*, "constructively" paid for his PSPRS benefits by agreeing to perform a job that involves dangers and risks to which civilians are not exposed. The PRPRS was established was "to provide a uniform, consistent and equitable statewide program for public safety personnel who are regularly assigned hazardous duty in the employ of the state of Arizona or a political subdivision thereof." A.R.S. § 38-841(B).

Turning back to the Restatement, Arizona courts have repeatedly looked to it when determining the scope of the collateral source rule. *See, e.g., Lopez*, 129 P.3d at 491-94; *Hall*, 579 P.2d at 577. The relevant provision of Restatement (Second) of Torts addressing the collateral source rule is Section 920A. Comment (c) to Section 920A specifically

identifies "pensions under special retirement acts" as "collateral benefits [that should] not be subtracted from the plaintiff's recovery." This suggests PSPRS benefits also should be deemed a collateral source.

Additionally, the Reporter's Note to Section 920A cites *Sinovich v. Erie R. Co.*, 230 F.2d 658 (3d Cir. 1956), as a decision properly applying the collateral source rule to pension benefits. In *Sinovich*, a railroad employee sued his employer after sustaining injuries during an on-the-job accident. *Id.* at 659. During trial, the defendant was allowed to introduce evidence that it was paying pension benefits to the plaintiff. *Id.* at 660. Notably, the pension plan was "jointly contributed to by the employer and the employee during the years of service." *Id.* The Third Circuit reversed, holding that the pension payments "were not to be considered in computing plaintiff's losses." *Id.* at 662. This outcome further undermines Defendants' argument that, whenever an employer pays a portion of the employee's pension or retirement fund premiums, payments from the fund cannot be considered a collateral source. If that were the rule, *Sinovich* would have come out differently.

Defendants also cite *McLean v. Runyon*, 222 F.3d 1150 (9th Cir. 2000), as a case supporting their position, but *McLean* actually cuts against them. Although *McLean* affirmed the district court's determination that an employee's front and back pay award should be offset by his federal workers' compensation ("FECA") benefits, it did so only because "[w]orkers' compensation benefits under FECA *are ultimately paid entirely by [the employer]* and thus are not derived from a collateral source." *Id.* at 1156 (emphasis added). In a footnote, the court clarified that "benefits received from a special government fund *supplied in part by contributions from the beneficiary . . . do not offset damages paid from a government agency*" and that an offset is required "only when it is clear that the government paid for the entire benefit." *Id.* at 1156 n.8 (citation omitted and emphasis added). Here, Defendants acknowledge they did not pay "the entirety" of Darren's PSPRS premiums—instead, the PSPRS benefits were derived "in part [from] contributions by the beneficiary," Darren. Thus, an offset is not required. *See also EEOC v. Grady*, 857 F.2d

383, 390 (7th Cir. 1988) ("Funds supported in part—but not entirely—by contributions from the defendant are generally considered collateral.").

Finally, Defendants argue that *Corzo v. Maricopa Cty. Cmty. Coll. Dist.*, No. CV-15-02552-PHX-ESW (D. Ariz. Jan. 16, 2019), Dkt. No. 340, supports their position, but the unpublished order in that case suggests that the court declined to apply the collateral source rule to the plaintiff's state retirement benefits because he was asserting a breach-of-contract claim, not a tort claim.   Under Arizona law, "[t]he collateral source rule is a concept of damages in tort cases and does not apply to an ordinary breach of contract case." *Grover v. Ratliff*, 586 P.2d 213, 215 (Ariz. Ct. App. 1978).[34]

Accordingly, Plaintiffs are entitled to summary judgment concerning the application of the collateral source rule.[35]

III.    <u>Motion To Exclude Defendants' Expert</u>

Plaintiffs seek to exclude certain opinions proffered by Defendants' expert witness, Brent Taylor, on the grounds that (1) some of the challenged opinions amount to an impermissible legal opinion concerning the applicability of the collateral source rule, (2) his methodology in reaching a conclusion about Darren's remaining work-life with the PPD is unreliable and relies on faulty reasoning, and (3) his opinion about Darren's mitigation efforts lacks a sufficient factual foundation and is outside the scope of his expertise.  (Doc. 99.)

A.    **Legal Standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  "The

---

[34]    Defendants suggest the plaintiff in *Corzo* was asserting tort claims (Doc. 104 at 16), but this suggestion is difficult to reconcile with the text of the January 16, 2019 unpublished order, which cited *Grover* and focused on the inapplicability of the collateral source rule in breach-of-contract actions.

