**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Darren Udd, et al., | No. CV-18-01616-PHX-DWL |
|        Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
|        Defendants. | |

The trial in this matter, which has been delayed due to the COVID-19 pandemic, has now been rescheduled for September 2021.  In advance of trial, the parties filed six motions that are styled as motions *in limine*.  (Docs. 137-142.)  The Court issued a tentative order addressing those motions (Doc. 163), then held oral argument (Doc. 164), and then allowed the parties to supplement the record concerning the first motion (Docs. 165, 166). The Court's final rulings are set forth below.

**RELEVANT BACKGROUND**

The background of this case is set out more fully in the order resolving the parties' cross-motions for summary judgment and Plaintiffs' motion to exclude certain expert testimony.  (Doc. 122.)  The following synopsis is derived from that order, as well as from the Joint Final Pretrial Order (Doc. 159).

I.    <u>Underlying Facts</u>

Plaintiffs in this action are (1) Darren Udd ("Darren"), a retired homicide detective who formerly worked for the Phoenix Police Department ("PPD"), and (2) his wife Amy

Udd ("Amy"), who worked at relevant times as a PPD communications operator.  The only remaining defendant is the City of Phoenix ("the City").[1]

### A.     The SID Time Theft Investigation

In October 2016, the PPD received an email from a concerned citizen alleging that Darren was parking his police cruiser at home and only leaving the house for three to four hours each day, sometimes not at all.  In response, a division of the PPD called the Professional Standards Bureau ("PSB") conducted an initial assessment, which seemed to indicate a large amount of missing time—over 1,050 hours in a twelve-month period.  After the results of the PSB assessment were forwarded to Chief Roberts, a separate division of the PPD called the Special Investigations Division ("SID") opened a criminal investigation into whether Darren had committed time theft.

The SID's criminal investigation of Darren related to time theft was led by Detective Sonya Stanley ("Detective Stanley").  As part of the investigation, Detective Stanley consulted a number of different sources in an attempt to track down Darren's missing hours, including spreadsheets of Darren's shift/work hours, electronic records of Darren's PPD access card activity, user history records for the PPD's records management system, and weekly payroll time forms.  Detective Stanley also spoke with Darren's supervisor, who generally spoke highly of Darren's work ethic but made several statements that suggested there might be a problem with Darren's hours.  Finally, Detective Stanley also obtained Darren's off-site parking permit, which revealed that he was not allowed to park his service vehicle at home.

In April 2017, during the final stages of the investigation, Detective Stanley and a fellow PPD officer, Sergeant Heather Maldonado ("Sergeant Maldonado"), interviewed Darren.  During the interview, Darren denied the allegations of time theft but admitted that he parked his work vehicle at home even though his request for permission to park at home

---

[1]     Plaintiffs initially asserted certain claims against another defendant, Mary Roberts, who worked at relevant times as a PPD Assistant Chief ("Chief Roberts").  Although some of those claims survived summary judgment, the parties clarified during the Final Pretrial Conference "that plaintiffs . . . no longer intend[] to proceed against defendant Mary Roberts with any claims."

had been denied.  At the conclusion of the interview, Detective Stanley told Darren that, based on his representations, she would be able to account for some of the missing time.

About a week later, during a follow-up discussion, Darren revealed that Amy had been the one using his access card to park her personal vehicle at the city garage.  Based on this new information, Detective Stanley informed Darren that she would have to add back the hours she had cleared and that she did not feel comfortable speaking to him without an attorney present.

Detective Stanley was ultimately unable to account for 221 of Darren's hours.  In her final report, Detective Stanley concluded as follows: "[T]he total amount of unaccounted for time over one hour is 221 hours, multiplied by Detective Udd's hourly wage of $34.82/hour, equals the amount of $7,695.22  It is recommended that [Darren] be charged with theft per A.R.S. § 13-1802, a Class 3 felony."  Sergeant Maldonado later wrote a summary of Detective Stanley's report in which she, too, recommended that Darren's case be submitted to the county attorney's office for prosecution.  This summary was forwarded to Chief Roberts, who approved the submittal.

The proposed criminal charges against Darren were declined by the county attorney's office in September 2017, which stated in its "turndown" notice that it was declining the case because there was "no reasonable likelihood of conviction."

B.   **The SID Parking Pass Investigation**

On April 27, 2017, SID began a separate criminal investigation into Plaintiffs' use of the parking pass.  The theory underlying the investigation was that Plaintiffs "committed theft when they utilized a City of Phoenix issued parking pass for the Adams Street garage for personal use.  In doing so, [Plaintiffs] did not pay the required fees for employees parking a personal vehicle at the garage. [Such conduct constitutes] theft for each employee, with the range of $390 - $611, a Class 1 misdemeanor."

The SID's criminal investigation of Plaintiffs related to the parking pass was led by Detective Christa Mose.  A few weeks after the investigation began, Darren sent an email to co-workers (which concerned a fellow detective's retirement party) that included the

following statement: "Be advised that you will most likely be under video surveillance when you are in my cubicle since I am still under investigation and will likely be indicted for my criminal behavior . . . ."

In June 2017, Detective Mose completed her incident report concerning the parking pass issue.  On the final page of the report, she concluded: "Theft, a Class 1 misdemeanor, is requested for [Darren] and [Amy]."  Sergeant Maldonado later wrote a summary of Detective Mose's report in which she, too, recommended that Darren and Amy be referred for prosecution.  This summary was forwarded to Chief Roberts, who approved the submittal.

The proposed criminal charges against Darren and Amy were declined by the city prosecutor's office in December 2017, which explained that it was declining the case because "the filing of charges was not appropriate."

C.     **The PSB Investigation**

In October 2017, the PSB began an administrative investigation into allegations that Darren (1) failed to complete his full duty shifts and (2) parked his city vehicle at his residence.  Around this time, Darren was also assigned to "call-back" duty, which he regarded as menial and punitive and which conflicted with Amy's work schedule.

In December 2017, while the PSB investigation was still pending, Darren took early retirement.

In March 2018, the PSB investigation of Darren concluded.  It sustained the allegations that Darren failed to complete his full duty shifts and improperly parked his city vehicle at his residence.  Nevertheless, because Darren had already retired before the investigation was completed, no disciplinary action was taken.

In October 2018, PSB issued a written reprimand to Amy for her misuse of the parking pass and closed the investigation.

D.     **The Documentation Arising From The Investigations**

Some of the remaining claims in this case are based on documents that were created during or in the aftermath of the SID and PSB investigations.

- 4 -

First, the "incident reports" summarizing the results of the SID investigations contain notations suggesting that Darren and Amy were both "arrested."  This is because the PPD's software required administrators to check the "arrested" box whenever an investigation was submitted to a prosecutor's office for potential prosecution, regardless of whether the subject of the investigation had actually been arrested.  Plaintiffs allege these false arrest records were sent to various third parties.

Second, in 2018, Darren's name was added to the "*Brady* list," a list of police officers accused of professional misconduct that prosecutors must disclose to criminal defendants.

Third, after retiring, Darren requested an "Honorably Retired" identification card.  This request was denied and Darren instead received a "Retired" identification card.

Fourth, upon Darren's retirement, the PPD provided a packet of documents to AZPOST, which is responsible for certifying Arizona's peace officers.  Although the content of those documents is disputed, Plaintiffs allege the documents stated that Darren had been "terminated for cause" and included the statement "Misconduct – YES Criminal Offenses" in yellow highlighting.

II.    The Remaining Claims

Although Plaintiffs initially asserted a wide array of federal and state-law claims, some of those claims were dismissed at the pleading stage (Doc. 32) and others were rejected at summary judgment (Doc. 122).  The four claims now remaining for trial are:

(1)    Darren's Title VII claim, to the extent it is premised on the theory that the City "preferentially refers male officers . . . to various prosecutor's offices for potential prosecution . . . while at the same time not referring similarly situated female officers for the performance of essentially the same or similar acts."  (*Id.* at 29-34 [concluding that Darren may present this theory but not a Title VII retaliation theory].)

