**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Darren Udd, et al., | No. CV-18-01616-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Pending before the Court is Defendant City of Phoenix's ("the City") motion to preclude Plaintiffs' expert from offering a particular opinion at trial. (Doc. 168.) For the following reasons, the motion is granted.

**RELEVANT BACKGROUND**

The parties are familiar with the background details of this case, which are summarized in earlier orders. (*See, e.g.*, Doc. 122 at 1-12; Doc. 167 at 1-6.) Plaintiffs are Darren Udd ("Darren"), a retired homicide detective who formerly worked for the Phoenix Police Department ("PPD"), and his wife Amy Udd ("Amy"), who worked at relevant times as a PPD communications operator. The sole remaining defendant is the City.

The essential facts are that Darren was twice referred for criminal prosecution for alleged work-related misconduct (time theft and misuse of a parking pass). (Doc. 167 at 1-4.) Amy was also referred for criminal prosecution related to the parking pass. (*Id.* at 3-4.) Both referrals were declined by prosecutors in late 2017. (*Id.*) Afterward, and while an administrative investigation into his conduct was still pending, Darren took early

1 retirement. (*Id.* at 4.) The resignation occurred in December 2017. (*Id.*)

2 Darren's remaining claims in this action are (1) a Title VII claim, which is premised on the theory that the City preferentially refers male officers for criminal prosecution while not referring similarly situated female officers; and (2) a defamation claim, which is premised in part on the theory that the City sent incident reports to prosecution and law enforcement agencies that falsely stated he had been "arrested." (*Id.* at 5-6.) Darren further contends that the City's conduct created such intolerable working conditions that he was effectively forced to resign—meaning he should be able to recover, as economic damages and/or as front and back pay, the additional amount he would have earned had he kept working for the PPD past December 2017. (*Id.* at 16-20.)[1] According to Tim Tribe, Plaintiffs' economic expert, the net present value of Darren's lost wages is nearly $800,000. (*Id.* at 16.)

Plaintiffs intend to introduce testimony from a different expert, C. Brady Wilson, Ph.D ("Dr. Wilson"), in support of their claim that Darren was effectively forced to resign from the PPD. Specifically, one of the opinions expressed in Dr. Wilson's report is that "[i]f, as a matter of material fact, the allegations . . . in [Darren's] Complaint are true, then it would have not only been reasonable for [Darren] to take a constructive discharge, but it would have been medically necessary. His history of heart problems would have posed a substantial health risk for [Darren] to continue to work under the circumstances articulated in his Complaint." (Doc. 146-1 at 11-12.)

Before the Final Pretrial Conference, the City filed a motion *in limine* to preclude Dr. Wilson from presenting any opinion concerning the "medical necessity" of Darren's resignation decision. (Doc. 141.) However, after reviewing Plaintiffs' response (Doc. 146) and holding oral argument (Doc. 164), the Court concluded that the record was undeveloped and authorized the parties to file additional briefing. (Doc. 167 at 31 ["A

---

[1] Although the Court has ruled that Darren may not assert a state-law claim for constructive discharge (*id.* at 8-16), "the City . . . agrees that Darren may argue, for purposes of his Title VII claim, that one of the adverse employment actions to which he was subjected was a constructive discharge" (*id.* at 7 n.2).

possible explanation for why the record is so undeveloped on these issues is that the City chose to raise its *Daubert* challenge to Dr. Wilson via a motion *in limine*. Under the Court's rules, such motions are subject to very short page limits and replies are not permitted. Because the City's *Daubert* challenge should be assessed on a better-developed record, the City's current motion is denied without prejudice and the City is granted leave to file a new exclusion motion that is not subject to the motion *in limine* page limits.").

On March 3, 2021, the City filed its renewed motion to exclude Dr. Wilson's opinion regarding medical necessity. (Doc. 168.)

On March 24, 2021, Plaintiffs filed a response. (Doc. 171.)

On March 30, 2021, the City filed a reply. (Doc. 172.)[2]

**DISCUSSION**

I. <u>Legal Standard</u>

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015

---

[2] Neither side's briefs include a request for oral argument. Additionally, although the order authorizing supplemental briefing stated that "[a]fter that motion is fully briefed, the Court will decide whether a hearing is necessary" (Doc. 167 at 31), the Court now concludes that a hearing is unnecessary because the issues have been fully presented.

- 3 -

1  (9th Cir. 2004) (internal quotation marks and emphasis omitted). Years of relevant
2  experience can establish the necessary "minimal foundation." *Id.* at 1015-16. "Disputes
3  as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of
4  his testimony." *Kennedy v. Collagen Cor*p., 161 F.3d 1226, 1231 (9th Cir. 1998) (first
5  alteration in original) (internal quotation marks omitted).

6        A district court's decision to admit or exclude expert testimony is guided by a two-
7  part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow*
8  *Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The inquiry envisioned by Rule 702 is . . . a
9  flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and
10 methodology, not on the conclusions that they generate." *Id.* at 595.