[35]    During oral argument, Defendants argued that even if Darren's PSPRS benefits should be considered a collateral source for purposes of his tort claims, the Court should retain the ability to consider those benefits (for offset purposes) when calculating any award of front pay under Title VII.  Because Plaintiffs have not yet had a chance to evaluate and respond to this argument, the Court will treat it as an unresolved issue to be addressed before trial.

party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). As a threshold matter, an expert witness must be qualified "by knowledge, skill, experience, training, or education," Fed. R. Evid. 702, but "Rule 702 'contemplates a broad conception of expert qualifications.'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation and emphasis omitted).

Under Rule 702, a qualified expert may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The Federal Rules of Evidence obligate trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

### B. **Legal Opinion**

As a general rule, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Hangarter*, 373 F.3d at 1017 (citation omitted). However, "instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Id*. (internal quotation omitted). "[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

Plaintiffs object to paragraphs 9 and 13-18 of Taylor's report. (Doc. 99 at 6.) In these portions of his report, Taylor concludes that (1) Darren's PSPRS pension benefits should offset his earnings, and (2) as a result, the lowest of the three damage figures

provided by Plaintiffs' expert (*i.e.,* $181,725) is the correct figure. (Doc. 99-1 at 44-45.) Defendants respond that Taylor's report does not make a legal conclusion but is rather an application of professional literature and experience to the case at hand. (Doc. 103 at 3-5.)

It is unnecessary to resolve whether the challenged portions of Taylor's report constitute impermissible legal conclusions. As discussed in Part II.E above, Darren's PSPRS benefits constitute a collateral source of benefits, so Defendants may not seek to offset his damages in this case by alluding to his PSPRS benefits. Accordingly, Taylor's opinions concerning any PSPRS-related offset calculations would not "help the trier of fact to understand the evidence or to determine a fact in issue" and are inadmissible under Rule 702(a). *Cf. Williams v. Manitowac Cranes, LLC*, 2016 WL 146516 (S.D. Miss. 2016) (excluding expert's opinions under Rule 702(a) because they constituted impermissible attempt to introduce collateral source evidence).[36]

## C.     Darren's Remaining Work-Life With The PPD

One of the key damage-related issues in this case is how long Darren, who began working for the PPD in 1994 at the age of 24, would have continued working for the PPD had he not been (allegedly) constructively discharged in 2017. Plaintiffs' expert, Tim Tribe, assumes that Darren would have continued working until 2026 (*i.e.,* until the age of 56), then opted into the PPD's deferred retirement option plan ("DROP"), and then worked for the PPD for another five years before finally retiring in 2031. (Doc. 99-1 at 8, 11.) Tribe's report identifies a single piece of evidence—a phone call between Tribe and Darren—as the providing the foundation for these assumptions. (*Id.* at 11 n.8.)

Defendants' expert, Taylor, utilizes a different set of assumptions concerning Darren's expected tenure at PPD but-for the alleged constructive discharge. Specifically, Taylor assumes that Darren would have opted into the DROP program after 24.5 years of service (not after 32 years, as Tribe assumed) and would have continued working for PPD for another 3.9 years afterward (not five years, as Tribe assumed). (Doc. 99-1 at 47.) The

---

[36]     This ruling, however, leaves unresolved whether the Court may consider Taylor's offset calculations for purposes of calculating front pay under Title VII.

foundation for these assumptions, according to Taylor's report, is "retirement information from the City of Phoenix for police officers who entered DROP and then retired from the PPD . . . . [This] data includes 707 police officers who entered DROP after June 25, 2001." (*Id.* at 46.)

Plaintiffs seek to preclude Taylor's opinions concerning Darren's future PPD earnings for three reasons: (1) Taylor's data is based on the conduct of only 707 PPD officers, when data from 721 officers was available, (2) Taylor's data omits officers who had not yet retired at the time the data was gathered, and thus improperly skews the average retirement age downward, and (3) Taylor should have compared Darren to "more appropriate comparators" within the data set. (Doc. 99 at 7-8.)