(2)    Amy's Title VII claim, which is premised on the theory that she was subjected to "illegal association discrimination and retaliation" due to "the protected activity of her spouse."  (*Id.* at 34-35.)

(3)     Plaintiffs' defamation claim, which is premised on the circulation of the incident reports to prosecution and law enforcement agencies stating that Plaintiffs had been "arrested" and may also be premised on the documents provided to AZPOST and/or the *Brady* list (but may not be premised on Chief Roberts's alleged statement at the fallen officers' memorial or on Heather Grosskopf's statement to Amy).  (*Id.* at 37-45.)

(4)     Darren's claim for constructive discharge (*id.* at 52-54), which is discussed in more detail *infra*.

Finally, as for damages, the summary judgment order clarified that (1) Amy may assert a claim for loss of consortium (*id.* at 50-52); (2) Darren's state-law tort damages need not be offset against the retirement benefits he is receiving through the Public Service Personnel Retirement System ("PSPRS"), because the collateral source rule applies to such damages (*id.* at 54-58); and (3) the City's economic expert may assume, for purposes of his opinions, that Darren would have opted into the PPD's deferred retirement option plan after 24.5 years of service (not after 32 years, as Plaintiffs' expert assumes), would have continued working for PPD for another 3.9 years afterward (not five years, as Plaintiffs' expert assumes) (*id.* at 60-63), and could have mitigated his damages by taking a job with a private investigation firm (rather than starting his own firm) after retiring (*id.* at 60-64).

## DISCUSSION

I.     The City's MIL No. 1: State-Law Constructive Discharge Claim (Doc. 137)

A.     **Background**

In Count Eight of the operative complaint, Darren asserts a claim for "Wrongful Termination/Constructive Discharge."  (Doc. 35 ¶¶ 248-56.)  This claim is alleged to arise "under both federal law, pursuant to 42 U.S.C. § 1983 or other applicable statute, and state law, pursuant to A.R.S. §§ 23-1501 and 23-1502(A)."  (*Id.* ¶ 250.)

In its motion for summary judgment, the City challenged Darren's constructive discharge claim on only one ground—that it was barred by the Ninth Circuit's decision in *Knappenberger v. City of Phoenix*, 566 F.3d 936 (9th Cir. 2009), because Darren "was not presented with the choice of retirement or termination" and instead made a voluntary

choice to retire, before the PSB investigation concluded, in an effort to avoid discipline arising from that investigation. (Doc. 98 at 4.) The Court rejected this argument, and thus denied the City's request for summary judgment on the constructive discharge claim, because "[a] claim for constructive discharge on the basis of coercion (which was the claim in *Knappenberger*) is distinct from a claim premised on discriminatory or intolerable working conditions (which is Darren's claim here)." (Doc. 122 at 53.) Nevertheless, the Court expressed doubt as to whether Darren could ultimately prevail on his constructive discharge claim at trial. (*Id.*) Specifically, the Court noted that Darren's federal theory of liability seemed to be that his constructive discharge claim was derivative of his § 1983 claim, yet the Court had granted summary judgment to Defendants on Plaintiffs' § 1983 claim. (*Id.*) As for Darren's state-law theory of liability, the Court noted that "although Darren asserts in his moving papers that his 'state law constructive discharge claim under A.R.S. § 23-1502(A) . . . [is] a standalone claim,' Arizona courts have made clear 'that although constructive discharge may transform a resignation into a discharge,' the discharge, 'by itself, . . . does not afford an employee a remedy." (*Id.*, alterations in original and citations omitted).

### B.   The Parties' Arguments

The City asks the Court to preclude Darren from presenting evidence of a state-law constructive discharge claim at trial and further argues that, in light of that requested ruling, the Court should dismiss the state-law constructive discharge claim. (Doc. 137.)[2] According to the City, Darren's initial theory of liability in this case was that he was pursuing a standalone state-law claim for constructive discharge under A.R.S. § 23-1502, but after the Court noted in the summary judgment order that Arizona law does not recognize that theory, he "pivoted" and announced an entirely new theory of liability (via

---

[2]    In its motion, the City asserts that Darren's federal claim for constructive discharge is no longer valid in light of the summary judgment ruling. (Doc. 137 at 1 n.2.) Nevertheless, Plaintiffs seem to include a federal constructive discharge claim (which they view as part of Darren's Title VII claim) in their proposed verdict form (Doc. 155 at 4) and in their proposed jury instructions (Doc. 156 at 74). During oral argument, the City clarified that it agrees that Darren may argue, for purposes of his Title VII claim, that one of the adverse employment actions to which he was subjected was a constructive discharge.

a June 2020 letter from his counsel).  (*Id.* at 1.)  This new theory, the City explains, is that Darren was subjected to retaliation based on his reporting of various state-law violations, which constitutes "whistleblower" retaliation under A.R.S. § 23-1501(A)(3)(c)(ii).  (*Id.*) The City argues that Darren should not be allowed to present this theory at trial because it was disclosed in an untimely manner, in violation of Rule 37(c) of the Federal Rules of Civil Procedure and the Mandatory Initial Disclosure Pilot Program ("MIDP").  (*Id.* at 2-3.)  Finally, the City also notes that, although Darren has now identified a list of statutory violations that he allegedly reported, some of the statutes have their own remedies and, thus, cannot form the basis for a claim under § 23-1501.  (*Id.*)

Plaintiffs oppose the City's motion.  (Doc. 144.)  Plaintiffs argue that their intent to rely on § 23-1501 was properly and timely disclosed because the complaint specifically identifies both §§ 23-1501 and 23-1502 as potential bases for liability and identifies Darren's submission of a notice of claim as the "protected activity" that triggered the difficult and unpleasant working conditions that followed.  (*Id.* at 1-2.)  Plaintiffs further contend they weren't required, under Rule 26 or the MIDP, to elaborate on this theory in their pre-trial disclosures because (1) the notice of claim itself, which is a "writing," placed the City on notice of the underlying statutory violations that Darren had reported, and (2) the City was able to (and did) ask further questions about the nature of Darren's state-law constructive discharge claim during his deposition.  (*Id.* at 2-3.)

C.    **Discussion**

As an initial matter, the Court disagrees with Plaintiffs' contention that the City is using its motion as a backdoor attempt to seek reconsideration of the summary judgment ruling.  (*Id.* at 1.)  Rather, the City is seeking to preclude Plaintiffs from presenting a particular theory of liability at trial, which Plaintiffs are alleged to have delayed disclosing until after the summary judgment ruling, as a discovery sanction.

On the merits, it is helpful to begin by summarizing the relevant Arizona statutes. Arizona's Employment Protection Act ("AEPA") is codified at A.R.S. § 23-1501 *et seq*. Section 1501 identifies the circumstances under which an employee may assert a claim for

wrongful termination.  Although subdivision (A)(2) provides that "[t]he public policy of this state is that . . . [t]he employment relationship is severable at the pleasure of either the employee or the employer unless both the employee and the employer have signed a written contract to the contrary," subdivision (A)(3) proceeds to identify various circumstances in which "[a]n employee has a claim against an employer for termination of employment" even in the absence of an employment agreement.  One of those circumstances, specified in subdivision (A)(3)(c)(ii), is when "[t]he employer has terminated the employment relationship of an employee in retaliation for . . . [t]he disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer . . . has violated, is violating or will violate the Constitution of Arizona or the statutes of this state."  The disclosure must be made "to either the employer or a representative . . . [who] has the authority to investigate the information provided by the employee and to take action to prevent further violations."  *Id.*  The upshot of these provisions is that, under § 23-1501(A)(3)(c)(ii), an employee may assert a claim for wrongful termination if he was terminated in retaliation for disclosing state-law violations being committed by his employer—that is, for acting as a whistleblower.  *See, e.g., Walters v. Maricopa County*, 990 P.2d 677, 682 (Ariz. Ct. App. 1999) ("This . . . section allows an employee who is discharged to file a civil action for wrongful discharge if whistle-blowing is alleged.").