11       Evidence is relevant if it has "any tendency to make the existence of any fact that is
12 of consequence to the determination of the action more probable or less probable than it
13 would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic
14 standard of relevance thus is a liberal one." *Id.*

15       The basic standard of reliability is similarly broad. "Shaky but admissible evidence
16 is to be attacked by cross examination, contrary evidence, and attention to the burden of
17 proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically,
18 the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude
19 opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget*
20 *Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory
21 committee's note to 2000 amendment ("[P]roponents do not have to demonstrate to the
22 judge by a preponderance of the evidence that the assessments of their experts are correct,
23 they only have to demonstrate by a preponderance of evidence that their opinions are
24 reliable . . . . The evidentiary requirement of reliability is lower than the merits standard
25 of correctness.") (alteration in original) (internal quotation marks omitted).

26       Nevertheless, courts serve an important "gatekeeper" role when it comes to
27 screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike
28 an ordinary witness, an expert is permitted wide latitude to offer opinions, including those

that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citation omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might be applicable, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169. *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."). The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment.

…

II.     The Parties' Arguments

The City moves, under Rule 702 and *Daubert*, to preclude Dr. Wilson from offering his medical necessity opinion. (Doc. 168.) The City's preclusion arguments fall into three categories. First, the City argues that Dr. Wilson isn't qualified to opine on this topic because he isn't a medical doctor, doesn't have any formal medical training, and "[t]he question of whether stress worsened [Darren's] preexisting heart condition is a medical, not a psychological, issue." (*Id.* at 5-7.) Second, the City argues the challenged opinion isn't "grounded in any identifiable scientific methodology" because Dr. Wilson didn't "consult with any medical professionals" or "specifically consult any medical journals" in forming this opinion and, instead, provided generic references to "two studies related to stress caused by wrongful accusations" without "methodically appl[ying] that literature to this case." (*Id.* at 7-8.) Third, the City argues the challenged opinion will not assist the trier of fact, and will likely result in confusion, because it is based on hypotheticals and fails to account for two key factors (first, that the criminal referrals had been declined well before Darren resigned, and second, that Darren's job as a homicide detective was inherently stressful). (*Id.* at 8-9.)

Plaintiffs oppose the City's motion. (Doc. 171.) First, Plaintiffs argue that Dr. Wilson is qualified to opine on the medical necessity of Darren's resignation decision because he has a Ph.D. in psychology, has been a licensed psychologist for 35 years, and provided the City "with a bibliography of clinical literature that he drew upon in forming his opinions regarding the epidemiological relationship between psychological stress and physical symptoms." (*Id.* at 3-4.) Thus, Plaintiffs argue that "[w]hile Dr. Wilson is not a cardiologist who could diagnose a heart condition, [he] has the requisite knowledge and experience to determine that psychological stress will adversely impact a known and documented heart condition." (*Id.*) Second, Plaintiffs argue that Dr. Wilson's opinion was based on reliable data and a reliable methodology because he reviewed Darren's underlying medical records (which revealed the existence of a heart condition); then conducted two "well-established and accepted" psychological examinations, called the MMPI-2 and

Millon tests, which revealed a "tendency to somatize"; and then concluded, based on the combination of those factors, that any stress caused by the events in question "would likely manifest as somatic symptoms and likely result in either further cardiovascular problems or worse cardiovascular problems." (*Id.* at 4-8.) Third, Plaintiffs argue that the City's arguments concerning relevance and prejudice are based on the mistaken belief that psychologists are categorically prohibited from offering expert testimony about the manifestation of physical symptoms. (*Id.* at 8-10.)

In reply, the City argues that Plaintiffs' qualification-based arguments miss the mark because Dr. Wilson's experience "is not a substitute for medical training or reliable methodology" and because Dr. Wilson did not explain "*how* his experience lead[s] to his conclusions reached, why the experience constitutes a sufficient basis for his opinion, and how that experience was reliably applied to the facts." (Doc. 172 at 3-5.) As for Plaintiffs' methodology-based arguments, the City argues that "Plaintiffs' Response fails to explain how Dr. Wilson's medical records review and IPE, which were completed in March 2019, justify his conclusion that [Darren's] December 2017 retirement was 'medically necessary.'" (*Id.* at 5-6.) The City also characterizes as "telling" Plaintiffs' failure to "respond to the argument that Dr. Wilson did not consider sufficient information, such as" the inherent stress of Darren's job and the lapse of time between the declination of criminal charges and the resignation. (*Id.* at 6.) Finally, as for prejudice and confusion, the City argues that it isn't advocating a *per se* rule that a psychologist can't opine on the connection between psychological stress and physical symptoms and is instead advancing a narrow argument based on the specific facts and circumstances of this case. (*Id.* at 6-10.)

III.   Analysis

The Court agrees with the City's second exclusion argument—Dr. Wilson's challenged opinion is not supported by a reliable methodology. Thus, even assuming that Dr. Wilson is otherwise qualified (despite his lack of medical training) to opine about the linkage between psychological stress and physical symptoms, Dr. Wilson will not be allowed to opine at trial that Darren's decision to resign was "medically necessary."