These arguments lack merit. To be clear, Taylor is not offering the *opinion* that Darren would have worked for 24.5 years, opted into the DROP program, and then worked for another 3.9 years before retiring. Instead, Taylor is merely *assuming* those retirement dates and milestones for purposes of formulating his damages-related opinions. (Doc. 99-1 at 47 ¶ 24-25 [questioning the "assumptions" used by Plaintiffs' expert, which "result in higher but-for earnings and alleged damages," and clarifying that "[I] use average PPD officer assumptions regarding years of service time and time spent in DROP (based on the 18-year data)"]; *id.* at 49 ¶ 33 ["[Tribe's] assumptions are aggressive and inconsistent. . . . [U]sing reasonable assumptions based on actual PPD data, results in no alleged damages . . . ."].) It is perfectly permissible for an expert to rely on assumptions when formulating opinions. *See* Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."). Disagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony. *See, e.g., Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals' opinions and the weaknesses in his assumptions are issues to be explored on cross-examination."); *Biltmore Assocs., L.L.C. v. Thimmesch*, 2007 WL 5662124, *6 (D. Ariz. 2007) ("Although Jenkins is not qualified to offer an opinion as to whether the shareholder

claims ever existed, she is permitted to assume that they existed and base her damages calculation on that assumption."); *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2014 WL 12621218, *1 (M.D. Fla. 2014) (drawing a distinction between "an expert's unquestioned ability to render an opinion based on assumed facts and an opposing party's ability to factually disprove the expert's factual assumptions" and emphasizing that "[t]he prospect that the opposition might disprove assumed facts . . . presents no barrier to the admissibility of an expert's opinion").

To be sure, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *See also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("*Joiner* requires an expert to justify a foundational assumption or refute contrary record evidence."). Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

Here, Taylor's assumptions about Darren's remaining work-life with the PPD have a sufficient foundation. Taylor considered the average retirement ages from a large sample of former PPD officers and then assumed that Darren, a former PPD officer, would have taken their average path to retirement. Plaintiffs have not shown that using 721 rather than

707 officers' data would have changed the average retirement age, and the supposed "downward skew" resulting from omitting officers who have not yet retired is speculative. Moreover, even if these criticisms had some merit, the overarching point is that Taylor had some foundation and justification for his assumption concerning when Darren would retire—the statistical study concerning 707 PPD officers. Plaintiffs' disagreement with that assumption is fodder for cross-examination at trial, not exclusion.

### D. **Mitigation Opinion**

Taylor opines that, had Darren taken a job with a private investigation firm rather than starting his own firm, he would have received more income to mitigate his damages. (Doc. 99-1 at 47-48.) Plaintiffs object to this opinion because (1) Taylor "does not base this assessment on any factors or evidence" and (2) this opinion falls outside the scope of Taylor's expertise because he is not a vocational expert. (Doc. 99 at 8-9.) Defendants respond that Taylor's opinion is grounded in fact and falls within his economic expertise. (Doc. 103 at 8-11.)

Plaintiffs' first objection is without merit. When opining about the earnings Darren would have received as an employee of a private investigation firm, Taylor relied on the same evidence that Plaintiffs' expert used. (*Compare* Doc. 99-1 at 13 [Tribe report: "I obtained the current income data for a private investigator in Arizona from the U.S. Bureau of Labor Statistics ( . . . *see* Schedule 13)"] *with* Doc. 99-1 at 51 [Taylor report, relying on Exhibit 13 from Tribe report].) The only difference is that Tribe assumed it would take five years for Darren to start earning the mean salary earned by private investigators in Arizona ($58,530), whereas Taylor assumed that Darren would begin earning the mean salary immediately. (*Id.*) Exclusion is not warranted in this circumstance—Taylor made an assumption, it has some foundational support, and Plaintiffs may attack it on cross-examination.

Plaintiffs also question Taylor's assumption that Darren could have secured a private investigator position after leaving PPD. (Doc. 108 at 6.) They contend this is an improper assumption because Taylor is not a vocational expert, he has not shown there

were such jobs available, and Darren wasn't, in fact, able to immediately replicate the average income of private investigators. (*Id*.) This marks yet another instance where Plaintiffs are confusing opinions with assumptions and does not provide a basis for excluding Taylor's opinion.

***

Accordingly, **IT IS ORDERED** that:

(1)  Defendants' motion for summary judgment on all remaining claims (Doc. 98) is **granted in part and denied in part**.

(2)  Plaintiffs' motion for partial summary judgment (Doc. 100) is **granted in part and denied in part**.

(3)  Plaintiffs' motion to exclude Defendants' expert witness (Doc. 99) is **granted in part and denied in part**.

(4)  Plaintiffs' motion to strike (Doc. 111) is **denied**.

Dated this 30th day of March, 2020.

_____
Dominic W. Lanza
United States District Judge