AEPA also contains a provision, codified at § 1502, entitled "Constructive discharge."  As relevant here, subdivision (A)(1) provides that "[i]n any action under the statutes of this state or under common law, constructive discharge may only be established by . . . [e]vidence of objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign, if the employer has been given at least fifteen days' notice by the employee that the employee intends to resign because of these conditions and the employer fails to respond to the employee's concerns."  At one time, there was some uncertainty over whether an employee could assert a standalone claim for constructive discharge under § 1502—that is, a claim based solely on the notion that

the employee was forced to resign due to objectively difficult or unpleasant working conditions, irrespective of the cause of those conditions. *See generally Wood v. Univ. Physicians Healthcare*, 2013 WL 6170604 (D. Ariz. 2013) (canvassing cases). But this is no longer an unsettled question. Arizona law is now clear "that although constructive discharge may transform a resignation into a discharge, by itself, it does not afford an employee a remedy. To prevail on a claim for constructive discharge, an employee also must prove a common-law or statutory claim for wrongful termination." *Peterson v. City of Surprise*, 418 P.3d 1020, 1023 (Ariz. Ct. App. 2018) (citation omitted). Put another way, a constructive discharge under § 1502 isn't, standing alone, an actionable tort—instead, a constructive discharge simply "transforms a resignation into a discharge," which in turn "satisfies the termination element of a wrongful termination claim" under § 1501. *McNicol v. DMB Sports Clubs LP*, 2020 WL 1323143, *6 (D. Ariz. 2020).

With this backdrop in mind, the Court agrees with the City that Plaintiffs failed to properly disclose their current theory of liability. That theory, again, is that (1) the City violated § 1501(a)(3)(c)(ii) by terminating Darren in retaliation for his whistleblowing efforts, and (2) Darren can satisfy the "termination" element of his § 1501 claim, even though he was not formally terminated, because he was exposed to objectively difficult or unpleasant working conditions that would have forced any reasonable person to quit, *i.e.,* he was constructively discharged under § 1502. (Doc. 144 at 3 ["[Darren's] wrongful termination claims include retaliation for complaining about violations of state law in violation of A.R.S. § 23-1501."].) In a letter sent to the City's counsel in June 2020, Plaintiffs' counsel identified, for the first time, the exact nature of the underlying state-law violations that Darren allegedly disclosed. (Doc. 137-1 at 3-6 [asserting that Darren reported violations of A.R.S. § 41-1461 *et seq.* (gender discrimination), A.R.S. § 13-3913 (requiring probable cause for warrants), A.R.S. § 23-350 *et seq.* (wage statutes), A.R.S. § 13-3883(A) (arrest by officer without a warrant), A.R.S. § 13-1802 (threshold requirement for probable cause), and Phoenix City Code 2-119(b) (accurate record of all arrests)].)

The starting point for assessing whether this theory was properly disclosed is the

complaint.  The key paragraph is paragraph 252, which sets out Plaintiffs' theory of why the City allegedly chose to retaliate against Darren.  It provides:

> Following [Darren] engaging in protected activity and asserting his legal rights under state law *by serving his original notice of claim and seeking to assert his rights under state statutory and common law*, [Darren] was subjected to objectively difficult and unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign.

(Doc. 35 ¶ 252, emphasis added.)  In the Court's view, this language did not provide fair notice to the City that Darren was proceeding under a whistleblowing theory.  The only "protected activity" mentioned in the complaint is Darren's filing of a notice of claim.  In contrast, Plaintiffs' June 2020 letter states that Darren's protected activity was actually "report[ing] a reasonable belief of multiple violations of state law" and that these reports took an array of different forms, including "verbal and written reports . . . to his immediate supervisor, through his chain of command, to bureau and department management, during separate SID and PSB investigations, during multiple interviews, during unit and bureau meetings, in association with the referrals for prosecution, and through a detailed notice of claim."  (Doc. 137-1 at 3.)  This description is not, as Plaintiffs argue, simply a rephrasing of the theory of liability they announced in the complaint.  It is an entirely different theory.  The only fair reading of the complaint is that Darren believed he was being retaliated against because he had asserted his *own* potential damage claims against the City (*i.e.,* "seeking to assert *his* rights under state statutory and common law"), not because he had acted as a whistleblower with respect to the state-law violations that may have undergirded those damage claims.  Tellingly, the complaint does not purport to identify or describe any of those state-law violations.  Also, although the complaint generally cites both § 1501 and 1502 (Doc. 35 ¶ 250), it provides no insight into whether Plaintiffs were proceeding under subdivision (A)(3)(c)(ii) or one of the other potential theories of liability under § 1501.

Of course, the complaint itself need not spell out a plaintiff's theory of liability in detail.  Rule 8(a)(2) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the preceding analysis is simply to show

that the complaint didn't set out Plaintiffs' current theory in such a crisp, understandable way that a subsequent disclosure error might be deemed harmless.

It was during the MIDP process that Plaintiffs were required to spell out their theories of liability.  Among other things, the MIDP requires the parties to disclose the following: "For each of your claims or defenses, state the facts relevant to it *and the legal theories upon which it is based*."  *See* D. Ariz. G.O. 17-08 ¶ B(4) (emphasis added).

In the tentative ruling, the Court noted that neither party had submitted Plaintiffs' MIDP disclosures as part of the briefing process.  (Doc. 163 at 13.)  During oral argument, Plaintiffs asserted that their MIDP disclosures would reveal they had properly disclosed their whistleblowing theory.  The City disputed this claim and argued that certain other discovery-related material, which also wasn't part of the record, would demonstrate the inadequacy of Plaintiffs' disclosure efforts.   In light of these assertions, the Court authorized both parties to supplement the record with the materials they had referenced during oral argument.  (Doc. 164.)  The parties have now done so.  (Docs. 165, 166.)

These submissions confirm that Plaintiffs didn't properly disclose their current liability theory during the discovery process.  In July 2018, Plaintiffs provided their initial set of MIDP disclosures.  (Doc. 165-1 at 3-23.)  In the portion of this document calling for Plaintiffs to identify all of the facts and legal theories on which Darren's constructive discharge claim was based, Plaintiffs (1) noted that one of the "procedural requirements" for a constructive discharge claim under Arizona law is that the employee provide written notice to the employer before resigning; (2) stated that Darren satisfied this procedural requirement by providing written notice on November 13, 2017, and not resigning until more than 15 days later; (3) provided a description of the "difficult or unpleasant" working conditions that caused Darren to resign, *i.e.,* "not [being] returned to his former position," and instead being "placed on punishment duty and subjected to a hostile work environment," after the prosecutors' offices turned down the criminal charges against him; and (4) argued that Darren would be able to recover attorneys' fees if he prevailed on his constructive discharge claim.  (*Id.* at 16-17.)  Finally, Plaintiffs also stated, without

1   elaboration, that "Mr. Udd engaged in whistleblowing activities and he was dismissed in

2   violation of the law."  (*Id.* at 17.)[3]

3         This description of Plaintiffs' liability theory is not at all similar to the description

4   provided in Plaintiffs' June 2020 letter to the City.  It does not say anything about Darren

5   "report[ing] a reasonable belief of multiple violations of state law," nor does it state that

6   Darren made these alleged reports in both "verbal and written" form to an array of different

7   individuals over a span of months.  (Doc. 137-1 at 3.)  Accordingly, Plaintiffs' MIDP

8   disclosure did not provide proper notice to the City that Plaintiffs intended to advance such

9   a theory at trial.  Although the MIDP disclosure did use the phrase "whistleblowing

10  activities" at one point, that reference was so undeveloped as to be meaningless.