In addressing this issue, it is important to isolate each step in Dr. Wilson's analytical process. His first step was to determine Darren's medical and psychological condition. He did so by reviewing Darren's medical records and conducting psychological tests. Based on those steps, he determined that Darren had a preexisting heart condition and a "tendency to somatize." So far, so good. The Court has no concern over these aspects of Dr. Wilson's analytical process.

Next, Dr. Wilson reviewed medical and clinical literature on the topic of "the epidemiological relationship between psychological stress and physical symptoms." (Doc. 171 at 4.) According to Plaintiffs, this literature shows that "psychological stress will impact a known and documented heart condition." (*Id.* at 5.) This again seems like a rational, reliable step.

The next step is the problem. According to the materials submitted by Plaintiffs—and it is Plaintiffs' burden to establish the reliability and admissibility of the challenged opinion—Dr. Wilson simply opined during his deposition that because Darren had preexisting conditions that rendered him "vulnerable" to stress-induced physical "problems," and because the events Darren was enduring at work could reasonably be expected to cause significant stress, it follows that it was medically necessary for Darren to retire:

> Q. And so how are you concluding that it would have been medically necessary for him to retire at that time?
>
> A. Because he's, one, vulnerable because of his preexisting cardiovascular condition; two, his makeup is such that he incubates. The way he deals with stress is he internalizes it and he suppresses it and he tries to deal with it on his own, which frequently manifests in terms of somatic symptoms. So the stress that would reasonably have been caused by these events, if they did in fact occur, would result in significant distress, which, based on [Darren's] constitution, would likely be manifest as somatic symptoms and likely result in either further cardiovascular problems or worse cardiovascular problems.

(Doc. 171-2 at 12.)

Conspicuously absent from Dr. Wilson's analysis is any attempt to explain why the

additional stress caused by the "events" in question (criminal referrals, demotion, etc.) was the tipping point that triggered the need for Darren to immediately retire. Indeed, even before those events, Darren had an underlying heart condition and a tendency to somatize. (Doc. 168-4 at 10 [Wilson report: "Concerns over [Darren's] health and physical status predated the acts alleged in the Complaint, and existed during the time of the events alleged in his Complaint."].) And as Plaintiffs acknowledge in their response, the medical literature on which Dr. Wilson relied suggests that "job stress [is] a chronic stressor that is likely to increase risk of heart attack." (Doc. 171 at 5.) Nevertheless, implicit in Dr. Wilson's opinion is that it was medically appropriate for Darren to work in the stressful field of homicide investigation, despite his preexisting heart condition and emotional "makeup" and the medical literature showing that psychological stress can lead to physical symptoms, and it was only the added stress arising from the events in question that made it medically unsound to continue working. Perhaps there is some body of medical literature out there that attempts to differentiate between the levels of work-related stress that are tolerable and those that are medically intolerable, but there is no evidence that Dr. Wilson reviewed that literature or attempted to apply its principles to the issue at hand.[3]

At bottom, Dr. Wilson's opinion is that Darren's old stress level was tolerable, but his new stress level (following the events in question) was medically unacceptable, with no explanation for the difference (other than that the stress level increased). That sort of *ipse dixit* is insufficient to pass muster under Rule 702. *Cf. Edmonds v. Illinois Cent. Gulf R.R. Co.*, 910 F.2d 1284, 1287-88 (5th Cir. 1990) (district court erred by allowing psychologist to testify there was a "causative link" between the plaintiff's stress and the

---

[3] The Court made the same point in the order authorizing supplemental briefing. (Doc. 167 at 30 ["There are many people with stressful jobs who have a history of heart problems, yet it's not medically necessary for all of those people to resign. Unfortunately, Dr. Wilson's report doesn't reveal whether he relied upon objective or commonly accepted criteria when determining why resignation was medically necessary in this particular case (or even whether such criteria exist). Nor does the record reveal whether those topics were explored during Dr. Wilson's deposition (or whether Dr. Wilson was deposed)."].) Since then, the parties have submitted Dr. Wilson's deposition testimony, which confirms that he did not attempt to identify or apply such principles when explaining why Darren's resignation was medically necessary.

worsening of his pre-existing heart condition, where the psychologist merely "refer[red] to studies suggesting a link between stress and illness" but did not "support their application to this case," because "an expert's testimony that 'it is so' is not admissible") (internal quotation marks omitted).[4]  *See generally Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Accordingly, **IT IS ORDERED** that the City's motion to preclude Plaintiffs' expert from offering a particular opinion at trial (Doc. 168) is **granted**.

Dated this 5th day of May, 2021.

_____
Dominic W. Lanza
United States District Judge

---

[4] Plaintiffs question whether a different portion of *Edmonds*, which addressed the psychologist's qualifications, remains good law in light of *Daubert* and *Kumho Tire* (Doc. 171 at 9), but the point here is that Dr. Wilson committed the same methodology-related error as the expert in *Edmonds*—he made no effort to explain why the general connection between stress and physical symptoms, which is established by the medical literature, supported his opinion that the specific stressors at issue (here, the criminal investigations/referrals, the demotion, and the alleged circulation of defamatory statements) had a causal relationship with a particular medical outcome (here, the necessity of retirement).