11        This conclusion is further bolstered by the discovery-related materials that the City

12  submitted following oral argument.  Those materials show that, during the discovery

13  process, the City propounded an interrogatory requiring Darren to "[i]dentify all persons

14  with whom you had any communications about the allegations in the present matter" and

15  to "describe in detail the content of the communication(s)."  (Doc. 166-1 at 3.)  Nowhere

16  in his response did Darren specifically say that he engaged in whistleblowing activity by

17  making "verbal and written" reports concerning the "multiple violations of state law" he

18  had observed.

19        Nor was this theory properly disclosed during Darren's deposition.  The Court has

20  carefully reviewed the excerpted pages of deposition testimony (Doc. 144-1) and has not

21  identified any instance where Darren specifically alleged that he had been exposed to

22  retaliation due to his efforts to report his co-workers' violations of state law.  Indeed, when

23  asked to identify the specific conduct that he viewed as retaliatory, Darren stated that he

24  was "retaliated against at every step of the investigation" (*id.* at 5, page 294, lines 15-16),

25  that he was "retaliated against . . . since I was fighting this every step of the way" (*id.* at 5,

26  page 296, lines 19-20), and that he viewed his assignment to call-back duty as retaliatory

27  ───────────
    [3]     Although Plaintiffs supplemented their MIDP disclosures on several occasions, they
28  never changed their description of the facts and theories underlying Darren's constructive
    discharge claim.  (Doc. 165-1 at 44-45 [April 2019 version]; *id.* at 83-84 [June 2019
    version]; *id.* at 126-27 [October 2020 version].)

(*id.* at 6, page 300, lines 4-24).  These statements did not come close to providing fair notice to the City of the theory of liability outlined in Plaintiffs' June 2020 letter.

Finally, Plaintiffs' statements during the summary judgment process confirm that their theory of liability as to the state-law constructive discharge claim was not, at that point, a theory based on whistleblowing activity under § 1501(A)(3)(c)(ii).  In their response to the City's summary judgment motion (which, as noted, argued solely that Count Eight was barred by *Knappenberger*), Plaintiffs wrote: "The MSJ ignores Plaintiff's state law constructive discharge claim under A.R.S. § 23-1502(A)(1), a standalone claim based solely on 'objectively difficult or unpleasant working conditions.'"  (Doc. 105 at 3, citation omitted.)  If, after the close of discovery, Plaintiffs still viewed Darren's state-law constructive discharge claim as a "standalone claim" under § 1502—a species of claim that, as discussed above, is not cognizable under Arizona law—it is difficult to understand how the City should have been on notice that it was actually a whistleblowing claim under § 1501(A)(3)(c)(ii).

For these reasons, the Court concludes that Plaintiffs did not satisfy their disclosure obligations during the discovery process with respect to their intent to proceed under a whistleblower theory on Count Eight.  The next question is what, if anything, to do about that disclosure violation.  This analysis is governed by Rule 37(c)(1) of the Federal Rules of Civil Procedure, which provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless."[4]  This rule has been described "as a self-executing, automatic sanction to provide a strong inducement for disclosure of material."  *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (internal quotation marks omitted).  Its purpose is to "give teeth to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed."  *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir.

---

[4]   "The discovery obligations" created by the MIDP "supersede the disclosures required by Rule 26(a)(1) and are framed as court-ordered mandatory initial discovery pursuant to the Court's inherent authority to manage cases, Rule 16(b)(3)(B)(ii), (iii), and (vi), and Rule 26(b)(2)(C)."  *See* D. Ariz. G.O. 17-08 at 1.

2011), *superseded by rule on other grounds as recognized in Shrader v. Papé Trucks, Inc.*, 2020 WL 5203459, \*2 n.2 (E.D. Cal. 2020) (brackets and internal quotation marks omitted).  "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012).  The court is not required "to make a finding of willfulness or bad faith" before ordering exclusion under Rule 37(c)(1) and "[t]he implementation of the sanction is appropriate even when a litigant's entire cause of action . . . [will be] precluded." *Hoffman*, 541 F.3d at 1180 (alterations in original) (internal quotation marks omitted).

Here, Plaintiffs have not met their burden of showing substantial justification or harmlessness.  Justification is lacking because nothing prevented Plaintiffs from developing and disclosing their whistleblowing theory at the outset of the case.  And harmlessness is lacking because, as the City explains in its motion, the late disclosure prevented it from "conduct[ing] discovery to determine whether (a) these reports were made in good faith and to the proper authorities; or (b) whether the alleged reports caused the City's alleged adverse employment actions and ultimately led to a constructive discharge."  (Doc. 137 at 2, emphasis omitted.)  Accordingly, the Court concludes that Plaintiffs are precluded, as a discovery sanction under Rule 37(c)(1), from pursuing a state-law constructive discharge claim at trial premised on a whistleblowing theory under § 1501(A)(3)(c)(ii).

In its motion, the City requests not only a finding of preclusion under Rule 37(c)(1) but the affirmative dismissal of Plaintiffs' state-law constructive discharge claim.  (Doc. 137 at 3.)  At first blush, this request seems improper.  After all, "an *in limine* pleading is generally not the appropriate vehicle for effecting dismissal of entire claims."  *New Am. Mktg. FSI LLC v. MGA Ent., Inc.*, 187 F. Supp. 3d 476, 481 (S.D.N.Y. 2016).  Nevertheless, courts have recognized that dismissal of a claim pursuant to a motion *in limine* may be appropriate in narrow circumstances.  For example, dismissal may be appropriate when allowing the claim to survive would "only prolong a meritless position." *Kaplan v. Mayo*

*Clinic*, 947 F. Supp. 2d 1001, 1012 (D. Minn. 2013) ("Mayo appears to be requesting dismissal of Mrs. Kaplan's claim rather than simply the exclusion of evidence in support of that claim.  Normally motions in limine are not proper procedural devices for the wholesale disposition of theories or defenses.  However, the Court finds that it is proper to dismiss Mrs. Kaplan's claim at this time because requiring Mayo to file a separate motion to dismiss would only prolong a meritless position . . . .") (citations and internal quotation marks omitted).  Courts have also found dismissal appropriate when, as here, the plaintiff's only remaining theory of liability has been stricken as a discovery sanction under Rule 37(c)(1).  *Inteum Co. v. Nat'l Univ. of Sing.*, 2019 WL 1282014, *2 (W.D. Wash. 2019) (granting motion *in limine* to preclude plaintiff from presenting undisclosed damages theory, as discovery sanction under Rule 37(c)(1), and then granting dismissal of underlying claim due to lack of viable remaining theory).

Here, because Plaintiffs no longer have a valid theory of liability that might support a state-law constructive discharge claim, it would be pointless (and, potentially, confusing to the jury and prejudicial to the City) to allow that claim to remain a part of this case until its inevitable dismissal at the directed-verdict stage following trial.  *Cf.* Fed. R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable . . . *and* the fact is of *consequence* in determining the action.") (emphases added).  To their credit, Plaintiffs acknowledged during oral argument that, if the Court chose (over their objection) to preclude them from pursuing a whistleblower theory of liability at trial as a discovery sanction under Rule 37(c)(1), it would be appropriate to order the pre-trial dismissal of the state-law constructive discharge claim based on that ruling.  Thus, the City's motion is granted in full and Plaintiffs' state-law constructive discharge claim is dismissed.

II.    The City's MIL No. 2: Motion To Exclude Plaintiffs' Economic Expert (Doc. 138)

    A.    **Background**

One of Plaintiffs' experts in this case is Tim Tribe, who was retained to "quantify the economic damages suffered by [Darren] due to the actions of Defendants."  (Doc. 138-

1 at 3.)  Mr. Tribe's ultimate opinion is that, assuming no offset is required for Darren's PSPRS benefits, "[t]he present value of net damages . . . is $792,008."  (Doc. 138-3 at 13.)

When calculating this damage figure, Mr. Tribe made several assumptions.  First, when calculating the amount of income Darren would have earned but-for the City's challenged conduct, Mr. Tribe assumed that Darren would have continued working for the PPD until 2026, then opted into the PPD's deferred retirement option plan ("DROP"), and then worked for the PPD for another five years before finally retiring in 2031.  (*Id.* at 7, 10.)  The apparent basis for this assumption was a telephone conversation between Mr. Tribe and Darren.  (*Id.* at 10 & n.34.)  Second, when calculating the amount of income Darren is expected to earn following his resignation from the PPD—*i.e.,* the amount Darren is expected to earn to mitigate his losses—Mr. Tribe "assumed [Darren] would be unlikely to obtain employment with another law enforcement agency as an officer or detective."  (*Id.* at 11.)  The basis for this assumption was Mr. Tribe's "consult[ation] with a former PPD Professional Standards Bureau Detective who identified the following [five] elements which are likely to impair [Darren's] ability to obtain employment as a law enforcement officer": (1) "The presence of a record of an 'arrest,' regardless of whether an arrest ever occurred"; (2) "Referral for prosecution, regardless of the refusal to pursue the cases"; (3) "PPD's failure to actually close the investigation files, providing an indicator that PPD is holding open both the Time Investigation and the Parking Investigation for possible future action"; (4) "PPD's failure to document the turn down actions by [the prosecutors' offices] in the respective investigation files"; and (5) "Submission of investigation files to AZPOST for possible decertification."  (*Id.*)

## B.    The Parties' Arguments

The City moves to preclude Mr. Tribe from testifying at trial.  (Doc. 138.)  First, the City argues that, under Rule 702 and *Daubert*, Mr. Tribe should be precluded from offering any opinions about Darren's "employability" because he is not a vocational expert, merely consulted with a former police officer about factors that might affect Darren's ability to obtain future employment as a law enforcement officer, and uncritically accepted the

proposition that Darren has a "record of arrest." (*Id.* at 1-2.)  Second, the City argues that Mr. Tribe should not be allowed to testify "[a]bout [d]efamation [d]amages" because Plaintiffs have elected to pursue a "theory of presumed damages" in this case and economic damages are not available under that theory.  (*Id.* at 2.)  Third, the City argues that Mr. Tribe's analysis is irrelevant for purposes of Darren's Title VII claim because the Court, rather than the jury, is responsible for calculating awards of front and back pay in the Title VII context.  (*Id.* at 2-3.)

Plaintiffs oppose the City's motion.  (Doc. 145.)  First, Plaintiffs contend that Mr. Tribe will not be offering any opinions about Darren's employability—instead, he will simply assume for purposes of his calculations that Darren could not obtain future employment as a law enforcement officer.  (*Id.* at 1-2.)  Plaintiffs note that the City's experts made the same assumption and argue that, to the extent the City wishes to question this assumption, the proper mechanism for doing so is cross-examination.  (*Id.*)  As for the City's second argument, Plaintiffs respond that "Mr. Tribe's analysis of lost earnings and benefits from no longer being able to work as a law enforcement officer is highly relevant to the issue of compensatory damages stemming from harm to [Darren's] reputation that effectively precludes him from working as a law enforcement officer." (*Id.* at 2-3.)  Finally, as for the City's Title VII argument, Plaintiffs argue that (1) because Mr. Tribe's analysis is relevant to their constructive discharge and defamation claims, it must be admitted regardless of its relevance to Darren's Title VII claim, and (2) the analysis is also admissible as to the Title VII claim because, under Rule 39(c), the Court may ask the jury to make advisory findings on the issues of front and back pay.  (*Id.* at 2-3.)

C.   **Discussion**

The City's motion to preclude Mr. Tribe from testifying is denied.  The City's first preclusion argument is based on an inaccurate premise—that Mr. Tribe intends to offer opinions concerning Darren's future employability as a law enforcement officer.  In fact, Mr. Tribe simply intends to assume, for purposes of his economic calculations, that Darren lacked such employability.

Ironically, during the summary judgment process, it was Plaintiffs who filed a motion to preclude the City's economic expert from presenting certain opinions at trial concerning Darren's future employment. (Doc. 99.)  In the order denying that motion, the Court explained that Plaintiffs were actually attacking one of the assumptions on which the City's expert had relied and noted that it is "perfectly permissible" for experts to rely on assumptions that have a sufficient foundation.  (Doc. 122 at 61-62.)  The Court thus concluded that "Plaintiffs' disagreement with that assumption is fodder for cross-examination at trial, not exclusion."  (*Id.* at 63.)  The same reasoning applies here.

During oral argument, the City argued that, even if the issue of future employability is characterized as an assumption rather than as an opinion, Mr. Tribe shouldn't be allowed to rely on that assumption at trial because it lacks a sufficient foundation.  This argument lacks merit.  Disagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony.  *See, e.g., Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals' opinions and the weaknesses in his assumptions are issues to be explored on cross-examination.").  To be sure, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  *See also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("*Joiner* requires an expert to justify a foundational assumption or refute contrary record evidence.").  Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010).  "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  *See also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[P]roponents do not have to demonstrate

to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . .  The evidentiary requirement of reliability is lower than the merits standard of correctness.") (alteration in original) (internal quotation marks omitted).  Here, Mr. Tribe's assumptions about Darren's future employability are not "unreliable nonsense," so exclusion is not warranted.

The City's next argument fails because it is based on the false premise that the only category of damages being sought by Darren pursuant to the defamation claim is "presumed damages."  In fact, Plaintiffs stated in their MIDP disclosures that Darren is seeking various categories of damages, including "damages for pain and suffering, emotional distress and other tangible and intangible harms" and "damages for the effects he suffered due to the defamation and interference with his prospective employment through the actions of Defendants seeking to have his certification removed by AZPOST. [Darren] will likely never obtain a position commensurate with the position he enjoyed prior to December 2016." (Doc. 138-1 at 6.)  Furthermore, the City stipulated in the parties' joint jury instructions that Darren's potential damages pursuant to the defamation claim are not limited to reputational harm but also may include "[m]onetary loss experienced and reasonably probable to be experienced in the future."  (Doc. 156 at 67.)  And Plaintiffs clarified in the Final Pretrial Order that Darren's defamation damages include "loss of future income due to his inability to work in his chosen field, as posited by Darren's expert." (Doc. 159 at 11.)  Thus, the City has long been on notice that economic damages are one of the categories Darren is seeking pursuant to his defamation claim.  Mr. Tribe's opinions are relevant to that issue.

Finally, even though the Court (rather than the jury) will decide the issues of front and back pay with regard to Darren's Title VII claim, this would not justify the categorical exclusion of Mr. Tribe as a witness because his expected testimony is relevant to other issues in the case.

…

1    III.    <u>The City's MIL No. 3: Crane And Bro (Doc. 139)</u>

2           A.    **Background**

3           One of Plaintiffs' initial theories in this case was that Darren had been subjected to

4    various forms of retaliation (including being placed under investigation, being referred for

5    criminal prosecution, and being reassigned to at-home work assignment and call back duty)

6    because he had engaged in various forms of protected speech (including acting as an

7    "outspoken critic" of the PPD at monthly meetings and filing a notice of claim).  Plaintiffs

8    argued this retaliation was actionable (1) under 42 U.S.C. § 1983, because it violated

9    Darren's First Amendment rights; (2) under Title VII, because Darren's protected speech

10   included reporting acts of gender-based discrimination; and (3) under the ADEA, because

11   Darren's protected speech included reporting acts of age-based discrimination.  However,

12   at summary judgment, the Court rejected all three retaliation-based claims.  (Doc. 122 at

13   21-26, 29-36.)  Accordingly, the § 1983 and ADEA claims are no longer part of the case

14   and Darren's sole remaining theory of gender discrimination under Title VII is that the City

15   "preferentially refer[s] male officers . . . to various prosecutor's offices for potential

16   prosecution for acts that were not criminal in nature, amounted to violations of department

17   policy, or had no reasonable likelihood of conviction while at the same time not referring

18   similarly situated female officers for the performance of essentially the same or similar

19   acts."  (Doc. 35 ¶ 220.)

20          In the Final Pretrial Order, Plaintiffs clarify that they have identified two other male

21   officers who were unsuccessfully referred for prosecution based on similar allegations and

22   one female officer who was not referred for prosecution despite being similarly situated.

23   (Doc. 159 at 7 ["Darren and similarly situated employees, Michael Rivera and Todd

24   Everett, were unjustly and aggressively targeted for theft of time allegations, whereas a

25   female coworker, Kim Cooper, who engaged in comparable behaviors, was treated much

26   more favorably."].)  The City, in turn, argues (among other things) that Ms. Cooper was

27   not similarly situated.  (*Id.* at 8.)

28          In the Final Pretrial Order, Plaintiffs also identify two witnesses who are expected

to testify more generally about the PPD's alleged mistreatment of officers.  The first, Ken Crane, is a retired PPD officer who "has information and knowledge of the pattern and practice of inappropriate enforcement actions taken against various police officers," "has knowledge of the criminal and administrative investigations of [Darren] and the retaliation suffered by [Y]vette Bro, then working in the sex crimes unit, after Ms. Bro complained about a botched investigation conducted by Assistant Chief Roberts when Ms. Roberts was assigned to work in the sex crimes unit, and subsequent events including a complaint Ms. Bro lodged against Defendant Roberts," and "will also testify about the Defendant's practice of knowingly pursuing weak criminal investigations against police officers as a means to exercise control." (*Id.* at 65-66.)  The second, Yvette Bro, is a current PPD officer who "will testify about her work history as a Phoenix Police officer, her various job assignments including her work in the sex crimes unit, the investigation of Mary Roberts related to the handling of one sex abuse case following a complaint by Ms. Bro[,] subsequent events following the investigation, the history and reasons for Ms. Bro's various transfers, her current assignment with PLEA, her knowledge of various investigations of sworn Phoenix law enforcement personnel, and events related to her assignment as the PLEA representative for [Darren] during his SID investigation." (*Id.* at 66.)

## B.    The Parties' Arguments

The City moves to preclude Crane and Bro from testifying.  (Doc. 139.)  The City notes that, during his deposition, Crane stated that he only had information about the investigations pertaining to three officers aside from Darren (Mark Wilcox, Phil Roberts, and Yvette Bro), yet none of those officers was referred for prosecution.  (*Id.* at 1.)  Thus, the City argues that any testimony concerning those investigations would be irrelevant.  (*Id.*)  The City further notes that, although Darren identified Crane as a person who had admitted there were problems with SID referrals under Chief Roberts, Crane stated the opposite during his deposition.  (*Id.* at 1-2.)  Finally, the City contends that Crane has no first-hand knowledge of the investigation related to Darren, so any testimony he might offer

on that topic would constitute hearsay.  (*Id.* at 2.)  As for Bro, the City argues she is being offered solely to testify about alleged retaliation she endured at the hands of Chief Roberts in 2013, yet such testimony is irrelevant because it didn't involve a referral for criminal prosecution and involved an alleged female victim (which, if anything, undermines Plaintiffs' Title VII theory).  (*Id.* at 3.)

Plaintiffs oppose the City's motion.  (Doc. 147.)  They contend that "the sole basis" for the City's exclusion request is that Crane's and Bro's testimony lacks relevance, yet their testimony "is inextricabl[y] intertwined with the issues of motive, intent and a demonstrable history of adverse actions taken against others like [Darren].  The essence of their testimony is that the Department and Defendant Roberts take unjust adverse actions against Department employees they do not like.  Both Crane and Bro have relevant information regarding motive, intent and a history of systematic abuse of criminal and administrative investigations to punish, intimidate, and force out of the workplace disfavored or unliked employees." (*Id.* at 1.)  Plaintiffs further contend "[t]heir testimony bears on [Darren's] state of mind concerning constructive discharge" because "[t]he Department's historic relentless pursuit of disfavored officers and the imposition of adverse actions bears on whether [Darren] believed he was subject to 'objectively difficult or unpleasant working conditions.'"  (*Id.* at 1-2.)  Finally, Plaintiffs contend that Crane's deposition testimony is actually consistent with their theory of the case, in that he acknowledged certain problems with how the PPD conducts investigations, and that because the City "did not depose Officer Bro [it] can only speculate on her testimony." (*Id.* at 2-3.)

C.     **Discussion**

The Court agrees with many of the arguments advanced in the City's motion. Although Darren previously sought to assert retaliation-based claims against the City, those claims did not survive summary judgment.  Darren's only remaining actionable theory (apart from defamation) is that the City's decision to investigate him and refer him for criminal prosecution was the product of gender-based discrimination.  Given this backdrop,

it appears that large portions (and perhaps all) of Crane's and Bro's expected testimony will be inadmissible.  Neither witness has any knowledge of the investigations and criminal referrals pertaining to the three PPD officers (Michael Rivera, Todd Everett, and Kim Cooper) whom Plaintiffs have now identified as the relevant Title VII comparators.  Nor have Plaintiffs argued that the flaws in the other investigations known to Crane and Bro were the product of gender-based bias—rather, Plaintiffs' contention is that the officers who were subjects of the other investigations, both male and female, were targeted in retaliation for being "disfavored or unliked."  The presence of such investigations has no tendency to make Darren's claim of gender-based discrimination more or less likely.

At most, the existence of the other investigations might be relevant to support a constructive discharge claim.  Specifically, Darren's knowledge that his colleagues had been subjected to baseless, damaging investigations could, at least in theory, bear on whether Darren viewed his existing work environment as too toxic to continue working.  And as discussed in footnote two of this Order, although the Court has now dismissed Darren's state-law constructive discharge claim, his theory of constructive discharge premised on federal law is still part of the case.  Accordingly, the Court cannot say that Crane's and Bro's anticipated testimony concerning other investigations is categorically irrelevant.  Additionally, it appears that at least Crane may have first-hand knowledge pertaining to Darren's investigation.  Although the City disputes whether Crane's knowledge on this topic is actually first-hand (as opposed to hearsay), the proper way to evaluate such disputes is on a question-by-question basis when the witness is on the stand, not via a pretrial motion to exclude.  Accordingly, the City's motion is denied to the extent it seeks to categorically prevent Crane and Bro from testifying.

Plaintiffs should not, to be clear, interpret this outcome as a sign that Crane and Bro will be given *carte blanche* to paint the City as a bad actor, via the admission of evidence that other PPD employees were subjected to different forms of mistreatment.  As an initial matter, if *Darren* was unaware (at the time of his resignation) of the other incidents that Crane and Bro intend to describe, it is difficult to understand how such incidents could bear

on Darren's mindset.  At most, Crane's and Bro's testimony might corroborate Darren's claims about the existence of other investigations.  Additionally, the Court notes that any evidence pertaining to the mistreatment of Bro seems particularly attenuated.  This case involves a claim that the PPD discriminated against a male officer through the referral of a weak case for criminal prosecution, but Bro is a female officer who contends she was subjected to a retaliatory administrative investigation several years earlier.  Nevertheless, the Court prefers to reserve any final judgments about admissibility until the evidence is offered at trial.

IV.    The City's MIL No. 4: Unrelated SID Investigations (Doc. 140)

A.    **Background**

As noted, Plaintiffs' initial theory in this case was that the retaliation to which Darren was subjected was part of a larger pattern of flawed investigations and criminal referrals involving PPD officers.  In paragraph 83 of the complaint, Plaintiffs identified 21 other "sworn officers and civilian employees of the Phoenix Police Department" who were unsuccessfully referred for prosecution between 2015 and 2017.  However, very few details were provided regarding those referrals.  Additionally, in paragraphs 84-89 of the complaint, Plaintiffs alleged in more detail that four officers were unsuccessfully referred for prosecution based on allegations that they had committed time theft when working as off-duty security guards.

B.    **The Parties' Arguments**

The City moves to preclude Plaintiffs from introducing evidence at trial concerning the "unrelated and largely dissimilar investigations" described in paragraphs 83 and 84-89 of the complaint.  (Doc. 140.)  As for the investigations discussed in paragraph 83, the City argues that Plaintiffs cannot prove they were similar to Darren's case because Plaintiffs never disclosed the underlying investigative files, Darren was not personally involved in any of the investigations, and Darren admitted during his deposition that, except for one, he did "not even know if any of them . . . involved 'time theft' allegations.  (*Id.* at 1-3.) Similarly, as for the off-duty time theft investigation discussed in paragraphs 84-89, the

City argues that "the investigations were not 'similar to SID's investigation of [Darren's] time theft,' Plaintiffs' information about these investigations is hearsay, and the information is inaccurate and therefore unreliable." (*Id.* at 3.) Finally, the City more broadly argues that, because the Court has now dismissed Darren's retaliation-based claims, evidence of dissimilar investigations is no longer relevant. (*Id.* at 1-3.)

Plaintiffs oppose the City's motion. (Doc. 148.) Plaintiffs argue that the other investigations remain relevant, despite the dismissal of Darren's retaliation-based claims, because "[t]he known and repeated flaws of SID investigations of Department employees impacts the credibility of the actions taken against Plaintiffs. This also impacts [Darren's] state of mind concerning the constructive discharge claim, Plaintiffs' awareness of a relentless pursuit of disfavored officers resulting in adverse actions, and whether [Darren] was subject to 'objectively difficult or unpleasant working conditions.' In other words this subject matter, allegations and evidentiary records are inextricabl[y] intertwined with the current claims and defense." (*Id.* at 1-2.) Plaintiffs also contend they will be able to present first-hand, non-hearsay evidence concerning the other investigations because some of the PPD officers identified on the parties' witness list (Detective Stanley, Detective Mose, and Sergeant Maldonado) were involved in the other investigations. (*Id.* at 2-3.)

C. **Discussion**

The analysis concerning this motion largely mirrors the analysis concerning the preceding motion.

On the one hand, the complexion of this case changed following the dismissal of Darren's retaliation-based claims at summary judgment. Darren's remaining theory (apart from defamation) is that gender-related bias explains why he was referred for criminal prosecution. To that end, Plaintiffs have identified two other male officers (Michael Rivera and Todd Everett) who were allegedly referred for criminal prosecution based on similar allegations of time theft and one female officer (Kim Cooper) who was not referred for criminal prosecution despite being similarly situated. Although Plaintiffs should be allowed to introduce evidence at trial concerning the investigations involving those three

officers, it doesn't follow—for purposes of establishing liability under Title VII—that Plaintiffs also should be allowed to introduce evidence pertaining to dissimilar investigations involving still other officers.

Even a cursory glance at the allegations appearing in paragraphs 84-89 confirms the soundness of this conclusion.  There, it is alleged that the PPD investigated four officers, one of whom was apparently female, for engaging in off-duty misconduct and then referred them for prosecution.  Although the complaint alleges that "[a] grand jury eventually declined to indict the four officers" (Doc. 35 ¶ 89), this is inaccurate—during his deposition, Darren acknowledged "there might have been indictments." (Doc. 140-1 at 30, page 165, lines 6-9.  *See also* Doc. 148 at 1 [Plaintiffs' response, noting that the referral resulted in a "2010 criminal matter" entitled "*State v. Peck, et al.*"].)  It is difficult to understand why the jury in this case—which, again, will be asked to determine whether the PPD was motivated by anti-male bias when it *unsuccessfully* submitted criminal charges against Darren in 2017 related to allegations of *on-duty* time theft—should hear about an incident occurring six years earlier in which a group of officers, including a female officer,[5] was *successfully* referred for prosecution based on allegations of *off-duty* misconduct.

On the other hand, the City's motion cannot be granted because one of the unsuccessful referrals referenced in paragraph 83 is the referral pertaining to Todd Everett, who is one of the three Title VII comparators Plaintiffs have specifically identified in the Final Pretrial Order.  To the extent Plaintiffs possess admissible, non-hearsay evidence concerning the Everett referral, they will be allowed to attempt to introduce it at trial. Although the City contends that Plaintiffs lack such evidence, the Court cannot make that evaluation on the current record and will thus defer any admissibility rulings until trial. Additionally, the record is undeveloped as to whether any of the other investigations referenced in paragraph 83 might be relevant in establishing Darren's mindset as to the constructive discharge claim that remains part of his Title VII claim.

Accordingly, the City's fourth motion *in limine* is denied.

---

[5]  Some of the unsuccessful referrals discussed in paragraph 83 also appeared to involve female officers.  (Doc. 35 ¶ 83.)

1  V.   The City's MIL No. 5: Dr. Wilson's Opinion Re: Medical Necessity (Doc. 141)

2      A.   **Background**

3      During the discovery process, Dr. Brady Wilson met with Darren for the purpose of

4  conducting an independent psychological evaluation.  In his resulting report, Dr. Wilson

5  opined, among other things, that "[i]f, as a matter of material fact, the allegations . . . in

6  [Darren's] Complaint are true, then it would have not only been reasonable for [Darren] to

7  take a constructive discharge, but it would have been medically necessary.  His history of

8  heart problems would have posed a substantial health risk for [Darren] to continue to work

9  under the circumstances articulated in his Complaint."  (Doc. 146-1 at 11-12.)

10     B.   **The Parties' Arguments**

11     The City moves to preclude Dr. Wilson from presenting this particular opinion at

12 trial.  (Doc. 141.)  The City first argues that Dr. Wilson identified "the threat of criminal

13 prosecution" as the source of stress that caused Darren to resign, yet the criminal referral

14 against Darren was declined in *September* 2017 and Darren kept working until *December*

15 2017, resigning only after his request to return to the homicide detail was denied and he

16 was instead placed on call-back duty.  (*Id.* at 1-2.)  The City thus argues that the threat of

17 prosecution couldn't have been the stressor that caused Darren to resign.  (*Id.*)  The City

18 further argues that Dr. Wilson is not qualified to opine on the issue of "medical necessity"

19 because he is not a medical doctor (*id.* at 2-3) and that Dr. Wilson's opinion on this topic

20 "is not supported by any acceptable methodology" (*id.* at 4).[6]

21     Plaintiffs oppose the City's motion.  (Doc. 146.)  Plaintiffs argue that Dr. Wilson is

22 qualified to offer opinions related to Darren's psychological state in light of his experience,

23 knowledge, skill, and training (*id.* at 1-2); that Dr. Wilson's challenged opinion is based on

24 sufficient facts and data because he reviewed Darren's medical records, which revealed a

25 preexisting cardiovascular condition (*id.* at 2); and that Dr. Wilson's challenged opinion is

26 ─────────────

27 [6]     In the tentative order, the Court construed the City's motion as seeking exclusion
only on the ground that Darren kept working after the threat of criminal prosecution went
28 away.  (Doc. 163 at 27-28.)  During oral argument, the City stated that its motion also
sought exclusion on other grounds.  Having now re-reviewed the motion, the Court agrees
with this interpretation.  The City's additional grounds are addressed below.

the product of reliable principles and methods because he was "not providing a medical diagnosis, but applying reliable principles he opines that the stressors would have an effect on the medical issues" (*id.* at 3).  Plaintiffs also accuse the City of "cherry-picking" Dr. Wilson's opinion out of context.  (*Id.* at 1.)

C.    **Discussion**

The City's first exclusion argument rests on an inaccurate premise.  In his report, Dr. Wilson did not identify the threat of criminal prosecution as the sole source of psychological stress to which Darren was exposed.  Rather, Dr. Wilson stated, after noting that Darren claimed to have suffered "emotional distress as a result of being wrongly referred for potential criminal prosecution, two false records of arrest and effectively being demoted," that such "*allegations* . . . could easily produce significant psychological symptoms in any reasonable person" and that "given [Darren's] psychological make-up and health history, *these kinds of stresses* would not only exacerbate any physical disorder (note his history of cardiovascular disease), but could cause additional stress-related difficulties like changes in blood pressure, headaches, upper gastrointestinal problems and other stress-related symptoms."   (Doc. 146-1 at 9, emphases added.)   Given this explanation, there is no inherent inconsistency between Dr. Wilson's opinion and the three-month delay between the declination of charges and Darren's resignation decision—Darren continued being exposed to stressors after the charges were declined.  Cross-examination, rather than exclusion, is thus the proper way for the City to explore any inconsistency between Dr. Wilson's opinion and Darren's request to return to the homicide detail.

The City's other exclusion arguments present a closer call.  Federal Rule of Evidence 702 governs the admissibility of expert testimony.  "The party offering expert testimony has the burden of establishing its admissibility."  *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).  As a threshold matter, Rule 702 requires that an expert witness be qualified "by knowledge, skill, experience, training, or education," but "Rule 702 'contemplates a broad conception of expert qualifications.'"  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998,

1015 (9th Cir. 2004) (citation and emphasis omitted).

Under Rule 702, a qualified expert may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The Federal Rules of Evidence obligate trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

Rule 702(a) "goes primarily to relevance" and "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. With respect to reliability, the "test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564 (internal quotation marks omitted). To "assess the reasoning or methodology," courts should consider "such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one." *Id.* Courts should not exclude an expert's opinion merely because it is "shaky," because such evidence may "be attacked by cross examination, contrary evidence, and attention to the burden of proof." *Id.*

The Court harbors some doubt as to whether Dr. Wilson's opinion on "medical necessity" is sufficiently reliable and supported by an acceptable methodology. In his report, Dr. Wilson appears to opine that because Darren's work environment was very stressful, and because Darren had a history of heart problems, it follows that it was medically necessary for Darren to resign. Yet the analysis is presumably more complicated than that. There are many people with stressful jobs who have a history of heart problems, yet it's not medically necessary for all of those people to resign. Unfortunately, Dr. Wilson's report doesn't reveal whether he relied upon objective or commonly accepted criteria when determining why resignation was medically necessary in this particular case (or even whether such criteria exist). Nor does the record reveal whether those topics were

explored during Dr. Wilson's deposition (or whether Dr. Wilson was deposed).

A possible explanation for why the record is so undeveloped on these issues is that the City chose to raise its *Daubert* challenge to Dr. Wilson via a motion *in limine.* Under the Court's rules, such motions are subject to very short page limits and replies are not permitted. Because the City's *Daubert* challenge should be assessed on a better-developed record, the City's current motion is denied without prejudice and the City is granted leave to file a new exclusion motion that is not subject to the motion *in limine* page limits. After that motion is fully briefed, the Court will decide whether a hearing is necessary.

VI.    <u>Plaintiffs' MIL: Collateral Source Rule And Title VII (Doc. 142)</u>

**A.    Background**

In their cross-motion for summary judgment, Plaintiffs sought a determination that Darren's damages need not be offset by the retirement benefits he is receiving through the Public Service Personnel Retirement System ("PSPRS") because the collateral source rule applies to such benefits. (Doc. 100 at 14-16.) In response, the City argued that the collateral source rule should be deemed inapplicable. (Doc. 104 at 14-17.) Additionally, "[d]uring oral argument, [the City] argued that even if Darren's PSPRS benefits should be considered a collateral source for purposes of his tort claims, the Court should retain the ability to consider those benefits (for offset purposes) when calculating any award of front pay under Title VII." (Doc. 122 at 58 n.35.)

In the summary judgment order, the Court concluded that "Plaintiffs are entitled to summary judgment concerning the application of the collateral source rule." (*Id.* at 54-58.) The Court reached this determination by analyzing Arizona law. (*Id.*) Finally, the Court declined to resolve whether Darren's damage claims under Title VII could be offset by his PSPRS benefits because that issue had not been briefed by the parties. (*Id.* at 58 n.35, 60 n.36.)

**B.    The Parties' Arguments**

Plaintiffs ask the Court to answer a question left unresolved at summary judgment— whether the collateral source rule applies to claims for front pay under Title VII. (Doc.

142.)  Plaintiffs contend that the Court "already determined" that the collateral source rule applies to Darren's claim for back pay under Title VII and argue that "if the collateral source rule would apply to back pay, then the collateral source rule would also apply to front pay."  (*Id.* at 2-4.)  Thus, Plaintiffs request a ruling that "there shall be no testimony, evidence, opinion, or argument regarding use of retirement benefits as an offset or deduction of [Darren's] back and front pay claims."  (*Id.* at 4.)

The City opposes Plaintiffs' motion in part.  (Doc. 143.)  On the one hand, the City "agree[s] that the jury should not hear from either expert about the use of retirement benefits as an offset or deduction of Plaintiff's retirement benefits."  (*Id.* at 1, internal quotation marks omitted.)  On the other hand, the City argues it would be "premature" to decide the legal question of whether the collateral source rule applies to claims for front and back pay under Title VII because "back and front pay awards are equitable remedies to be decided by the court, not the jury" and the Court can defer resolving this question until the jury returns a Title VII liability finding.  (*Id.* at 1-2.)  The City argues that deferral is particularly appropriate here because the legal question is complex and cannot be adequately addressed under the short page limitations applicable to motions *in limine*.  (*Id.* at 3 & n.1.)  Additionally, the City argues that because Darren's state-law constructive discharge claim is subject to dismissal and his defamation claim seeks only reputational damages, the jury will not be asked to decide any questions related to front and back pay.  (*Id.* at 2.)

C.   **Discussion**

The Court agrees with the City that it is unnecessary, at this juncture, to decide whether the collateral source rule applies to claims for front and back pay under Title VII.  Because those are equitable remedies, *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000), they will only be decided by the Court, post-trial, if the jury rules in Plaintiffs' favor on Title VII liability.  Prudence and judicial modesty counsel in favor of postponing the resolution of pure legal questions until necessary.

The Court also notes that one of the premises underlying Plaintiffs' motion—that

the Court previously determined that the collateral source rule applies to claims for back pay under Title VII—is inaccurate.  The analysis in the summary judgment order was limited to the applicability of the collateral source rule to Plaintiffs' state-law tort claims. Although footnote 35 stated that the Court was reserving judgment with respect to claims for front pay under Title VII, this was not intended to function as an implicit determination that the collateral source rule applies to claims for back pay under Title VII.  The Court apologizes to the parties for any confusion this imprecision may have created.  In any event, the question of the collateral source rule's applicability to Title VII claims simply wasn't before the Court at summary judgment.

Finally, given the City's non-opposition to it, the Court grants Plaintiffs' request for a ruling that "there shall be no testimony, evidence, opinion, or argument regarding use of retirement benefits as an offset."  Again, there is no need for the jury to hear anything about Darren's PSPRS benefits because the decision whether to apply those benefits as an offset against any front or back pay award under Title VII will be made by the Court post-trial. Also, although the City is incorrect that Plaintiffs are barred from seeking economic damages based on their state-law defamation claim, *see* Part II.C *supra*, the summary judgment ruling establishes that such damages need not be offset by Darren's PSPRS benefits.

…

…

…

…

…

…

…

…

…

…

1     Accordingly,

2     **IT IS ORDERED** that:

3     (1)    The City's first motion *in limine* (Doc. 137) is **granted**.  Darren's state-law

4    constructive discharge claim is dismissed.

5     (2)    The City's second motion *in limine* (Doc. 138) is **denied**.

6     (3)    The City's third motion *in limine* (Doc. 139) is **denied**.

7     (4)    The City's fourth motion *in limine* (Doc. 140) is **denied**.

8     (5)    The City's fifth motion *in limine* (Doc. 141) is **denied without prejudice**.

9     (6)    Plaintiffs' motion *in limine* (Doc. 142) is **granted in part and denied in

10  part**.

11     (7)    The City may, by March 5, 2021, file a renewed motion to exclude Dr.

12  Wilson's opinion concerning "medical necessity."

13     Dated this 12th day of February, 2021.

_____
Dominic W. Lanza
United States District Judge